Russell S. Thompson, IV (029098)
Thompson Consumer Law Group, PLLC
5235 E. Southern Ave., D106-618
Mesa, AZ 85206
Telephone: (602) 388-8898
Facsimile: (866) 317-2674
rthompson@ThompsonConsumerLaw.com
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Latricia Flowers-Carter, Douglas Carter, and Latricia Flowers-Carter as guardian for Shanyce Flowers, | ) ) ) Case No. 2:18-cv-03836-DWL |
| Plaintiffs, | ) ) **PLAINTIFFS' SECOND AMENDED** |
| vs. | ) **COMPLAINT** ) |
| The Braun Corporation, | ) ) |
| Defendant. | ) |

**NATURE OF ACTION**

1.      This is an action brought pursuant to Arizona's Assistive Device Warranties Act, A.R.S. § 44-1351-1355 (AADWA), and Arizona common law.

**PARTIES**

2.      At all times relevant to this action, Plaintiffs, Latricia Flowers-Carter ("Ms. Flowers-Carter"), Douglas Carter ("Mr. Carter"), and Shanyce Flowers ("Ms. Flowers") (collectively "Plaintiffs"), resided in Queen Creek, Arizona, in Pinal County.

3.      Plaintiffs are "consumers" as defined by A.R.S. § 44-1351(5)(b).

4.      Defendant, The Braun Corporation ("Defendant"), is an Indiana company that at all relevant times, was a business that manufactures or assembles assistive devices.

5.      Upon information and belief, Defendant was authorized to conduct business in the state of Arizona at all relevant times.

6.      Defendant is a "manufacturer" as defined by A.R.S. § 44-1351(10).

## THE AADWA

7.      The AADWA mandates certain requirements for assistive device manufacturers such as Defendant and provides certain protections to consumers who purchase assistive devices such as Plaintiffs.

8.      For example, the AADWA requires manufacturers to provide an express warranty against the occurrence of defects, malfunctions or conditions for the assistive device for at least one year.

9.      Defendant's written "limited warranty" contains no such express warranty.

10.      Where a manufacturer such as Defendant provides a written warranty in dereliction of this duty the AADWA implies one, affirmatively requiring any new assistive device supplied in this State to be free from any defect, malfunction or condition that substantially impairs its use, safety or value for a period of at least one year from the date of delivery.

11.      According to the AADWA's plain language, the mere existence of a defect, malfunction or condition that substantially impairs a device's use, safety or value constitutes a breach of express warranty.

12.     The AADWA also provides that where an assistive device is not free from defect, malfunction or condition that substantially impairs its use, safety or value the assistive device manufacturer is only allowed a "reasonable attempt to make a repair."

13.     The AADWA defines a "reasonable attempt to make a repair" as "(a) [a]ny nonconformity that is covered by the warranty and that has been repaired at least twice by the manufacturer or the manufacturer's authorized assistive device dealer or the assistive device lessor and the same nonconformity continues," or, where "(b) [t]he new assistive device is out of service for repair for an aggregate of at least thirty cumulative days due to a nonconformity covered by the warranty." A.R.S. § 44-1351(12).

14.     Pursuant to the AADWA, where the device cannot be cured after two (2) attempts or thirty (30) aggregate days, i.e., a reasonable attempt to make a repair, the consumer may direct the manufacturer to either replace or repurchase the assistive device. A.R.S. § 44-1352(D).

15.     Pursuant to the AADWA, the manufacturer is affirmatively obligated to comply with the option chosen by the consumer. A.R.S. § 44-1353(A).

16.     Pursuant to the AADWA, complying with the option chosen by the consumer requires the manufacturer to actually provide the consumer with a comparable assistive device or a refund within thirty days after receiving notification of a nonconformity. *Id.*

17.     Only after the consumer receives the new assistive device or refund is the consumer obligated to return to the manufacturer the defective assistive device and any endorsements necessary to transfer physical possession to the manufacturer. *Id.*

18.     The AADWA does not limit any rights or remedies available to a consumer under any other law, and explicitly preserves them.  *See* A.R.S. § 44-1355(B).

19.     Defendant's written warranty ignores this statutory protection and purports to restrict all remedies to repair or replacement of defective parts and further purports to disclaim all damages arising from defects.

20.     Where a manufacturer such as Defendant provides a written warranty that purports to disclaim liability for damages, the AADWA voids the waiver as a matter of law and allows an aggrieved consumer to pursue all other remedies available under any other law.  A.R.S. §§ 44-1355(B); (C).

21.     The AADWA further provides that in addition to a refund or replacement and all remedies under other laws, a consumer may bring an action in superior court to recover damages caused by an AADWA violation, including triple the amount of any pecuniary loss plus costs, disbursements and attorney fees, plus any equitable relief deemed appropriate.  A.R.S. § 44-1355(C).

22.     Where a statute has been specifically designed to redress existing grievances and introduce regulations conducive to the public good, such statutes are considered "remedial." *Sellinger v. Freeway Mobile Home Sales, Inc., 521* P.2d 1119 (Ariz. 1974). The AADWA as a lemon law is one such remedial statute. *See also Moedt v. General Motors Corp.,* 389 Ariz. Adv. Rep. 21 (App. 2002) (lemon laws are "manifestly a remedial measure, intended for the protection of the consumer").

23.     The cardinal rule of statutory construction is that "statutes shall be liberally construed to effect their objects and to promote justice." A.R.S. §1-211; *Special Fund*

*Div. v. Industrial Com'n of Arizona,* 953 P.2d 541, 544 (Ariz. 1998) ("Generally, we construe remedial statutes liberally to achieve the special purpose underlying the legislation"); *Bogue v. Better-Bill Aluminum Co.,* 875 P.2d 1327, 1338 (Ariz. 1994) ("a remedial statute is entitled to liberal construction"); *Great American Mortg., Inc. v. Statewide Ins. Co.,* 938 P.2d 1124 (App. 1997) ("duty to construe, where possible, remedial statutes liberally in favor of the class intended to be protected"); *Bullard v. Garvin,* 401 P.2d 417 (App. 1965) ("Statutes providing a remedy for those who may have been taken advantage of have been liberally construed in favor of persons whom they are designed to protect").

## JURISDICTION AND VENUE

24.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).

25.     Venue is proper before this Court pursuant to A.R.S. § 12-401 where Defendant transacts business in the State of Arizona, County of Maricopa.

## FACTUAL ALLEGATIONS

26.     Ms. Flowers suffers from cerebral palsy and encephalopathy.

27.     She is a quadrapalegic and suffers from seizures.

28.     Ms. Flowers-Carter is Ms. Flowers's legal guardian.

29.     Ms. Flowers-Carter has Multiple Sclerosis ("MS").

30.     Plaintiff Douglas Carter is a kidney cancer survivor without a single kidney, on dialysis, and with bone cancer.

31.     To help care for and transport Ms. Flowers, including to her vocational training as well as her physical, occupational, and speech therapies, Plaintiffs sought a wheelchair van.[1]

32.     On December of 2017, Plaintiffs purchased a 2017 Chrysler Pacifica (the "Vehicle") from non-party, Earnhardt Chrysler Jeep Dodge Ram, for $48,582.

33.     Defendant was then engaged through its authorized dealer, United Access (formerly known as Performance Mobility) ("UA"), to install a model 778646N Braun in-floor conversion (the "Conversion") in the Vehicle.

34.     UA is also one of Defendant's authorized repair facilities.

35.     The purpose of engaging Defendant to provide the Conversion was for Ms. Flowers's direct and intentional benefit.

36.     The purpose of engaging Defendant to provide the Conversion was for Ms. Flowers-Carter's direct and intentional benefit as Ms. Flowers's legal guardian and for Mr. Carter's direct and intentional benefit as a primary caregiver to Ms. Flowers.

37.      At all times, Defendant had knowledge and notice that Ms. Flowers would not drive the Vehicle herself.

38.     At all times Defendant had knowledge and notice that Ms. Flowers-Carter was Ms. Flowers's primary caregiver and the person who ordinarily transported Ms. Flowers in the Vehicle.

---

[1] A wheelchair van is a vehicle that has been specially modified to allow persons using wheelchairs to access and safely ride in the vehicle.

39.     The contracts and documents attendant to the Conversion bear Ms. Flowers's name and/or Ms. Flowers-Carter's name as Ms. Flowers's legal guardian.

40.     The Conversion is a vehicle modification that enables an individual with a disability, Ms. Flowers, to maneuver more easily through her environment.

41.     The Conversion is an "assistive device" as defined by A.R.S. § 44-1351.

42.     The price of the Conversion, including its related accessories and sales tax was $34,928.08.

43.     On or about December 27, 2017, Plaintiffs delivered the Vehicle to UA so that it could be sent to Defendant's service center for conversion.

44.     Thereafter, Defendant installed the Conversion in the vehicle.

45.     The Conversion required the Vehicle to be extensively modified.

46.     For example, the Vehicle's floor was completely cut out from the firewall back and lowered approximately ten inches, the Vehicle's seats were removed and modified, and specialized hardware was added to the Vehicle.

47.     On or about February 20, 2018, Ms. Flowera-Carter picked up the newly converted Vehicle.

48.     Shortly after delivery, the Conversion experienced defects, malfunctions and/or conditions that seriously impacted its use, value and/or safety.

49.     This included the Vehicle's door opening by itself while Ms. Flowers-Carter was driving on the freeway.

50.     Plaintiffs first tendered the conversion back to Defendant's authorized repair facility, UA, for repair sometime in the middle of March, 2018.

51.     UA represented that the Conversion's defects, malfunctions or conditions were fixed after this repair.

52.     The repairs were performed pursuant to Defendant's warranty.

53.     In reliance on these representations, Ms. Flowers-Carter retrieved the Vehicle.

54.     The defects, malfunctions or conditions persisted, so Plaintiffs again tendered the Conversion for repair.

55.     Upon information and belief, the Conversion was tendered to UA for repair the very next day.

56.     On or about March 27, 2018, UA again represented that the Conversion's defects, malfunctions or conditions were fixed so Mrs. Flowers-Carter went to UA.

57.     The repairs were performed pursuant to Defendant's warranty.

58.     When Ms. Flowers-Carter went to retrieve the Conversion it exhibited persisting issues and was in fact not repaired.

59.     This prompted Plaintiffs to again leave the Vehicle at UA for repairs.

60.     By this time, the Conversion had been tendered to UA on at least two prior occasions for repair.

61.     On or about March 30, 2018, UA represented that the Conversion was fixed.

62.     The repairs were performed pursuant to Defendant's warranty.

63.     By this time, the Conversion's defects were so stressful to Ms. Flowers-Carter that she suffered a stress-induced MS flare up and needed to be hospitalized.

64.     Once out of the hospital, Ms. Flowers-Carter retrieved the Vehicle on or about April 2, 2018.

65.     The repair order generated for this repair reflects Defendant had actual notice of the Conversion's defects, malfunctions or conditions as evidenced by its opening "Braun Case 80644."

66.     In reliance upon the representation that the Conversion was fixed, Ms. Flowers-Carter took the Vehicle and used it to bring Ms. Flowers to Nevada for vocational training.

67.     But in Nevada, the Conversion broke down again.

68.     Being in another state, and unable to lift Ms. Flowers into the Vehicle, Ms. Flowers-Carter had to enlist strangers to lift Ms. Flowers into the Vehicle.

69.     Additionally, because Ms. Flowers-Carter was unable to remove Ms. Flowers from the vehicle, Ms. Flowers was unable to leave the vehicle to use the bathroom during the journey home and she was forced to relieve herself using a bucket.

70.     Plaintiffs returned the Conversion for repair after this trip, on or about April 8, 2018.

71.     On or about April 9, 2018, UA again represented the Conversion was fixed.

72.     The repairs were performed pursuant to Defendant's warranty.

73.     Plaintiffs immediately went to UA to retrieve the Vehicle but again the Conversion exhibited persisting issues when Plaintiffs arrived to retrieve it, so Plaintiffs left the Vehicle at UA for repair.

74.     On or about April 10, 2018, UA again represented the Conversion was fixed.

75.     The repairs were performed pursuant to Defendant's warranty.

76.     Plaintiffs immediately went to UA to retrieve the Vehicle but again the Conversion exhibited persisting issues and was not repaired, so Plaintiffs left the Vehicle at UA for repair.

77.     On or about April 13, 2018, UA again represented to Plaintiffs the Conversion was repaired.

78.     The repairs were performed pursuant to Defendant's warranty.

79.     Ms. Flowers-Carter again went to UA to retrieve the Vehicle, and again the Conversion exhibited persisting issues and was not fixed.

80.     At this time, UA employee Brent Heermans ("Heermans") advised Ms. Flowers-Carter that he was going inside to call Braun.

81.     Heermans came outside after the call, advising Ms. Flowers-Carter that "Braun knows about the issue here" and asking Ms. Flowers-Carter to once again leave the Vehicle.

82.     Ms. Flowers-Carter returned to UA soon thereafter to check on the Conversion, but it was still not fixed.

83.     This time, Defendant blamed the Vehicle's manufacturer, Chrysler, for the Conversion's defects, malfunctions or conditions.

84.     In reliance on Defendant's representation, Ms. Flowers-Carter brought the Vehicle to a Chrysler dealer for repair.

85.    The Chrysler dealer "recommended the vehicle going back to the company who installed handicap conversion for further repairs."

86.    Of course, defects, malfunctions or condition that substantially impair its use, safety or value persisted after Plaintiffs' Chrysler repair visit.

87.    Accordingly, Plaintiffs again returned the Conversion to UA for repair.

88.    On or about May 1, 2018, Ms. Flowers-Carter called Defendant on two occasions.

89.    The first May 1, 2018 call, Ms. Flowers-Carter left a voice message.

90.    The second May 1, 2018 call, Ms. Flowers-Carter spoke with Defendant by and through "customer experience group manager" Elaine Haschel ("Haschel").

91.    This approximately sixteen minute conversation was very difficult and emotional for Ms. Flowers-Carter.

92.    Ms. Flowers-Carter cried when telling Haschel of the hardships the Conversion was causing Plaintiffs.

93.    During this call, Ms. Flowers-Carter explained to Haschel *inter alia*:

   a)  that she had been hospitalized due to a stress-related MS flare up caused by the Conversion's problems;

   b)  that Ms. Flowers was missing therapies and school, costing her financial aid;

   c)  that Ms. Flowers was having stress-related seizures from the Conversion's problems and her mother's related health flare ups;

   d)  about the debacle in Nevada described above; and,

e) that she was missing work and losing wages as a result of dealing with the Conversion's defects, malfunctions or conditions.

94. During this conversation, Ms. Flowers-Carter also personally gave Haschel notice of the Conversion's non-conformities and requested a replacement.

95. Haschel did not accept Ms. Flowers-Carter's replacement demand.

96. Instead, Haschel represented that Defendant's repair personnel had flown in/was flying in from Indiana to handle the repairs.

97. Haschel further pleaded with Ms. Flowers-Carter to allow Defendant to fix the Conversion rather than replace it, "promising" it would be repaired.

98. On or about May 4, 2018, Defendant, by and through Haschel, called Ms. Flowers-Carter on her cell phone.

99. During the May 4, 2018 call, Haschel represented that the Braun team had performed a thorough evaluation of the Conversion and found several concerns.

100. Haschel further represented that Defendant believed they had resolved each of the issues.

101. The repairs were performed pursuant to Defendant's warranty.

102. At this time, despite having found defects and nonconformities within the Conversion, Haschel did not offer a replacement or a refund.

103. Instead, Haschel offered a one month vehicle loan payment as its way of showing "sincere regret" to Plaintiffs.

104. Defendant memorialized this conversation in an E-mail from Haschel to Ms. Flowers-Carter, stating *inter alia*:

…As discussed, our team at the BraunAbility Mesa facility has performed a thorough evaluation of your Pacifica door. They did find several concerns that they believe to now be resolved. They also worked with the Chrysler dealer to ensure the necessary updates were performed to your vehicle.

We would like to reimburse you for one month payment of your Chrysler Pacifica…This credit will be our way of showing our sincere regret for the concerns that you've experienced…

…We sincerely hope that we're able to restore your trust in your BraunAbility Pacifica so that you and your family can enjoy your vehicle.

105.    Haschel did not call Plaintiffs again after this phone call.

106.    Shortly after this conversation, Ms. Flowers-Carter and Ms. Flowers went to retrieve the Vehicle.

107.    This trip to UA caused Ms. Flowers to miss one of her scheduled field trips.

108.    When Ms. Flowers-Carter and Ms. Flowers arrived at UA to retrieve the Conversion exhibited persisting issues.

109.    Accordingly, Plaintiffs left the Vehicle at Defendant's repair facility, UA.

110.    Soon thereafter, Ms. Flowers-Carter went to UA to check on the Conversion and to retrieve Mr. Carter's wheelchair from the Vehicle.

111.    The Conversion still exhibited persisting issues and was still in a state of disrepair at this time so Plaintiffs were forced to leave it at UA.

112.    Shortly thereafter, sometime between May 18 and May 20, 2018, Ms. Flowers-Carter again went to UA to check on the Vehicle.

113.    At this time, the Vehicle was not at UA.

114.    Ms. Flowers-Carter was advised at this time that Defendant had moved it to its Braun West facility for further repair.

115.    Ms. Flowers-Carter then went to Braun West to check on the Vehicle and Conversion, which still exhibited persisting issues and remained in disrepair.

116.    The Vehicle and Conversion remained in Defendant's exclusive custody and control from, at the latest, the end of April 2018 through the time Plaintiffs had it towed home, on or about June 6, 2018.

117.    The Conversion still exhibited persisting issues and was in a state of disrepair at the time the Vehicle was towed.

118.    In the time between Ms. Flowers-Carter's May 1, 2018 replacement election and June 6, 2018:

    a)  on or about May 14, 2018, Ms. Flowers-Carter first contacted attorneys Thompson Consumer Law Group PLLC ("TCLG");

    b)  on or about May 31, 2018, Ms. Flowers-Carter first met with and formally retained TCLG;

    c)  by June 2, 2018, Defendant had not provided Plaintiffs' with a comparable assistive device; and,

    d)  on or about June 5, 2018, Defendant, by and through Haschel, sent Ms. Flowers-Carter an E-mail.

119.    Defendant's aforementioned June 5, 2018 E-mail from Haschel carbon copied Heermans, Bill Schwam, Mike Smith, and Rick Nelson, and stated in full:

As you know, on Friday, May 18th your van was taken from United Access to be left at our BraunWest facility in Mesa so that it would be out of the way during the United Access open house event.  At that time, you came to BraunWest and voiced your concern and then ultimately asked for Mike Smith, BraunWest location manager, to keep the vehicle at our facility.  At that time, you told Mike Smith that you'd have your vehicle picked up from our facility on May 21st. To date, your vehicle is still at our location.

Our legal team has concerns that your vehicle has been at our facility for over two weeks now. Our insurance does not have sufficient coverage to house vehicles for this period of time. Our dealer, United Access, would have sufficient garage coverage and so if you are unable to pick your van up by tomorrow, May 6th, we will ask for United Access to come and pick it up from our facility and store it until you are able to have it picked up.

120.    Although Defendant's June 5, 2018 E-mail referenced a conversation between Mike Smith and Ms. Flowers-Carter, the reference was solely towards the Vehicle being at Braun West.

121.    Defendant's June 5, 2018 E-mail referenced Braun's "legal team['s]" concern over its own insurance issues and a demand that Plaintiff get the Vehicle off Braun's lot.

122.    Defendant's June 5, 2018 E-mail to Ms. Flowers-Carter did not:

a)  state that either Defendant or UA had attempted to contact Ms. Flowers-Carter or Plaintiffs;

b)  state that either Defendant or UA had been unable to contact Ms. Flowers-Carter or Plaintiffs;

c) inquire as to why Plaintiffs were not responding to any attempt by Defendant or UA at communicating with them; or

d) mention an outstanding offer to replace the Vehicle and Conversion.

123.    And although Defendant's June 5, 2018 E-mail carbon copied Heermans, Bill Schwam, Mike Smith, and Rick Nelson, none of these recipients replied to the E-mail to address Ms. Flowers-Carter on any of the issues raised in the preceding paragraph.

124.    If, as of June 5, 2018, Defendant or UA had been trying to contact Ms. Flowers-Carter or Plaintiffs and had been unable to, it would have been reasonable for Defendant or any of this E-mail's recipients to mention it in this written communication directly to Ms. Flowers-Carter.

125.    If, as of June 5, 2018, Defendant or UA had made a replacement offer to Ms. Flowers-Carter and had not heard back, it would have been reasonable for Defendant or any of this E-mail's recipients to mention it in this written communication directly to Ms. Flowers-Carter.

126.    On June 6, 2018, Ms. Flowers-Carter went to Braun West to have the Vehicle towed per Defendant's directive to get the Vehicle off its lot.

127.    At this time, Ms. Flowers-Carter spoke to Mike Smith.

128.    At this time Mike Smith said, "we sincerely apologize for the inconvenience," which caused Ms. Flowers-Carter to retreat back to her mother's car and cry.

129.    At no time during this conversation, or any other time, did Mike Smith, UA, or Braun offer Plaintiffs a replacement.

130.   On or about June 19, 2018, Plaintiffs, by and through counsel, sent Defendant written notice of representation with regard to Plaintiffs.

131.   By the date of this letter Defendant had:

   a)  opened an internal case with regard to this matter;

   b)  flown repair personnel from Indiana to Arizona for the purpose of thoroughly inspecting and repairing Plaintiffs Conversion;

   c)  been afforded a reasonable number of attempts to cure the Conversion;

   d)  personally spoken to Ms. Flowers-Carter twice, including initiating a successful call to her on May 4, 2018;

   e)  actual knowledge that the Conversion exhibited persisting issues;

   f)  E-mailed Mrs. Flowers-Carter twice;

   g)  refused Plaintiffs demand for a replacement and instead offered a single loan payment, and,

   h)  let over thirty days lapse since Plaintiffs provided notice of the non-conformities and demand for replacement without providing the same.

132.   On or about June 25, 2018, Plaintiffs, by and through counsel, sent Defendant written notice of the non-conformities and demanded a refund.

133.   On or about July 11, 2018, Plaintiffs, by and through counsel, sent Defendant follow up correspondence.

134.   On or about July 12, 2018, Defendant, through its in-house counsel Brad Johnston ("Johnston"), sent Plaintiffs' counsel an E-mail acknowledging receipt of correspondence on behalf of Ms. Flowers-Carter.

135.    Johnston's July 12, 2018 E-mail, did not comply with Plaintiffs' counsel's election for a refund.

136.    Johnston's July 12, 2018 E-mail did not mention an outstanding replacement offer to Mrs. Flowers-Carter.

137.    Johnston's July 12, 2018 E-mail did not mention having previously tried to and been unable to contact Plaintiffs.

138.    Instead, Johnston's July, 2018 12 E-mail stated Defendant was sending the matter to a second attorney, an outside counsel who usually handles such matters for Defendant ("Mike Dolenga"), and that Dolenga would respond to Plaintiffs' counsel "once he's had an opportunity to review your claim and our file history."

139.    Meanwhile, Plaintiffs' Vehicle and Conversion exhibited persisting issues and remained in disrepair.

140.    On July 18, 2018, Dolenga first contacted Plaintiffs' counsel.

141.    By this time, no less than one hundred days had passed since Defendant first opened its case on Plaintiffs conversion, and no less than seventy-five days had passed since Plaintiffs made their replacement demand.

142.    Dolenga's July 18, 2018 E-mail did not offer Plaintiffs a replacement or a refund.

143.    Dolenga's July 18, 2018 E-mail did not reference an outstanding replacement offer to Plaintiffs.

144.    Dolenga's July 18, 2018 E-mail did not mention Defendant having previously tried to and been unable to contact Plaintiffs.

145.    Meanwhile, the Conversion exhibited persisting issues and the Vehicle remained in disrepair.

146.    Plaintiffs' counsel responded to Dolenga via E-mail that day and invited a phone call.

147.    Dolenga and Plaintiffs' counsel spoke three business days later, on or about July 23, 2018, and discussed the case and Plaintiffs' demand.

148.    During this July 23, 2018 conversation, Dolenga did not offer Plaintiffs a replacement or a refund.

149.    During this July 23, 2018 conversation, Dolenga did not reference an outstanding replacement offer to Plaintiffs.

150.    During this July 23, 2018 conversation, Dolenga did not mention Defendant having previously tried to and been unable to contact Plaintiffs.

151.    Meanwhile, the Conversion exhibited persisting issues and the Vehicle remained in disrepair.

152.    On or about July 31, 2018, Dolenga communicated, *inter alia*, to Plaintiffs' counsel that:

a) Dolenga was scheduled to take a couple of days off that week for family vacation time;

b) Dolenga had provided Defendant the demand [he and one of Plaintiffs' attorneys, Jose Gill] discussed;

c) Defendant was "kind of taken back a little bit as to the amount of the demand, but they understand the concepts of the trebling and all of, statute,

and all of the things [he and one of Plaintiffs' attorneys, Jose Gill] talked about;"

d) Dolenga "told [Gill] that I would likely get back to you this week, [but] I don't think that's going to happen at this point;"

e) Defendant "wanted to digest [the demand], do some factual and some legal research on a few of the concepts and the things I talked to them about to get a better understanding of what kind of counter-offer they want to make;"

f) Defendant "need[s] to get a better feel for the exposure, and the laws, and the facts, and etcetera, etcetera;" and,

g) Dolenga would "most likely…back to you on Monday or Tuesday of next week with a counter-offer to the last demand."

153.    Dolenga's July 31, 2018 communication did not offer Plaintiffs a replacement or a refund.

154.    Dolenga's July 31, 2018 communication did not reference an outstanding replacement offer to Plaintiffs.

155.    Dolenga's July 31, 2018 communication did not mention Defendant having previously tried to and been unable to contact Plaintiffs.

156.    Meanwhile, the Conversion exhibited persisting issues and the Vehicle remained in disrepair.

157.    On August 6, 2018, Plaintiffs' counsel followed up with Dolenga.

158.    On August 7, 2018, Dolenga communicated to Plaintiffs' counsel via E-mail.

159.     Dolenga's August 7, 2018 E-mail stated that Defendant had not provided Dolenga "any official authority" to resolve the matter.

160.     Dolenga's August 7, 2018 E-mail continued, stating *inter alia*:

> I know they are interested in knowing some official numbers on the amount of the loan that your client has with the bank, monthly payments, and the current payoff amount.  In my discussions with them they are having a hard time figuring out where you came up with the numbers you provided me other than you have clearly built in incidental and consequential damages, costs, attorney fees, and treble damages.  They are interested in having some more hard numbers on the actual, economic losses in this matter.  To that end, anything you can provide on the loan issues would be appreciated.

> I will let you know as soon as I hear from Braun, which I anticipate will definitely be this week, likely by the end of the day on Wednesday.

161.     Dolenga's August 7, 2018 E-mail did not offer Plaintiffs a replacement or a refund.

162.     Dolenga's August 7, 2018 E-mail did not reference an outstanding replacement offer to Plaintiffs.

163.     Dolenga's August 7, 2018 E-mail did not mention Defendant having previously tried to and been unable to contact Plaintiffs.

164.     Meanwhile, the Conversion exhibited persisting issues and the Vehicle remained in disrepair.

165.     August 7, 2018 was, upon information and belief, more than thirty days after Defendant's receipt of Plaintiffs' counsels' first and second letters.

166.     On August 9, 2018, Dolenga again contacted Plaintiffs' counsel via E-mail.

167.    Dolenga's August 9, 2018 E-mail stated he was "prepared to talk" if Plaintiffs provide "hard numbers…especially loan amount, payment amounts, payoff amount."

168.    Dolenga's August 9, 2018 E-mail did not offer Plaintiffs a replacement or a refund.

169.    Dolenga's August 9, 2018 E-mail did not reference an outstanding replacement offer to Plaintiffs.

170.    Dolenga's August 9, 2018 E-mail did not mention Defendant having previously tried to and been unable to contact Plaintiffs.

171.    Meanwhile, the Conversion exhibited persisting issues and the Vehicle remained in disrepair.

172.    Plaintiffs' counsel responded to Dolenga on August 10, 2018 via E-mail.

173.    Plaintiffs' counsel's August 10, 2018 E-mail clarified the repurchase demand, providing Dolenga the prices for the Vehicle and the Conversion and an estimate of a small amount of consequential economic damages incurred at the time.

174.    Plaintiffs' counsel's August 10, 2018 E-mail put Dolenga and Defendant on notice that Ms. Flowers-Carter's "MS has flared up from dealing with all of this, and [that] Mr. Carter is battling cancer."

175.    Plaintiffs' counsel's August 10, 2018 E-mail further made a single reference to the statute's treble damages provision and requested Defendant's offer/counter via E-mail.

176.    Dolenga responded that same day stating, *inter alia*:

…Once you get me the requested information, I will provide Braun's counter offer. At this point, they are not comfortable with me putting a precise number together as you are claiming an $84,806 buy back, plus $26,000 of unsupported other economic damages, and it is extremely difficult to calculate an appropriate response to that.

177.    According to Dolenga's first August 10, 2018 E-mail:

    a)  Defendant's comfort level in making an offer was its highest priority; and,

    b)  Defendant would not make an offer until it was provided the information it desired.

178.    Dolenga's first August 10, 2018 E-mail did not offer Plaintiffs a replacement or a refund.

179.    Dolenga's first August 10, 2018 E-mail did not reference an outstanding replacement offer to Plaintiffs.

180.    Dolenga's first August 10, 2018 E-mail did not mention Defendant having previously tried to and been unable to contact Plaintiffs.

181.    Meanwhile, the Conversion exhibited persisting issues and the Vehicle remained in disrepair.

182.    Dolenga E-mailed Plaintiffs' counsel again later that day, stating:

I also want to make sure something is clear so that we can, hopefully, discuss this some more next week and finalize a resolution.  Braun has authorized me to negotiate a repurchase of Ms. Flowers-Carter's van.  Braun intends to repurchase the van to bring this matter to a conclusion. Once you provide the precise economic figures, we can determine the appropriate amount to accomplish that.  I realize that you have a different position than Braun about potential non-economic damages,

treble damages, and other things, but we can discuss that further next week as well.  At this point, my contacts at Braun want me to make sure it is clear to you and Ms. Flowers-Carter (so please convey this to her) that Braun understands that individuals who purchase their products have certain needs. Therefore, without addressing the merits of the allegations and/or whether Ms. Flowers-Carter is entitled to a buy back, Braun wants to make sure that we negotiate a fair resolution, so she can obtain appropriate transportation.  Therefore, Braun has authorized me to negotiate a repurchase with you and Braun has specifically advised me to let you know that it intends to repurchase Ms. Flowers-Carter's van from her.

183.   Dolenga's second August 10, 2018 E-mail expressed that Defendant had provided Dolenga "authority to negotiate."

184.   Authority to negotiate is not compliance with the consumer's election.

185.   Authority to negotiate is not even an offer.

186.   Negotiating a repurchase is not timely compliance with a consumer's election.

187.   Negotiating a repurchase is not an offer, let alone a tender as required by the AADWA.

188.   Dolenga's second August 10, 2018 E-mail further conditioned negotiations on Plaintiffs' counsel first providing "precise economic figures" to Defendant.

189.   The AADWA does not require a consumer tender precise economic figures when demanding the manufacturer refund the assistive device.

190.   "Precise economic figures" are not a prerequisite to good faith negotiations.

191.   "Precise economic figures" are not a prerequisite to making an offer.

192.   "Precise economic figures" are not a prerequisite to tendering a remedy.

193.   Upon information and belief, Defendant's insistence upon "precise economic figures" was a business decision.

194.   Upon information and belief, Defendant's insistence upon "precise economic figures" is predicated on achieving the best possible settlement for itself.

195.   Upon information and belief, Defendant's insistence upon "precise economic figures" is predicated on the belief Plaintiffs are not entitled to anything but a repurchase minus an offset for use.

196.   Upon information and belief, Defendant's insistence upon "precise economic figures" is predicated on the belief all of Plaintiffs' damages can be reduced to writing.

197.   Dolenga's second August 10, 2018 E-mail further stated Defendant "understands that individuals who purchase their products have certain needs...[and that] Braun want[ed] to make sure that we negotiate a fair resolution, so she can obtain appropriate transportation."

198.   According to Dolenga's second August 10, 2018 E-mail, negotiating itself a fair resolution, so that Plaintiffs could afterwards obtain a substitute conversion, was Defendant's highest priority at this time.

199.   Dolenga's second August 10, 2018 E-mail did not reference an outstanding replacement offer to Plaintiffs.

200.   Dolenga's second August 10, 2018 E-mail did not mention Defendant having previously tried to and been unable to contact Plaintiffs.

201.    Meanwhile, the Conversion exhibited persisting issues and the Vehicle remained in disrepair.

202.    Defendant's faulty wheelchair Conversion has wreaked and continues to wreak irreparable havoc and damage upon Plaintiffs.

203.    These damages:

a)      began accruing upon the Conversion's defective and non-conforming delivery;

b)      continued to accrue as Defendant unsuccessfully tinkered with the Conversion;

c)      continued to accrue after Plaintiffs' made their replacement election;

d)      continued to accrue after Defendant made its one month payment offer;

e)      continued to accrue after Defendant failed to comply with Plaintiff's replacement election within thirty days;

f)      continued to accrue after Plaintiffs' counsel's refund election;

g)      continued to accrue while Defendant had sole and exclusive possession of the Conversion;

h)      continued to accrue after Defendant failed to comply with Plaintiffs counsel's refund election, or even provide authority to make an offer to do so, within thirty days of Plaintiffs' demand; and,

i)      continue to accrue.

204.    These damages are directly attributed to Defendant's defective and non-conforming delivery and include but are not limited to:

a)    Loss of all moneys expended towards the subject Vehicle and Conversion;

b)    Ms. Flowers's and Ms. Flowers-Carter's missed school, and missed vocational training for Ms. Flowers, which results in lost education and opportunity, and lost financial aid for both Ms. Flowers and Ms. Flowers-Carter;

c)    missed physical, occupational and speech therapies for Ms. Flowers;

d)    significant stress, aggravation and inconvenience for Mrs. Flowers-Carter resulting in the need for medical attention, including hospitalization, as well as significant emotional distress and medical expense;

e)    Ms. Flowers-Carter's lost wages and spent sick time;

f)    an inflated debt to credit ratio that prevented Plaintiffs from buying a home or obtaining a cover conversion;

g)    increased cost of base vehicle and conversion;

h)    economic damage including falling into debt and loss of credit score;

i)    loss of the opportunity to timely sell Plaintiffs prior conversion, which itself resulted in additional payments, finance charges, insurance, repair costs, and diminution in value when the vehicle was finally sold;

j)    Mrs. Flowers-Carter being forced to sell her Camaro to make ends meet;

k)      vehicle rental expenses;

l)      the purchase of a new, standard car because they could not qualify

for or afford a conversion; and,

m)      all other damages actually incurred.

205.    Most of the aforementioned damages cannot be cured by a replacement or repurchase alone.

206.    Nearly all of Plaintiffs' damages began accruing prior to August 7, 2018.

207.    Many of these damages have been exacerbated by Defendant's conduct since August 7, 2018.

208.    Any new damages incurred since August 7, 2018 are the result of Defendant's negotiation tactics.

209.    Plaintiffs are unlikely to be able to reduce the full extent of their economic damages to paper.

210.    Many of Plaintiffs' damages can only be explained through testimony.

211.    Many of Plaintiffs' damages are issues of fact, for the trier of fact to decide.

212.    On October 2, 2018, Dolenga contacted Plaintiffs' counsel via E-mail, stating, *inter alia*:

> Braun needs further information from you and/or your client to
> assess the settlement demand that you made, especially since
> it is so high and actually well over the purchase price of the
> vehicle in question.  Please provide the documentation we
> discussed in the past so that Braun can further evaluate the
> numbers, mitigation issues, etc.  As you know, Braun wants
> those numbers to fully evaluate this claim and so that it can
> determine your client's out of pocket damages.  Braun intends
> to repurchase the vehicle from your client but cannot do so

> without more information from you and/or your client, especially the exact numbers that we have talked about so that we can calculate the appropriate repurchase amount.

213. Dolenga's October 2, 2018 E-mail, stated Defendant thought Plaintiffs' demand was "so high," and that that Defendant "cannot" offer a remedy, let alone comply with an election, until it received what it deemed sufficient documentation to "fully evaluate this claim and so that it can determine your client's out of pocket damages…[and] calculate the appropriate repurchase amount."

214. According to Dolenga's October 2, 2018 E-mail, fully calculating the claim and unilaterally determining Plaintiffs' damages were Defendant's highest priorities at the time.

215. Dolenga's October 2, 2018 E-mail did not reference an outstanding replacement offer to Plaintiffs.

216. Dolenga's October 2, 2018 E-mail did not mention Defendant having previously tried to and been unable to contact Plaintiffs.

217. Meanwhile, Plaintiffs' Vehicle and Conversion remained in disrepair. Meanwhile, the Conversion exhibited persisting issues and the Vehicle remained in disrepair.

218. Plaintiffs' counsel responded to Dolenga that same day, stating *inter alia*:

> We met with our clients, their case worker and the assistive device director earlier last week and are filing suit today. Our filing should not be construed as a lack of interest in discussing settlement, we just need to expedite this matter.

> Our prior demand is revoked and we intend on seeking all available damages, statutory and/or otherwise. Our

> calculations put this number between $350,000 and $400,000 as of this date, continuing to increase, and excluding damages for emotional distress. Given the same we are planning for a jury trial here.

> Still, it occurred to me that it may be possible to mitigate damages and reach a bifurcated settlement regarding refund of the vehicle/assistive device. Perhaps the parties can agree on a repurchase number for the vehicle and the device, plus finance charges they have paid and costs collateral to the purchase itself, and leave the remaining damages to litigation, and possibly even negotiation?

219.    Dolenga responded via E-mail that same day, telling Plaintiffs' counsel that because Defendant "expressed a willingness to repurchase" that he was "not sure [Plaintiffs] have a cause of action for the other damages."

220.    Dolenga's second October 2, 2018 E-mail did not reference an outstanding replacement offer to Plaintiffs.

221.    Dolenga's October 2, 2018 E-mail did not mention Defendant having previously tried to and been unable to contact Plaintiffs.

222.    As of October 2, 2018, Plaintiffs' Vehicle and Conversion remained in disrepair.

223.    Plaintiffs' counsel again responded to Dolenga that same day, explaining Dolenga's position on damages was incorrect and inviting further communication.

224.    Dolenga responded the next day via E-mail, stating, *inter alia*:

> …Based on your email I will let them know that it seems like you still have a willingness to try to discuss settlement, although I am not sure the tone or approach of your email is reasonable.  If Braun authorizes me to continuing communicating with you so that we can try to work something out I will let you know.  Otherwise, I believe that Braun is

> going to retain a different lawyer now that you have filed a lawsuit… Despite its liability defenses to the claims you made, Braun has had an offer to repurchase the van outstanding for some time. Rather than responding to that you have made claims about damages that your client is allegedly entitled to over and above a repurchase…

225.   According to Dolenga's October 3, 2018 E-mail, he recognized Plaintiffs' still wanted to negotiate and would tell Defendant the same.

226.   Dolenga's October 3, 2018 E-mail did not reference an outstanding replacement offer to Plaintiffs.

227.   Dolenga's October 3, 2018 E-mail did not mention Defendant having previously tried to and been unable to contact Plaintiffs.

228.   Meanwhile, the Conversion exhibited persisting issues and the Vehicle remained in disrepair.

229.   On October 12, 2018 Dolenga again E-mailed Plaintiffs' counsel, stating, *inter alia*:

> …I have been asked to reiterate, again, that Braun is willing to litigate this matter if necessary, but that it would prefer to reach a negotiated resolution with you and your clients instead…However, we still need figures from you so that we can calculate the buyback amount…as soon as it receives an itemization of the expenses incurred related to the purchase, which may include things like license, registration, and potentially insurance or loan payments, less a reasonable offset for use. Braun may even be willing to waive the reasonable offset for use, and it is willing to pay a reasonable attorney fee for your firms' representation of Ms. Flower-Carter, and the assistance you provide in negotiating a resolution…You have advised that you believe your clients are entitled to more than that based on the statute we have discussed many times…As a result, I advised you that Braun was turning this matter over to its Arizona counsel...and proceed accordingly with defending

the litigation…If you decide to litigate this matter over issues that we strongly disagree with your position on, especially with Braun's long standing, open offer to repurchase the vehicle Braun, will defend those allegations and the litigation…

230.    Dolenga's October 12, 2018 E-mail did not reference an outstanding replacement offer to Plaintiffs.

231.    Dolenga's October 12, 2018 E-mail did not mention Defendant having previously tried to and been unable to contact Plaintiffs.

232.    Meanwhile, the Conversion exhibited persisting issues and the Vehicle remained in disrepair and have been in this condition since the date of the last unsuccessful repair, and Plaintiffs continue to accrue damages.

## COUNT I
## VIOLATION OF THE AADWA

233.    Plaintiffs incorporate by reference all the preceding paragraphs.

234.    Pursuant to A.R.S. § 44-1352:

[A] manufacturer who sells an assistive device to a consumer, directly or through an assistive device dealer, shall give the consumer an express warranty against defects, malfunctions or conditions for the assistive device. The duration of the express warranty shall be for at least one year after the initial delivery of the assistive device to the consumer.

*        *        *

D. If [a] nonconformity is not repaired after a reasonable attempt to make a repair, a consumer . . . may direct the manufacturer to perform one of the following options and the manufacturer shall comply with the option chosen by the consumer:

1. Accept return of the assistive device and replace the assistive device with a comparable new assistive device and refund any collateral costs to the consumer and assistive device lessor.

2. Accept return of the assistive device and refund to the consumer and to any holder of a perfected security interest in the assistive device the full purchase price plus any finance charge paid by the consumer at the point of sale and collateral costs minus a reasonable allowance for use. A reasonable allowance for use shall not exceed the amount obtained by multiplying the full purchase price of the assistive device by a fraction, the numerator of which is the number of days that the assistive device was used before the consumer first reported the nonconformity to the assistive device dealer and the denominator of which is one thousand eight hundred twenty-five.

235.   Pursuant to A.R.S. § 44-1353, the manufacturer must promptly comply with the consumer's election:

A. A consumer, as defined in section 44-1351, paragraph 5, subdivision (a), (b) or (c), shall notify the manufacturer of a nonconformity. Within thirty days after receiving notification of a nonconformity, the manufacturer shall provide the consumer with a comparable assistive device or a refund. After receiving the new assistive device or refund, the consumer shall return to the manufacturer the assistive device that has the nonconformity including any endorsements necessary to transfer physical possession to the manufacturer.

A.R.S. § 44-1353(A).

236.   Compliance under the AADWA requires the manufacturer to actually effectuate the remedy of refund or replacement within thirty days of receiving the consumer's notice of election.

237.   A manufacturer does not comply with the AADWA by making an offer more than thirty days of receiving the notice of election.

238.   A manufacturer does not comply with the AADWA by gesturing that an offer may be made if certain conditions are complied with.

239.   A manufacturer does not comply with the AADWA by suggesting it will negotiate an offer if certain conditions are complied with.

240.   If a manufacturer fails to timely comply with the consumer's election and the statute, the consumer may "bring an action in superior court to recover damages caused by a violation of this section. The court may award the prevailing consumer triple the amount of any pecuniary loss plus costs, disbursements, and attorney fees. The court may also award any equitable relief deemed appropriate by the court." A.R.S. § 44-1355.

241.   The Conversion experienced repeated defects, malfunctions or conditions that substantially impair its use, safety or value.

242.   Plaintiffs allowed Defendant a "reasonable attempt to repair" the non-conformities as defined by A.R.S. § 44-1351(12).

243.   Plaintiffs personally demanded that Defendant replace the Conversion on May 1, 2018.

244.   Defendant failed to replace the Conversion by June 2, 2018.

245.   Defendant therefore failed to comply with Plaintiffs' election within the time period called for by the AADWA.

246.   Plaintiffs' counsel sent Defendant correspondence on June 25, 2108 demanding Defendant refund the full purchase price of the conversion and provide Plaintiffs other damages and relief to which Plaintiffs are entitled to under the law.

247.    As of August 7, 2018, Defendant had not yet even provided authority to repurchase the Conversion, let alone actually complied with the repurchase election.

248.    Defendant therefore also failed to comply with Plaintiffs' counsel's election within the time period called for by the AADWA.

249.    Plaintiffs' began suffering irreparable damages upon Defendant's defective and non-conforming delivery.

250.    Plaintiffs' had already suffered damages too great to be undone by a repurchase (or replacement) alone by the time Defendant gestured that it would make an offer of its liking, if documents to its liking were provided.

251.    Defendant's refusal to timely comply with Plaintiffs' election was intentional, willful and in wanton and reckless disregard for Plaintiffs' rights.

252.    Defendant's refusal to timely comply with Plaintiffs' counsel's election was intentional, willful and in wanton and reckless disregard for Plaintiffs' rights.

253.    Defendant's business decision in choosing to "do some factual and some legal research on a few of the concepts and the things [Dolenga] talked to [it] about to get a better understanding of what kind of counter-offer they want to make" was intentional, willful and in wanton and reckless disregard for Plaintiffs' rights.

254.    Defendant's business decision in "need[ing] to get a better feel for the exposure, and the laws, and the facts, and etcetera, etcetera" prior to making an offer or complying with the elections were intentional, willful and in wanton and reckless disregard for Plaintiffs' rights.

255.   Defendant's conditioning of only making an offer upon receipt of documents to its liking were intentional, willful and in wanton and reckless disregard for Plaintiffs' rights.

256.   Defendant's conditioning of an offer to repurchase upon Plaintiffs' waiving other remedies they are expressly entitled to was intentional, willful and in wanton and reckless disregard for Plaintiffs' rights.

257.   Defendants' negotiation tactics in threatening protracted litigation in this matter unless Plaintiffs' accepted whatever terms it unilaterally decided were intentional, willful and in wanton and reckless disregard for Plaintiffs' rights.

258.   Defendant engaged in these negotiation tactics despite:

a)  having actual knowledge of the Conversion's defects, malfunctions or conditions that substantially impairs its use, safety or value;

b)  having actual knowledge that the Conversion exhibited persisting issues after its last repair;

c)  having actual knowledge Ms. Flowers-Carter's "MS has flared up from dealing with all of this, and [that] Mr. Carter is battling cancer;" and,

d)  despite "understand[ing] that individuals who purchase their products have certain needs."

259.   Upon information and belief it is Defendant's "understand[ing] that individuals who purchase their products have certain needs" that has emboldened Defendant's "hard ball" negotiation strategy and protracted litigation tactics here.

260.   Upon information and belief Defendant figures it can wage a war of attrition upon Plaintiffs through protracted litigation.

261.   Defendant's other actions in otherwise failing to provide the mandated remedies, and doing so within the time period provided by the AADWA, were willful and in wanton and reckless disregard for Plaintiffs' rights.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a)  Adjudging that Defendant violated the AADWA;

b)  Directing Defendant to accept return of the Conversion and to refund to Plaintiffs the full purchase price plus any finance charge they have paid and all collateral costs;

c)  Awarding Plaintiffs triple the amount of any pecuniary loss;

d)  Awarding Plaintiffs all actual, special, incidental and consequential damages allowed; including but not limited to all monies expended by Plaintiffs reasonably related to Plaintiffs' purchase and possession of the Conversion, damages for loss of use, all cover damages, damages for emotional distress, aggravation, and inconvenience;

e)  Awarding all other economic and non-economic damages actually incurred;

f)  Awarding Plaintiffs all reasonable attorney fees, litigation costs and expenses pursuant to A.R.S. § 44-1355(C);

g)  Awarding Plaintiffs pre-judgment and post-judgment interest as permissible by  law; and,

h)  Awarding such other and further relief as the Court may deem just and

proper.

## COUNT II
## BREACH OF COMMON LAW EXPRESS WARRANTY

248.    Plaintiffs incorporate by reference all the preceding paragraphs.

249.    Pursuant to A.R.S. § 44-1352 (A):

> In the absence of an express warranty from the manufacturer,
> the manufacturer is deemed to have expressly warranted to the
> consumer that the assistive device will be free from any defect,
> malfunction or condition that substantially impairs the use,
> safety or value of the assistive device. The duration of the
> express warranty shall be for at least one year after the initial
> delivery of the assistive device to the consumer.

A.R.S. § 44-1352(B).

250.    The Conversion immediately upon delivery experienced repeated defects,

malfunctions or conditions that substantially impairs its use, safety or value.

251.    As a direct and foreseeable result of Defendant's breach of express warranty

Plaintiffs have suffered actual damages.

252.    Plaintiffs' actual damages exceed the purchase price of the Vehicle and

Conversion, and exceed the cost of cover.

253.    Pursuant to its express language, the AADWA "does not limit any rights or

remedies available to a consumer under any other law. Any waiver of rights by a

consumer is void."

254.    Defendant's written limited warranty contains an illegal restriction of rights

and damages.

255.    Defendant's limitation of remedy is wholly void.

256.    Defendant written limited warranty's inclusion of this restriction of rights and damages was a misrepresentation in connection with the delivery of merchandise that caused Plaintiffs to suffer consequent and proximate damages.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a)  Adjudging that Defendant breached its warranty;

b)  Awarding Plaintiffs their actual, special, incidental and consequential damages including but not limited to emotional distress, aggravation and inconvenience, loss of use and all other economic and non-economic damages actually incurred;

c)  Awarding Plaintiffs their reasonable attorney fees and costs pursuant to A.R.S. §§ 12-341 and 12-341.01;

d)  Awarding Plaintiffs pre-judgment and post-judgment interest as permissible by law; and

e)  Awarding such other and further relief as the Court may deem just and proper.

**TRIAL BY JURY**

257.    Plaintiffs are entitled to and hereby demand a trial by jury.

Dated: March 26, 2019.

Respectfully submitted,

/s/ Russell S. Thompson, IV

Russell S. Thompson, IV (029098)
Thompson Consumer Law Group, PLLC
5235 E. Southern Ave., D106-618
Mesa, AZ 85206
Telephone: (602) 388-8898
Facsimile: (866) 317-2674
rthompson@ThompsonConsumerLaw.com
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

On March 26, 2019, I electronically submitted the attached document for filing with the Clerk of the Court of the U.S. District of Court of Arizona and for distribution of electronic notices of filing to be distributed to all counsel/parties of record.


/s/ Russell S. Thompson, IV
Russell S. Thompson, IV