**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Latricia Flowers-Carter, et al., | No. CV-18-03836-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| Braun Corporation, | |
| Defendant. | |

Pending before the Court is Plaintiffs' motion to compel and for sanctions.  (Doc. 157.)  This motion represents at least the seventh time the parties have asked the Court to intervene in a discovery-related dispute.  For the following reasons, the motion will be granted in part and denied in part.

## BACKGROUND

This case arises from a failed attempt to install a wheelchair conversion kit in a minivan.   Despite multiple post-installation repair attempts by Defendant Braun Corporation ("Braun") and an entity associated with Braun, the defects could never be cured.  The key disputed issue in this case, which has erupted into a bitter discovery battle, is when (or whether) Braun first made an effective offer to repurchase or replace the defective vehicle—conduct that that has important liability-related ramifications under Arizona law.

I.    Background Law

In 1998, Arizona enacted the Assistive Device Warranties Act ("AADWA"), which

is now codified at A.R.S. § 44-1351 *et seq.*  It provides, in relevant part, that a manufacturer that sells an "assistive device," such as a wheelchair conversion kit, must "give the consumer an express warranty against defects, malfunctions or conditions." *Id.* § 44-1352(A).  This express warranty, which must remain in effect "for at least one year," obligates the manufacturer to repair non-conformities "at no charge to the consumer." *Id.* § 44-1352(A), (C).

The AADWA further provides that if a manufacturer cannot repair a non-conformity "after a reasonable attempt," the consumer has the right to "direct the manufacturer" to either (1) provide a "comparable" replacement, while "refund[ing] any collateral cost to the consumer," or (2) provide a refund consisting of "the full purchase price plus any finance charge paid by the consumer at the point of sale and collateral costs minus a reasonable allowance for use." *Id.* § 44-1352(D)(1)-(2).  The manufacturer must honor the consumer's preferred option. *Id.* § 44-1352(D) ("[T]he manufacturer shall comply with the option chosen by the consumer.").

Finally, the AADWA creates an express cause of action for a violation of its requirements: "In addition to any other remedy, a consumer may bring an action in superior court to recover damages caused by a violation of this section.  The court may award the prevailing consumer triple the amount of any pecuniary loss plus costs, disbursements and attorney fees.  The court may also award any equitable relief deemed appropriate by the court." *Id.* § 44-1355(C).

II.    Plaintiffs' Factual Allegations

The underlying facts, as alleged in the operative complaint (Doc. 38), are as follows:

A.    **Plaintiffs' Purchase Of A Minivan And Wheelchair Conversion Kit**

Shanyce Flowers ("Flowers") is a quadriplegic who suffers from cerebral palsy and seizures.  (*Id.* ¶¶ 26-27.)  Flowers's primary caregivers are Latricia Flowers-Carter ("Flowers-Carter"), who also serves as Flowers's legal guardian, and Douglas Carter ("Carter").  (*Id.* ¶¶ 28, 30, 36, 38.)  Flowers-Carter and Carter also suffer from serious physical ailments: Flowers-Carter has multiple sclerosis ("MS"), while Carter has bone

1   cancer and receives dialysis as treatment for a prior bout with kidney cancer.  (*Id.* ¶¶ 29-

2   30.)  Flowers, Flowers-Carter, and Carter will be referred to collectively as "Plaintiffs."

3         In December 2017, Plaintiffs purchased a 2017 Chrysler Pacifica minivan from a

4   non-party for $48,582.  (*Id.* ¶ 32.)  Plaintiffs then contracted with Braun, via an authorized

5   Braun dealer known as United Access ("UA"), to equip the minivan with a Braun

6   wheelchair conversion kit.  (*Id.* ¶ 33.)  Plaintiffs' intent in buying and converting the

7   minivan was to enhance their ability to transport Flowers to medical and vocational

8   appointments.  (*Id.* ¶ 31.)  The cost of the conversion was $34,928.08.  (*Id.* ¶ 42.)

9         B.   **The Repair Attempts**

10        On February 20, 2018, Flowers-Carter picked up the newly converted minivan from

11   UA.  (*Id.* ¶ 47.)  Plaintiffs immediately began experiencing malfunctions, including one

12   incident in which the door opened by itself while Flowers-Carter was driving on the

13   freeway.  (*Id.* ¶¶ 48-49.)  As a result, Plaintiffs "tendered" the vehicle back to UA (which

14   also served as Braun's authorized repair facility) in mid-March 2018 so it could be repaired.

15   (*Id.* ¶¶ 34, 50.)

16        At some unspecified point later, UA informed Plaintiffs that the problem had been

17   fixed, which prompted Flowers-Carter to retrieve the minivan.  (*Id.* ¶¶ 51, 53.)

18   Unfortunately, "[t]he defects, malfunctions or conditions persisted," so Plaintiffs tendered

19   the minivan back to UA for another repair attempt "the very next day."  (*Id.*¶¶ 54-55.)

20        On March 27, 2018, after being told the repairs had been completed, Flowers-Carter

21   returned to UA to retrieve the vehicle.  (*Id.* ¶¶ 56, 58.)  The second repair attempt was also

22   unsuccessful.  (*Id.* ¶ 58.)  "This prompted Plaintiffs to again leave the [v]ehicle at UA for

23   repairs."  (*Id.* ¶ 59.)

24        On March 30, 2018, Flowers-Carter was informed by UA that the third round of

25   repairs had been completed.  (*Id.* ¶ 61.)  However, Flowers-Carter wasn't able to

26   immediately return to UA to retrieve the vehicle because the stress associated with the

27   conversion process had caused her MS to flare up, resulting in hospitalization.  (*Id.* ¶ 63.)

28        On April 2, 2018, after being discharged from the hospital, Flowers-Carter again

returned to UA to retrieve the minivan.  (*Id.* ¶ 64.)  Afterward, Flowers-Carter used the minivan to transport Flowers to Nevada for vocational training.  (*Id.* ¶¶ 66.)  During this trip, the minivan "broke down again," causing Flowers-Carter "to enlist strangers to lift Ms. Flowers into the vehicle" and forcing Flowers-Carter to use a bucket as a toilet during the return trip (because she could not leave Flowers alone in the vehicle).  (*Id.* ¶¶ 68-69.)

On April 8, 2018, after returning from Nevada, Flowers-Carter brought the minivan back to UA for a fourth round of repairs.  (*Id.* ¶ 70.)

On April 9, 2018, UA informed Plaintiffs that the minivan was fixed, but because it "exhibit[ed] persisting issues when Plaintiffs arrived to pick it up," they decided to leave it at UA for additional repairs.  (*Id.* ¶¶ 71, 73.)

On April 10, 2018, UA informed Plaintiffs that the minivan was fixed.  (*Id.* ¶ 74.) However, just as the previous time, the minivan "exhibited persisting issues" when Plaintiffs arrived to pick it up, so they left it at UA for further repairs.  (*Id.* ¶ 76.)

On April 13, 2018, UA informed Plaintiffs that the minivan was fixed.  (*Id.* ¶ 77.) When Flowers-Carter arrived to retrieve it, it once again exhibited "persisting issues." (*Id.* ¶ 79.)   In response, a UA employee named Brent Heermans ("Heermans") told Flowers-Carter that he was going inside to call Braun.  (*Id.* ¶ 80.)   When Heermans returned, he stated that "Braun knows about the issue here" and asked her to once again leave the minivan for additional repairs.  (*Id.* ¶ 81.)  She agreed to do so.  (*Id.*)

At some unspecified point afterward, Flowers-Carter returned to UA.  (*Id.* ¶ 82.) She was told that the minivan still wasn't fixed and that the problem was the fault of the minivan's manufacturer, Chrysler.  (*Id.* ¶ 83.)  However, when Flowers-Carter contacted Chrysler, she was told that the repairs were the responsibility of the company that provided the conversion.  (*Id.* ¶¶ 84-85.)

### C.   The Alleged May 1, 2018 Replacement Request By Flowers-Carter

On May 1, 2018, Flowers-Carter placed two phone calls to Braun.  (*Id.* ¶ 88.) During the first call, Flowers-Carter left a voicemail message.  (*Id.* ¶ 89.) The second call resulted in a "very difficult and emotional" 16-minute conversation with a Braun employee

named Elaine Haschel ("Haschel"), during which Flowers-Carter described all of the hardships that Plaintiffs had suffered due to the minivan's defects.  (*Id.* ¶ 90-93.)  During this call, Flowers-Carter "personally gave Haschel notice of the Conversion's non-conformities and requested a replacement."  (*Id.* ¶ 94.)

Haschel "did not accept" this replacement request and instead "pleaded" with Flowers-Carter to allow Braun to fix the problem.  (*Id.* ¶¶ 95-97.)  Haschel also stated that Braun had flown (or was going to fly) specialized repair personnel from Indiana to Arizona to oversee the repair.  (*Id.* ¶ 96.)

D.   **The Subsequent Repair Attempts**

On May 4, 2018, Haschel placed a phone call to Flowers-Carter.  (*Id.* ¶ 98-100.) During this call, Haschel stated that the "Braun team" had "found several concerns" during its inspection but had been able to successfully repair each one.  (*Id.*)  Haschel did not offer a refund or replacement but did offer a one-month vehicle loan as a way of showing "sincere regret."  (*Id.* ¶¶ 102-03.)  Braun memorialized this offer in an email to Flowers-Carter.  (*Id.* ¶ 104.)

At some unspecified point after this May 4, 2018 call, Flowers-Carter and Flowers went to UA to retrieve the minivan.  (*Id.* ¶ 106.)  When they arrived, they discovered it was still not fixed.  (*Id.* ¶ 108.)  They left it at UA for further repairs.  (*Id.* ¶ 109.)

At some unspecified point afterward, Flowers-Carter again went to UA to retrieve the minivan.  (*Id.* ¶ 110.)  It again "exhibited persisting issues" so she again left it at UA for further repairs.  (*Id.* ¶ 111.)

At some point on or between May 18-20, 2018, Flowers-Carter went to UA to retrieve the minivan.  (*Id.* ¶ 112.)  When she arrived, she was told that Braun had moved it to a different facility for repairs.  (*Id.* ¶ 114.)  She then traveled to the other facility, but it "still exhibited persisting issues and remained in disrepair."  (*Id.* ¶ 115.)

On June 5, 2018, Flowers-Carter received an email from Haschel.  (*Id.* ¶¶ 118-19.) In this email, Haschel purported to recount a conversation between Flowers-Carter and an employee at the Braun repair facility on May 18, 2018 during which Flowers-Carter

promised to pick up the minivan from the facility on May 21, 2018.  (*Id.* ¶ 119-20.)  The email stated that Braun's "legal team" had "concerns" over insurance coverage for vehicles left at its facility and thus informed Flowers-Carter that, if she didn't retrieve the minivan by the next day, Braun would move it back to the UA facility.  (*Id.*)

On June 6, 2018, Flowers-Carter went to the Braun facility to have the minivan towed away.  (*Id.* ¶ 126.)  During this visit, she spoke with a Braun representative, Mike Smith ("Smith"), who apologized to her.  (*Id.* ¶ 128.)  Smith did not, however, offer to replace the minivan.  (*Id.* ¶ 129.)

E.    **The Communications Between Plaintiffs' Counsel And Braun's Counsel**

On June 19, 2018, Plaintiffs' counsel sent a representation letter to Braun.  (*Id.* ¶ 130.)

On June 25, 2018, Plaintiffs' counsel sent a letter to Braun demanding a refund.  (*Id.* ¶ 132.)

On July 12, 2018, a Braun in-house attorney, Brad Johnston ("Johnston"), sent a responsive email.  (*Id.* ¶¶ 134-38.)  This email did not accept Plaintiffs' demand for a refund and "did not mention an outstanding replacement offer."  (*Id.*)  Instead, it stated that Braun was referring the matter to an outside attorney, Mike Dolenga ("Dolenga").  (*Id.*)

On July 18, 2018, Dolenga contacted Plaintiffs' counsel for the first time.  (*Id.* ¶ 140.)  In his initial email, Dolenga "did not offer Plaintiffs a replacement or a refund" and "did not reference an outstanding replacement offer."  (*Id.* ¶¶ 142-43.)

On July 23, 2018, Dolenga spoke with Plaintiffs' counsel on the phone.  (*Id.* ¶ 147.)  During this call, Dolenga again "did not offer Plaintiffs a replacement or a refund" and "did not reference an outstanding replacement offer."  (*Id.* ¶¶ 148-49.)

On July 31, 2018, Dolenga had another communication with Plaintiffs' counsel.  (*Id.* ¶ 152.)  During this communication, Dolenga explained that Braun needed to "do some factual and some legal research" before deciding "what kind of counter-offer they want to make."  (*Id.* ¶ 152(e).)  Dolenga did not, once again, "offer Plaintiffs a replacement or a refund" or "reference an outstanding replacement offer."  (*Id.* ¶¶ 153-54.)

On August 7, 2018, Dolenga sent an email to Plaintiffs' counsel.  (*Id.* ¶ 158-63.)  In this email, Dolenga sought more information about the basis for Plaintiffs' settlement demand, which "clearly built in incidental and consequential damages, costs, attorney fees, and treble damages."  (*Id.* ¶ 160.)  This email again "did not offer Plaintiffs a replacement or a refund" and "did not reference an outstanding replacement offer."  (*Id.* ¶¶ 161-62.)

On August 9, 2018, Dolenga sent an email to Plaintiffs' counsel.  (*Id.* ¶ 166-67.)  In this email, Dolenga reported that Braun was "prepared to talk" if Plaintiffs provided "hard numbers."  (*Id.* ¶ 167.)  This email again "did not offer Plaintiffs a replacement or a refund" and "did not reference an outstanding replacement offer."  (*Id.* ¶¶ 168-69.)

On August 10, 2018, Plaintiffs' counsel sent a response email to Dolenga.  (*Id.* ¶ 172.)  This email "clarified the repurchase demand" and also provided an "estimate of a small amount of consequential economic damages incurred at the time."  (*Id.* ¶ 173.)

Later that day, Dolenga responded via email.  (*Id.* ¶ 176.)  In this email, Dolenga stated that he understood Plaintiffs as seeking "an $84,806 buy back, plus $26,000 of unsupported other economic damages" and relayed that Braun was "not comfortable with me putting a precise [counter-offer] number together" in light of Plaintiffs' demand.  (*Id.*)  As with the previous communications, this email "did not offer Plaintiffs a replacement or a refund" and "did not reference an outstanding replacement offer."  (*Id.* ¶¶ 179-80.)

Still on August 10, 2018, Dolenga wrote a second email to Plaintiffs' counsel.  (*Id.* ¶ 182.)  In it, Dolenga stated:

> Braun has authorized me to negotiate a repurchase of Ms. Flowers-Carter's van.  Braun intends to repurchase the van to bring this matter to a conclusion.  Once you provide the precise economic figures, we can determine the appropriate amount to accomplish that.  I realize that you have a different position than Braun about potential non-economic damages, treble damages, and other things, but we can discuss that further next week as well.  At this point, my contacts at Braun want me to make sure it is clear to you and Ms. Flowers-Carter (so please convey this to her) that . . . . Braun has specifically advised me to let you know that it intends to repurchase Ms. Flowers-Carter's van from her.

(*Id.* ¶ 182.)

According to Plaintiffs, Dolenga's second August 10, 2018 did not constitute an actual repurchase offer because "[n]egotiating a repurchase is not an offer" and the email "conditioned negotiations on Plaintiffs' counsel first providing 'precise economic figures' to [Braun]." (*Id.* ¶¶ 187-88.)

On October 2, 2018, Dolenga wrote another email to Plaintiffs' counsel. (*Id.* ¶ 212.) In this email, Dolenga stated that Braun needed additional information "to assess the settlement demand that you made, especially since it is so high and actually well over the purchase price of the vehicle in question." (*Id.*) The email further stated that "Braun intends to repurchase the vehicle from your client but cannot do so without more information . . . , especially the exact numbers that we have talked about so that we can calculate the appropriate repurchase amount." (*Id.*)

Later that day, Plaintiffs' counsel sent a response email to Dolenga that revoked Plaintiffs' earlier offer, announced that Plaintiffs were "filing suit today," and estimated Plaintiffs' damages as $350,000 to $400,000 and "continuing to increase." (*Id.* ¶ 218.)[1]

III.  Procedural Background (Other Than Discovery)

On October 6, 2018, Plaintiffs initiated this action by filing a complaint in Maricopa County Superior Court. (Doc. 1-3 at 8-14.) The complaint alleged a single cause of action (a violation of the AADWA) and asserted claims on behalf of only two Plaintiffs (Flowers-Carter and Carter). (*Id.* at 8.)

On November 5, 2018, Braun removed the action to federal court. (Doc. 1.)

On November 12, 2018, Braun filed a motion to dismiss under Rule 12(b)(6). (Doc. 8.) Braun argued in this motion that it made several replacement offers to Plaintiffs

---

[1] The categories of damages alleged in the complaint include, but are not limited to, (1) the money spent on the minivan and conversion, (2) economic damages arising from missed educational and vocational training opportunities by Flowers-Carter and Flowers, (3) economic damages arising from missed physical, occupational, and speech therapy sessions by Flowers, (4) emotional distress damages and medical bills incurred by Flowers-Carter due to the "stress, aggravation, and inconvenience," (5) reimbursement for Flowers-Carter's lost wages and use of sick leave, and (6) damages arising from an impaired credit score and falling into debt. (Doc. 38 ¶ 204.) The complaint further alleges that, although most of these damages began accruing before August 7, 2018, they "have been exacerbated by [Braun's] conduct since August 7, 2018." (*Id.* ¶¶ 206-08.)

beginning in May 2018, which Plaintiffs ignored "in a bad-faith attempt to fabricate [an] alleged 'violation' of the [AADWA] in order to seek treble damages and attorneys' fees." (*Id.* at 1.)  In support of this claim, Braun provided an affidavit from Smith, who asserted (among other things) that "Braun" offered to replace Plaintiffs' minivan on May 7, 2018 and that "Braun" reiterated this offer on several occasions between May 8, 2018, and June 6, 2018.  (Doc. 8-1 ¶¶ 4-8.)

On December 3, 2018—before responding to the motion to dismiss—Plaintiffs filed an amended complaint.  (Doc. 13.)  In it, Plaintiffs specifically alleged that they made a request for a replacement vehicle on May 1, 2018, which Braun declined to honor.  (*Id.* ¶¶ 33-35, 59.)  Plaintiffs also added a second cause of action—a claim for "common law breach of warranty."  (*Id.* ¶¶ 73-79.)[2]

On December 28, 2018, Braun filed an amended answer.  (Doc. 21.)  Braun also attached several exhibits to its amended answer, including another affidavit from Smith. (Doc. 21-1 at 22-23.)   This version of the Smith affidavit differed from the previous version.  Specifically, although the final paragraph of the old Smith affidavit provided that "[a]t no point during contact with plaintiffs through June 6, 2018, did plaintiffs request that Braun *either repurchase or replace* the subject vehicle" (Doc. 8-1 ¶ 8, emphasis added), the final paragraph of the new Smith affidavit provided that "Plaintiffs' counsel's June 25, 2018 *repurchase* demand correspondence was the first request Braun received from plaintiffs to repurchase the subject van and conversion" (Doc. 21-1 at 23 ¶ 7, emphasis added).  The new version, in other words, didn't deny that Plaintiffs made any *replacement* demands before June 25, 2018—it only contended that Plaintiffs' first *repurchase* demand was made on that date.

On December 28, 2018, Braun filed a motion for judgment on the pleadings.  (Doc. 22.)  In it, Braun again argued that Plaintiffs couldn't prevail on their AADWA claim because the Smith affidavit proved it had made repurchase/replacement offers.  (*Id.* at 8.)

---

[2]      Based on Plaintiffs' submission of an amended complaint, the Court denied, as moot, Braun's motion to dismiss the earlier iteration of the complaint.  (Doc. 14.)

On January 18, 2019, Plaintiffs filed a motion for leave to file a second amendment complaint ("SAC").  (Doc. 29.)  In it, they sought leave to add Flowers as a plaintiff and to refine some of their factual allegations.  (*Id.*)

On March 13, 2019, the Court issued an order denying Braun's motion for judgment on the pleadings and granting Plaintiffs' motion for leave to amend.  (Doc. 37.)  As for Braun's motion, the Court held that (1) the motion was procedurally improper because Braun was seeking to rely on evidence outside the pleadings (the second Smith affidavit), and (2) the motion failed on the merits because the second Smith affidavit established, at most, a "classic dispute of fact" concerning who made (and who failed to respond to) a replacement offer.  (*Id.* at 4-5.)  The Court also noted that the "subtle differences" between Smith's first and second affidavits underscored why Plaintiffs should be able to explore the replacement-offer issue through the discovery process.  (*Id.* at 4 n.3.)  Finally, as for Plaintiffs' motion, the Court held it should be granted because the proposed amendment was not futile and Braun would suffer no unfair prejudice.  (*Id.* at 6-7.)

IV.   Procedural Background (Discovery-Related Disputes)

A.   **The First Discovery Dispute**

On June 5, 2019, the Court held the Rule 16 scheduling conference.  (Doc. 53; Doc. 132 [transcript].)  During this hearing, Plaintiffs' counsel reported that the parties were already embroiled in a "full-blown" discovery dispute concerning "where the evidence is that [Braun] ever made a replacement offer to our client.  They filed an affidavit saying that they did that, but all of the evidence they produced does not support the affidavit. . . . [T]hat's an issue that we need to resolve, the discovery issue of where is this evidence." (Doc. 132 at 12.)  Later, Plaintiffs' counsel reiterated that what this case "comes down to" is "this evidence that they made this replacement offer[.]  It is critical that they produce it. . . .  [W]e keep asking, how did you make the offer and who made the offer?"  (*Id.* at 14.)  Braun's counsel responded by stating that "we've provided [Plaintiffs' counsel with] affidavits, we've provided him with the materials that we have that we were given by our client.  There is no email, we've told him 100 times."  (*Id.* at 23.)  However, Braun's

1   counsel then stated that "it's my belief" that another Braun employee, Haschel, was "at the

2   center of all the communications with plaintiff." (*Id.* at 24.)

3       In reply, Plaintiffs' counsel stated: "I'm going to give the Court what I expect to be

4   advance warning that we're going to be back here with this issue. I've been asking for this

5   stuff about who made this offer for six months. . . . For the first time today I hear it's Elaine

6   Haschel. I won't explain to you how the evidence shows it's not Elaine Haschel, but I'll

7   defer and just wait." (*Id.* at 27.) Plaintiffs' counsel also requested an order specifically

8   compelling Braun to disclose "who communicated these offers and how they were

9   communicated." (*Id.* at 32.) The Court declined to issue such an order because "I prefer

10  not to make specific orders to tell attorneys to do things within ten days. But if that doesn't

11  happen within ten days, I will be quite surprised . . . ." (*Id.*)

12      **B.    The Second Discovery Dispute**

13      On July 22, 2019, Plaintiffs unilaterally filed a four-page notice of discovery

14  dispute. (Doc. 64.) Among other things, Plaintiffs argued that (1) Braun had improperly

15  refused to respond to an interrogatory that sought a summary of all communications in

16  which Smith or Haschel made a replacement/repurchase offer to Plaintiffs and (2) Braun

17  had failed to justify the inclusion of two particular entries on its privilege log. (*Id.*)[3]

18  Plaintiffs' counsel also avowed that they had attempted to work with Braun's counsel to

19  present the discovery dispute in a joint filing, as required by the case management order

20  (Doc. 54 at 4-5), but Braun's counsel had failed to respond to multiple inquiries. (Doc. 64

21  at 4.)[4]

22      On July 24, 2019, the Court held a telephonic hearing. (Doc. 68; Doc. 133

23  [transcript].) As for the first issue, Braun's counsel avowed that there were six dates during

24  the relevant timeframe on which a Braun representative conveyed a replacement offer, or

25  otherwise discussed the possibility of a replacement, with Plaintiffs. (*Id.* at 10-14.)

26  ———————————

27  [3]     The notice identified an array of additional disputed discovery issues, but it is
    unnecessary to summarize those issues here because they do not bear on the issues raised
    in Plaintiffs' pending motion.

28  [4]     Braun filed a response that disputed whether Plaintiffs had provided an adequate
    chance to present the discovery dispute as a joint filing. (Doc. 66.)

- 11 -

Counsel identified those communications as follows:

▪ <u>May 1, 2018</u>: "Haschel[] . . . spoke with . . . Flowers-Carter via telephone and discussed Braun's warranty repairs to the subject conversion and possible replacement of the subject van and conversion."

▪ <u>May 4, 2018</u>: No summary provided (but presumably referring to Haschel's May 4, 2018 email to and phone call with Flowers-Carter, which are addressed in the complaint).

▪ <u>May 7, 2018</u>: "Braun contacted plaintiffs on May 7th and offered to replace the subject van and conversion with a new one."

▪ <u>May 8, 2018</u>: "Braun again tried to contact plaintiffs to discuss replacing the subject van and conversion, but again received no response."

▪ <u>May 21, 2018</u>: "Braun spoke with . . . Flowers-Carter in person and asked whether she had responded regarding Braun's offer to replace the subject van and conversion with a new one. . . .  Flowers-Carter said she had not and would not."

▪ <u>June 6, 2018</u>: "Braun spoke with [Flowers-Carter] in person and again asked whether she responded regarding Braun's offer to replace the subject van."

(*Id.*)   Counsel further clarified that, although Smith's affidavit generically referred to "Braun" as providing some of these communications, the speaker on May 7 and May 8 was Haschel.  (*Id.* at 14 ["[T]he Braun employee who communicated with plaintiffs were Elaine Haschel.  Because that point wasn't clear in Mike Smith's affidavit, and I acknowledge that.  We since clarified that."].)

Given this explanation, the Court declined to require Braun to supplement its response to the interrogatory.   (*Id.* at 18-19.)   Specifically, although the Court acknowledged that Plaintiffs had identified colorable reasons to be skeptical of Braun's position that Haschel had conveyed an oral replacement offer to Flowers-Carter on May 7 or 8, 2018,[5] Braun had adequately described its position through its affidavits and MIDP

---

[5]      Among other things, Plaintiffs' counsel pointed out that (1) although Haschel had submitted an affidavit at the start of the case (Doc. 21-1 at 16-17), her affidavit did not mention any discussions occurring after May 4, 2018, and (2) Braun had not produced any documentary evidence referring to a replacement offer made by Haschel on May 7 or 8,

responses.  (*Id.* at 19.)

As for the second issue—the privilege log—Braun argued that the challenged entries were clearly privileged because they involved "conversations with attorneys, they're people within the legal department with respect to legal strategy," that Braun had gone "above and beyond" the usual privilege-log rules by disclosing the subject line of each email, and that requiring any additional disclosure would delve into the substance of the emails.  (*Id.* at 33-34.)  The Court agreed and declined to require Braun to proffer any additional information in support of its decision to withhold the two documents based on the attorney-client privilege.  (*Id.* at 44-45.)

C.     **The Third Discovery Dispute**

On October 16, 2019, the parties filed a joint notice of discovery dispute.  (Doc. 84.) As with the previous notice, this notice exceeded the two-page limit specified in the Court's case management order.  (Doc. 54 at 4-5.)  Additionally, it again reflected disagreement between the parties as to the adequacy of Plaintiffs' meet-and-confer efforts.  Accordingly, the Court issued an order that set the matter for an in-person hearing but also ordered the parties' respective counsel to report to the courtroom one hour before the hearing to meet-and-confer in person.  (Doc. 86.)

On October 23, 2019, the hearing took place.  (Doc. 90; Doc. 134 [transcript].)  One of the issues that was addressed during the hearing concerned the applicability of the attorney-client privilege to Dolenga's communications with Braun.  Braun's counsel stated that "[t]he principal issue in this case is whether or not a repurchase offer was extended," Dolenga was a key fact witness because he "extended an offer prelitigation" to Plaintiffs' counsel, Dolenga had already signed an affidavit summarizing his settlement-related communications with Plaintiffs' counsel, and Braun wished to have Dolenga testify (and be deposed) on the "limited" issue of his involvement in the conveyance of the settlement offer.  (*Id.* at 9-11.)  Braun's counsel argued that, if Dolenga's testimony were limited in this fashion, there would be no need to delve into Dolenga's privileged communications

_____

2018.  (Doc. 133 at 16-17.)

with Braun.  (*Id.*)  Plaintiffs' counsel disagreed, arguing that because Dolenga had stated at one point during the settlement negotiations that he lacked authority to convey a settlement offer, he had placed at issue the substance of his underlying communications with Braun (and thus waived the privilege as to those communications).  (*Id.* at 14-15.)

The Court largely rejected Plaintiffs' argument concerning the waiver issue, concluding that "[t]o the extent there was some theoretical meeting where Mr. Dolenga was in a meeting with his clients within the Braun Corporation when they were formulating a settlement strategy and deciding what to do, it would not be okay to ask questions about those private meetings between an attorney and the attorney's clients and what was communicated between the two of them."  (*Id.* at 17.)  Notably, Plaintiffs' counsel seemed to agree with this statement: "[T]he way that you've explained it makes sense."  (*Id.*)  Nevertheless, the Court informed the parties that, if a privilege-related dispute arose during Dolenga's deposition, they were free to call the Court, mid-deposition, for a ruling.  (*Id.* at 17-18.)

During the hearing, the parties also raised concerns related to a Rule 45 subpoena that Plaintiffs had issued to UA.  (*Id.* at 18-20.)  Plaintiffs' counsel explained that the subpoena called for the production of various communications between UA and Braun concerning UA's attempt to repair Plaintiffs' vehicle, but when Braun learned about the subpoena, it instructed UA not to produce the communications.  (*Id.* at 19-20.)  In response, Braun's counsel argued that the communications were not actually responsive to the subpoena and were, in any event, immune from production pursuant to the "common interest privilege."  (*Id.* at 20-21.)  Braun's counsel further stated that "we're happy to put those in a common privilege log and even have you review them *in camera*.  They're not exciting.  They're really about the coordination of what . . . documents that [UA] could produce of Braun's with or without a protective order."  (*Id.*)  Plaintiffs' counsel, in turn, disputed the applicability of the common interest doctrine and stated that Braun's belated invocation of that doctrine was "part of a larger problem" concerning the adequacy of Braun's disclosures.  (*Id.* at 21-26.)

After additional discussion, Braun's counsel stated that, although Braun had already conducted a diligent search for relevant documents, "[i]f the Court would like us to go back and ask again, I can do that." (*Id.* at 32.) The Court agreed that this approach made sense: "I would like you to do that, just because it seems to me that there are unresolved issues in this case about the adequacy of your investigation." (*Id.* at 32-33.) Thus, the Court ruled as follows:

> Defendants have said they're going to go back to their client, take another run at things, try to ensure that they didn't miss anything the first time around. After they've done that, the two parties need to meet and confer. If the plaintiffs are still dissatisfied with the scope of the investigation at that point, I think we've reached the point of diminishing returns on these joint discovery dispute letters . . . . So in the future if you feel like you're still not getting everything to which you're entitled, the plaintiffs can file a motion to compel and then we can have that fully briefed.

(*Id.* at 34.) The Court also clarified that this procedure would apply to the dispute over the common interest doctrine: "[T]hat includes this common interest privilege issue. . . . [The parties] should keep talking about that, but ultimately if [Plaintiffs] think that [Braun's] privilege theory lacks merit, then [Plaintiffs] can file a motion and explain why that is." (*Id.* at 35-36.)

### D.   **The Fourth Discovery Dispute**

On December 5, 2019, Braun filed a motion for an expedited ruling concerning another discovery dispute. (Doc. 102.) The motion explained that, although one of the disputed issues in the case had been whether Plaintiffs' minivan was "defective" (which is one of the elements of a claim under the AADWA), Braun had recently decided to concede that issue. (*Id.* at 1.) Thus, Braun sought a ruling that Plaintiffs were not entitled to conduct any additional "discovery intended to establish the existence of a defect or nonconformity," because that issue was now "undisputed," and that any further discovery should be limited to the circumstances surrounding the replacement/repurchase offer. (*Id.* at 2-7.)

On December 19, 2019, Plaintiffs filed a response. (Doc. 108.) Among other things, they argued they were still entitled to pursue vehicle-related discovery because it was

relevant to their claim for damages: "The earlier [Braun] knew the Conversion was defective, the efforts [Braun] took to work on the Conversion, and the severity of the defects are all relevant to Plaintiffs' claim for damages, potentially even treble damages." (*Id.* at 5-6.) Plaintiffs added: "[I]n June of 2018, [Braun] issued a special campaign to repair door defects within Pacifica conversions like Plaintiffs'. Notably, [Braun] only turned over this campaign in response to the Court's last order compelling it to 'look again' for evidence it was required to disclose. . . . If [Braun] learned its Pacifica Conversions had incurable defects, but still sold the Conversion to Plaintiffs, or failed to immediately repurchase it upon such problem arising, treble damages are all the more justified." (*Id.* at 6.)[6]

On January 6, 2020, the Court held a hearing on Braun's motion. (Doc. 120; Doc. 135 [transcript].) During the hearing, the Court noted that, although there did not appear to be any Arizona case law addressing which factors a court should consider when deciding whether to award treble damages under the AADWA, the case law construing analogous Arizona statutes suggested that evidence bearing on Braun's mindset and knowledge of the defect would potentially be relevant. (*Id.* at 6-8.) Plaintiffs' counsel agreed, arguing that California courts construing analogous statutes have emphasized the need for broad discovery concerning the defendant's knowledge and mindset. (*Id.* at 18-20.) After additional (and sometimes heated) back-and-forth between the parties' counsel over an array of issues, the Court ruled that, to the extent Braun's motion was seeking "a categorical ruling that any discovery related to . . . defect should be forbidden because that issue was no longer relevant in light of Braun's admissions," the motion was denied because the requested information might be relevant to Plaintiffs' claim for treble damages. (*Id.* at 32-34.)

…

---

[6]  Plaintiffs also argued that they needed to pursue vehicle-related discovery, despite Braun's "defect" admission, because Braun was still disputing a different element of their AADWA claim—whether they afforded Braun a "reasonable opportunity" to repair the defect. (Doc. 108 at 4-5.) In its reply, Braun conceded that it was not disputing that element, either. (Doc. 109 at 1-2.) Afterward, Plaintiffs sought (Doc. 113) and obtained (Doc. 120) permission to file a sur-reply (Doc. 121).

1

### E.    **The Fifth Discovery Dispute**

On February 6, 2020, Plaintiffs unilaterally filed a four-page notice of discovery dispute.  (Doc. 124.)  It concerned Plaintiffs' upcoming Rule 30(b)(6) deposition of Braun and Braun's objections to some of the noticed topics.  (*Id.*)

On February 10, 2020, the Court issued an order explaining that, because Plaintiffs had once again failed to comply with the page-limit and meet-and-confer requirements set forth in the case management order, it would take no action on Plaintiffs' filing.  (Doc. 124.)  The order added: "Plaintiffs are free to re-file a new notice of discovery dispute that complies with the Court's procedural requirements if, after further meet-and-confer efforts, there remains a dispute that requires court intervention."  (*Id.*)

### F.    **The Sixth Discovery Dispute**

After several extensions, the Court had set March 2, 2020 as the deadline for the completion of fact discovery.  (Doc. 90.)  On March 2, 2020, Plaintiffs filed a motion to extend the fact-discovery deadline, as well as several other deadlines.   (Doc. 130.)  Plaintiffs argued an extension was necessary because, among other things, (1) during two recent depositions of Braun witnesses (Haschel and Braun's 30(b)(6) designee), the witnesses had provided testimony that "contradicted prior testimony and discovery on several issues including those related to the circumstances surrounding Defendant's alleged 'replacement offer' to Plaintiff," and (2) Plaintiffs were currently embroiled in subpoena-compliance litigation in the Eastern District of Michigan concerning a subpoena they had issued to Dolenga following his deposition.  (*Id.* at 2-4.)

On March 11, 2020, Braun filed a response.  (Doc. 139.)  Among other things, it accused Plaintiffs of misrepresenting the parties' negotiations and asked the Court to order Plaintiffs to respond to one of Braun's discovery requests, which concerned the amount of attorneys' fees Plaintiffs had incurred in this case.  (*Id.*)

On March 17, 2020, the Court issued an order that granted Plaintiffs' motion in part and denied it in part.  (Doc. 142.)  The order began by noting that "[t]he discovery process in this case has been unusually contentious.  The parties have repeatedly sought judicial

1    intervention to resolve discovery-related disputes and the parties' filings are replete with
2    name-calling and accusations.  Neither side has covered itself in glory." (*Id.* at 1.)  As for
3    Braun's request to compel Plaintiffs to produce fee-related information, the Court denied
4    it on timeliness grounds (while acknowledging that the information was not privileged).
5    (*Id.* at 3.)  As for the discovery deadline, the Court concluded it should be bilaterally
6    extended to May 29, 2020.  (*Id.* at 3-4.)  Finally, as for Plaintiffs' request for an extension
7    of time to file a motion to compel, the Court granted it "with some reservations" and set a
8    new deadline of April 1, 2020.  (*Id.* at 4-5.)

9          G.    **The Pending Discovery Dispute**

10          On April 1, 2019, Plaintiffs filed their motion to compel and for sanctions.  (Doc.
11    143.)  They subsequently filed an amended version of the motion.  (Doc. 157.)[7]

12          On April 15, 2020, Braun filed a response.  (Doc. 154.)

13          On April 24, 2020, Plaintiffs filed a reply.  (Doc. 164.)

14                                    **ANALYSIS**

15    I.    Motion To Compel

16          A.    **Meet-And-Confer Certification**

17          Plaintiffs ask the Court to compel Braun to produce six categories of discovery
18    material.  (Doc. 157 at 1-14.)  In response, Braun argues the motion to compel "should be
19    denied in its entirety" because it does not contain the required certification verifying that
20    Plaintiffs' counsel met and conferred with Braun's counsel before filing.  (Doc. 154 at 2-
21    6.)  Braun contends this failure was particularly prejudicial because it was able, in the days
22    following receipt of Plaintiffs' motion, to locate and produce some of the items at issue
23    and to obtain additional information explaining why other items are non-discoverable.  (*Id.*)
24    Finally, Braun argues that the 22-page "LRCiv 37.1 Statement" enclosed as an exhibit to
25    Plaintiffs' motion should be disregarded because it does not certify the existence of any
26    meet-and-confer efforts, fails to include Braun's as-served responses to the discovery
27    requests at issue, and includes arguments concerning additional discovery issues that aren't

28    _____
[7]       The amended motion contains some redactions.  (Doc. 160.)  The unredacted, sealed
version of the amended motion appears at Doc. 145.

1   even mentioned in the motion to compel.  (*Id.* at 3-5.)  In their reply, Plaintiffs contend that

2   (1) the Court previously gave them permission to file a motion to compel without the need

3   for further meeting and conferring and (2) any further efforts to meet and confer would

4   have been futile, given Braun's track record in this case.  (Doc. 164 at 1-3.)

5        Braun is correct that Plaintiffs have not complied with the procedural requirements

6   governing motions to compel.  Rule 37(a)(1) of the Federal Rules of Civil Procedure

7   provides that a motion to compel "*must* include a certification that the movant has in good

8   faith conferred or attempted to confer with the person or party failing to make disclosure

9   or discovery in an effort to obtain it without court action."  *Id.* (emphasis added).  Similarly,

10  Local Rule 7.2(j) provides that "[n]o discovery motion will be considered or decided unless

11  a statement of moving counsel is attached thereto certifying that after personal consultation

12  and sincere efforts to do so, counsel have been unable to satisfactorily resolve the matter."

13       Here, Plaintiffs have not provided such a certification.  The "LRCiv 37.1 Statement"

14  filed as an attachment to their motion (Doc. 157-20 at 1-22) only summarizes the substance

15  of the disputed discovery requests—it does not address whether Plaintiffs' counsel

16  attempted to confer with Braun's counsel in an effort to resolve those disputes.  Thus,

17  Plaintiffs' motion is deficient under Rule 37(a)(1) and LRCiv 7.2(j).

18       Plaintiffs are also incorrect that the Court, during the October 23, 2019 discovery

19  hearing, somehow excused them from any future meet-and-confer obligations.  During that

20  hearing, the Court held that if Plaintiffs remained dissatisfied after Braun's follow-up

21  investigation, "*the two parties need to meet and confer*" and "[i]f the plaintiffs are *still*

22  dissatisfied with the scope of the investigation at that point, I think we've reached the point

23  of diminishing returns on these joint discovery dispute letters in this case" so "the plaintiffs

24  can file a motion to compel."  (Doc. 134 at 34, emphases added.)  Similarly, with respect

25  to the dispute over Braun's invocation of the common interest doctrine, the Court stated

26  that the parties "*should keep talking about that*, but ultimately if [Plaintiffs] think that

27  [Braun's] privilege theory lacks merit, then [Plaintiffs] can file a motion and explain why

28  that is."  (*Id.* at 35-36.)  As the italicized language makes clear, the Court explicitly

1    instructed the parties to continue engaging in the meet-and-confer process and simply held

2    that, if those meet-and-confer efforts proved unsuccessful, Plaintiffs could present the

3    dispute in one particular format (a formal motion to compel) instead of a different format

4    (a joint discovery letter).

5         Those statements also need to be viewed in the broader context of this case.  The

6    October 23, 2019 hearing was preceded by Plaintiffs' filing of a deficient discovery-dispute

7    notice that suggested the parties had failed to adequately meet and confer before seeking

8    judicial intervention.  As a result, the Court took the somewhat unusual step of ordering

9    the parties to meet in the courtroom an hour before the hearing (so they would be forced to

10   talk to each other face-to-face).  Moreover, in February 2020—several months after the

11   October 23, 2019 hearing, and less than two months before Plaintiffs filed the motion to

12   compel—the Court denied a different discovery-related request filed by Plaintiffs due to

13   their failure to comply with the applicable meet-and-confer requirements.  (Doc. 125.)

14        For these reasons, Plaintiffs' motion likely could be denied outright.  *See, e.g.,*

15   *Lathan v. Ducart*, 2017 WL 4457198, *1 (9th Cir. 2017) ("The district court did not abuse

16   its discretion by denying [plaintiff's] motion to compel discovery because [plaintiff] failed

17   to meet and confer with defendants."); *Sandpiper Resorts Dev. Corp. v. Global Realty Inv.*,

18   2012 WL 2009965, *1 (D. Ariz. 2012) (denying motion to compel for failure to meet and

19   confer).  A blanket denial would be particularly justifiable in this case given the tremendous

20   amount of judicial resources that have been expended on discovery disputes and the

21   multiple prior reminders, to both parties, to continue meeting and conferring.

22        Nevertheless, it is possible that Plaintiffs may have, in good faith, misunderstood

23   the instructions provided during the October 23, 2019 hearing.  Additionally, it's clear that

24   at least some of the issues raised in the motion to compel have been the subject of earlier

25   meet-and-confer efforts, given that they were discussed (but not definitively resolved)

26   during earlier discovery hearings.  Accordingly, the Court will exercise its discretion to

27   overlook Plaintiffs' non-compliance with Rule 37(a)(1) and LRCiv 7.2(j) as to some, but

28   not all, of the discovery disputes at issue.

As noted, Plaintiffs' motion to compel encompasses six categories of documents: (1) 22 internal Braun emails that Braun withheld pursuant to the work-product doctrine (Doc. 157 at 2-6), (2) 17 communications between Braun and UA that Braun withheld pursuant to the common interest doctrine (*id.* at 6-8), (3) an unspecified number of communications, primarily involving Dolenga, that Braun withheld pursuant to the attorney-client privilege (*id.* at 8-12), (4) Braun's "legal file" (*id.* at 11-12), (5) Braun's "Epicor" file (*id.* at 12-13), and (6) documents related to the Pacifica "Health Check" campaign (*id.* at 13-14).   The Court is satisfied that the parties previously met-and-conferred concerning two of those topics: (1) the application of the common interest doctrine to Braun's communications with UA, and (2) the application of the attorney-client privilege to Braun's communications with Dolenga (both of which were discussed during the October 23, 2019 hearing).   In contrast, Plaintiffs have not demonstrated that they exhausted the meet-and-confer process concerning the work-product doctrine, the legal file, the Epicor file, or the Pacifica "Health Check" campaign.[8]   Thus, the Court will only consider, on the merits, Plaintiffs' arguments concerning the common interest doctrine and Dolenga.

## B.    **Common Interest Doctrine**

On August 9, 2019, Plaintiffs issued a Rule 45 subpoena to UA that sought, among other things, documents associated with the dealer agreement between UA and Braun. (Doc. 154 at 15; Doc. 157 at 6.)   In response, a UA representative notified Plaintiffs' counsel that "Braun[] advises us that the information contained in the materials is highly confidential, and that they will permit [UA] to produce it only after entry of an adequate protective order."  (Doc. 157-4 at 2.)   That same day, Braun's counsel sent an email to Plaintiffs' counsel that conveyed the same message—although UA intended to produce the documents at issue, they could only be produced pursuant to a protective order because

---

[8]    Braun states in its response that, upon receipt of Plaintiffs' motion, it disclosed the Epicor file and provided an affidavit from its in-house counsel explaining why the "legal file" is privileged. (Doc. 154 at 3.)   Braun further states that, as to the Pacifica "Health Check" campaign, it already disclosed the documents at issue and "[w]hat addition[al] or different documentation Plaintiffs contend exists is not clear—because they failed to meet and confer."  (*Id.* at 7.)

they "contain highly sensitive, confidential information including financial and sales information." (Doc. 157-5 at 2.) The parties later stipulated to the entry of a protective order (Docs. 83, 87), and it appears the underlying documents were ultimately produced by UA pursuant to that order.

The pending dispute concerns a series of 17 emails that Braun's attorneys (both in-house counsel and outside counsel) exchanged with three non-attorney UA employees (Rich Venhaus, Kent Powers, and John Beering) between August 14, 2019 and September 25, 2019. (Doc. 157-6 at 2-7.) During the discovery process, Braun refused to produce those emails, arguing they were protected from disclosure under the common interest doctrine. (*Id.*) In their motion to compel, Plaintiffs argue the common interest doctrine is inapplicable because (1) it is not an independent privilege, but merely allows parties with a common interest to share communications that are privileged for other reasons, and here Braun "did not even assert an attorney-client or work product privilege for sixteen of the seventeen entries listed on its privilege log," and (2) Braun and UA could not, in any event, share a "common legal interest" because UA is a non-party that has never faced any liability in this case. (Doc. 157 at 6-8.) In response, Braun argues that Plaintiffs' first argument is unavailing because it conflates the common interest doctrine and the joint-defense privilege. (Doc. 154 at 14-15.) As for Plaintiffs' second argument, Braun argues that it "unquestionably shared a common legal interest" with UA for two reasons: first, because "UA was a potential defendant in this matter [due to] its repair work on the subject conversion," and second, "[b]ecause UA's failure to respond to the Subpoena could lead to legal action against both Braun or UA." (*Id.* at 15-16.) In their reply, Plaintiffs argue that UA couldn't have faced liability for the unsuccessful repair attempts (because the statute of limitations had expired), that there was no need for UA and Braun to formulate a joint strategy for how to respond to the subpoena (if Braun found it improper, it could have simply objected under Rule 45), and that the common interest doctrine cannot, in any event, apply here because the UA employees at issue were unrepresented non-attorneys. (Doc. 164 at 9-10.)

Braun has not met its burden of demonstrating that the common interest doctrine is applicable here, so Plaintiffs' motion to compel as to the UA-Braun emails will be granted. In *Ariz. Independent Redistricting Comm'n v. Fields*, 75 P.3d 1088 (Ariz. Ct. App. 2003), the court "look[ed] to the Restatement (Third) of Law Governing Lawyers" to define the contours of the common interest doctrine.  *Id.* at 1099-1100.  The court noted that, under § 76(1) of the Restatement, "[i]f two or more clients with a common interest in a litigated or nonlitigated matter *are represented by separate lawyers* and they agree to exchange information concerning the matter, a communication of any such client that otherwise qualifies as privileged [as attorney-client communications] that relates to the matter is privileged as against third persons."  *Id.* (emphasis added).  The court emphasized that "[t]he purpose of the common interest doctrine is to permit persons with common interests to share privileged attorney-client and work-product communications in order to coordinate their respective positions without destroying the privilege."  *Id.* at 1100.  Thus, "[e]xchanged communications subject to the common interest doctrine must themselves be privileged as well as related to the parties' common interest."  *Id.* (citation omitted). Additionally, the doctrine must be construed "narrowly."  *Id.*

Given these principles, it's unnecessary to decide whether Braun and UA shared a common interest in the underlying litigation (or in the subpoena-compliance issue) that might otherwise be sufficient to trigger the common interest doctrine.  Braun's reliance on the doctrine fails for the threshold reason that it has not demonstrated that the UA representatives with whom its lawyers were communicating were themselves lawyers or represented by lawyers at the time of the communication.  As noted, this is a prerequisite to the application of the doctrine.  *Fields*, 75 P.3d at 1100 (both clients must be "represented by separate lawyers") (citation omitted).  Indeed, comment (d) to Section 76 of the Restatement expressly provides that "[a] person who is not represented by a lawyer and who is not himself or herself a lawyer cannot participate in a common-interest arrangement."  *Id.  See generally Regents of Univ. of Cal. v. Affymetrix, Inc.*, 2018 WL 4896066, *3-5 (S.D. Cal. 2018) (rejecting invocation of common interest doctrine because

proponent failed to demonstrate that each party to the communication was represented by counsel, noting that "several district courts within the Ninth Circuit have expressly held that the common interest privilege only applies when clients are represented by separate counsel," and further noting that the proponent had "fail[ed] to identify any decision where the Ninth Circuit or a district court within the Ninth Circuit found the common interest privilege applicable even though one of the parties to the agreement was not represented by counsel") (quotation omitted); *State Farm Mut. Auto. Ins. Co. v. Hawkins*, 2010 WL 2287454, *7 (E.D. Mich. 2010) ("[T]he common interest exception should not apply to unrepresented parties.").[9]

### C.   Dolenga Communications

As noted, Braun engaged an outside attorney, Dolenga, to represent it during settlement negotiations with Plaintiffs' counsel.  Because Plaintiffs' AADWA claim turns in part on when (or whether) Braun made an effective offer to replace or repurchase Plaintiffs' defective minivan, Dolenga may end up serving as an important fact witness in this case.

Braun's privilege log identifies an array of its communications with Dolenga (Doc. 157-7 at 2-5), and Braun invoked the attorney-client privilege during the discovery process as its basis for refusing to produce those communications.  Plaintiffs now move to compel the production of the Dolenga communications, arguing that (1) Braun waived the privilege by placing Dolenga's conduct and intent at issue, (2) Dolenga engaged in "apparent duplicity" during his deposition by providing "equivocal and contradictory" testimony, which heightens Plaintiffs' need to view his emails, and (3) Dolenga's emails merely reveal

---

[9]      The Court recognizes that it is possible (and perhaps even likely) that UA may have been represented by separate counsel with respect to the subpoena compliance communications.   Nevertheless, Braun has not submitted any *evidence* of such representation—the email from one UA employee (Venhaus) identifies him as a "Director of Store Operations," which is a non-legal position, and doesn't refer to the existence of any UA lawyers (Doc. 157-4 at 2); the email from Braun's outside counsel likewise does not refer to any UA lawyers (Doc. 157-5 at 2); and although Braun's "Common Interest Privilege Log" identifies two other UA representatives (Powers and Beering) who were parties to the communications at issue, it does not identify them as attorneys, even as it conspicuously identifies each of the Braun participants as attorneys (Doc. 157-6 at 2-7). As the proponent of the privilege claim, it was Braun's burden to substantiate it.

his "contemporaneous recitation of disputed facts like when [Braun] provided Dolenga with authority" to make a repurchase offer, and "the attorney-client privilege does not shield facts."  (Doc. 157 at 8-11.)[10]  Braun disagrees, arguing that each of Plaintiffs' arguments is unavailing and that the Court already "adjudicated" the sufficiency of its privilege log during an earlier discovery hearing, so Plaintiffs are effectively (and improperly) seeking reconsideration of that ruling.  (Doc. 154 at 7-10.)

Plaintiffs' motion to compel as to the Dolenga emails will be denied.  As a threshold matter, Braun is incorrect that Plaintiffs' current arguments are foreclosed by the Court's earlier ruling.  During the July 24, 2019 hearing, the Court merely held that Braun's privilege log wasn't facially deficient under Rule 26 because it contained an adequate amount of information concerning the identity of the participants and the general subject matter of the withheld communications.

Nevertheless, on the merits, this is not a close call.  As for Plaintiffs' first argument, it is true that "[t]he privilege which protects attorney-client communications may not be used both as a sword and a shield.  Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (citation omitted). But here, Braun is not attempting to use the privilege as both a sword and shield.  As Braun correctly states in its response, "whether Braun offered or attempted to repurchase the subject van and conversion can only be resolved based on the communications between Braun's representatives and Plaintiffs' representatives.  Privileged emails between Braun and its counsel have nothing to do with whether Braun, through Mr. Dolenga, manifested its willingness to repurchase the vehicle."  (Doc. 154 at 8-9.)

Plaintiffs' second argument—that they have a heightened need to inspect Dolenga's emails in light of his shifting deposition testimony—fares no better.  Although "substantial need" may be a basis for overcoming the work-product doctrine, it is not a basis for piercing

---

[10]    Plaintiffs also challenge Braun's invocation of the attorney-client privilege to withhold "several emails listed on Defendant's privilege log between Haschel, Smith, and Nelson" (Doc. 157 at 11), but as discussed above, Plaintiffs forfeited the right to move to compel as to those emails by failing to meet and confer.

the attorney-client privilege.  *Admiral Ins. Co. v. U.S. Dist. Ct.*, 881 F.2d 1486, 1494-95 (9th Cir. 1989).

Plaintiffs' final argument also lacks merit.  Although it is true that, under Arizona law, the attorney-client privilege does not shield the disclosure of "facts solely because they have been communicated to an attorney," *see* A.R.S. § 12-2234(C), Braun has certified, through its placement of each disputed email on the privilege log, that the emails aren't limited to mere facts and instead include privileged communications.  *See* Fed. R. Civ. P. 26(b)(5)(A).  Plaintiffs' apparent belief that Braun's placement of the emails on the privilege log was incorrect, because the emails only discuss non-privileged facts, is pure speculation and thus doesn't trigger the need for further judicial intervention.  *In re Grand Jury Investigation*, 974 F.2d 1068, 1074-75 (9th Cir. 1992) (a party opposing a privilege claim must provide "a factual basis sufficient to support a reasonable, good faith belief that *in camera* inspection may reveal evidence that information in the materials is not privileged").  *Cf. King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 721 (5th Cir. 2011) ("[T]he privilege log . . . . describes communications between client and attorney for the purpose of obtaining legal advice. . . .  In rebuttal, King has offered only speculation that the e-mails are not covered by privilege because they were made for a purpose other than obtaining legal advice.  In such a situation, the district court did not err in declining to engage in a full *in camera* review of the challenged e-mails.").

II.   <u>Motion For Sanctions</u>

In the final portion of their motion, Plaintiffs seek the imposition of sanctions under Rule 37(b)(2)(A).  (Doc. 157 at 14-17.)  Plaintiffs contend that, although they "have been seeking full disclosure regarding the replacement offer that [Braun] alleges Haschel made since they first learned of this defense," Braun has responded by providing a series of ever-changing disclosures.  (*Id.*)  Specifically, Plaintiffs note that Braun stated on multiple occasions during the early stages of the case that Haschel made an *explicit* replacement offer to Flowers-Carter in early May 2018, yet Haschel ultimately testified during her deposition that she merely left a voicemail for Flowers-Carter stating that Braun was

"willing to do whatever we can to make the situation right."  (*Id.*)  In a related vein, Plaintiffs note that Braun stated in its earlier MIDP disclosures that Haschel had received authority to repurchase Plaintiffs' vehicle from a particular Braun official (Rick Nelson), yet Nelson testified during his deposition that he had not provided such authorization.  (*Id.*)  Additionally, Haschel stated during her deposition that she met with two different Braun officials (Brad Johnston and Kevin McMahon) in an effort to obtain repurchase authorization, yet neither of those officials has ever been disclosed by Braun as a witness.  Plaintiffs argue that "[Braun's] continuing uncertainty and equivocation on this critical issue is tantamount to non-disclosure.  The Court should therefore bar testimony as to [Braun's] alleged replacement offer because [Braun] has yet to present the full circumstances."  (*Id.* at 17.)  "In the alternative," Plaintiffs argue that Braun "should be ordered to produce Johnston, McMahon and a 30(b)(6) witness on the unanswered topics for depositions, and at its cost."  (*Id.* at 18.)

In its response, Braun construes Plaintiffs' request for sanctions as being predicated on Braun's untimely production of documents.  (Doc. 154 at 16 [characterizing Plaintiffs' motion as premised on the belief "they are entitled to sanctions because they wanted to receive certain documents they now admittedly have, earlier"]; *id.* ["Plaintiffs now ask this Court to sanction Braun for following the Court's decisions, and providing the additional discovery ordered."].)  Braun contends that it "cannot fairly be sanctioned" for the timing of these disclosures because it initially concluded, "in good faith," that Rule 26's limitations on "proportionality justified limited discovery in this matter" and that it promptly provided additional discovery once the Court provided more guidance concerning proportionality.  (*Id.* at 16-17.)  Braun also contends that Plaintiffs' request for sanctions is untimely because Plaintiffs "waited until the last possible moment of the Court's extension to file this Motion."  (*Id.* at 17.)

Plaintiffs' motion for sanctions will be granted in part and denied in part.  On the one hand, Braun's arguments are unhelpful.  Plaintiffs are not, as Braun suggests, seeking sanctions simply due to the late *timing* of Braun's disclosures.  Rather, Plaintiffs are

1   seeking sanctions because Braun *misled* them during the discovery process about two

2   important issues: (1) whether Haschel made an explicit replacement offer to Flowers-Carter

3   on May 7-8, 2018, and (2) who within Braun authorized Haschel to make that offer.

4   Although parties can and often do reach good-faith disagreements about whether a

5   particular discovery request is proportional under Rule 26, this dispute has nothing to do

6   with proportionality. Rather, it concerns the accuracy of Braun's initial disclosures.

7        Nor is Plaintiffs' motion untimely. It is predicated on new information that came to

8   light during Nelson's deposition on February 12, 2020 and Haschel's deposition on

9   February 13, 2020. Plaintiffs filed their motion a few weeks later, in compliance with the

10  deadline set by the Court. This was timely.

11       On the other hand, although Plaintiffs seek to portray Haschel's deposition as a

12  bombshell in which she contradicted Braun's earlier disclosures in this case, the materials

13  submitted in support of Plaintiffs' motion do not support this conclusion. Although Braun

14  has repeatedly avowed (in affidavits, MIDP disclosures, interrogatory responses, and court

15  proceedings) that Haschel made an express replacement offer to Flowers-Carter during a

16  communication on May 7 and/or 8, 2018,[11] the deposition excerpts attached to Plaintiffs'

17  motion don't necessary refute this point. The excerpts reflect that, when Haschel was asked

18  about the voicemail she left for Flowers-Carter on *May 8*, 2018, she testified that she did

19  not explicitly say "We're willing to replace the vehicle" and instead said that "we're willing

20

---

21  [11]   *See, e.g.,* Doc. 21-1 at 22-23 ¶¶ 3-4 (Smith affidavit, dated December 20, 2018:
    "Braun contacted plaintiffs on May 7, 2018 and offered to replace the subject van and
22  conversion with a new one. Plaintiffs failed to respond. The following day on May 8,
    2018, Braun again tried to contact plaintiffs to discuss replacing the van and conversion,
23  but again received no response."); Doc. 157-20 at 93 (Braun's third supplemental MIDP
    disclosure, dated June 24, 2019: "Braun has, for several months, attempted to replace and
24  later repurchase the subject assistive device. The Braun employee who communicated with
    Plaintiffs was Elaine Haschel . . . . Plaintiffs, however, repeatedly refused to respond to
25  Ms. Haschel, preventing any replacement from taking place."); Doc. 157-15 at 2 (Braun's
    counsel's email to Plaintiffs' counsel, dated July 2, 2019: "The supplemental MIDP does
26  in fact verify that Ms. Haschel made calls during which an offer was communicated");
    Doc. 133 at 13 (Braun's counsel's statement during July 24, 2019 discovery hearing:
27  "Braun contacted plaintiffs on May 7th and offered to replace the subject van and
    conversion with a new one, period"); Doc. 157-16 at 3 (Braun's interrogatory response,
28  dated September 9, 2019: "Elaine Haschel left messages for . . . Flowers-Carter on May 7
    and May 8, 2018 . . . conveying that Braun would do whatever it took to replace the
    vehicle").

to do whatever we can to make the situation right." (Doc. 157-10 at 9 [deposition transcript page 65, lines 9-14].)   Conspicuously absent from Plaintiffs' excerpts, however, is Haschel's deposition testimony concerning her separate communication with Flowers-Carter on *May 7*, 2018, which is the communication that Braun has repeatedly identified during the discovery process as containing the express replacement offer.  On this record, Plaintiffs have not demonstrated that Haschel's deposition testimony contradicts Braun's earlier disclosures concerning the replacement offer.

As for the identity of the Braun employee who authorized Haschel to make the replacement offer, this does appear to be an instance where Braun's earlier disclosures were inaccurate.  In November 2019, Braun provided a supplemental MIDP disclosure stating that "Rick Nelson . . . made the decision to repurchase the Subject Conversion, and directed Elaine Haschel to effectuate the repurchase."  (Doc. 157-17 at 7.)   However, Nelson testified during his deposition that, although authorizing replacements was "[g]enerally . . . [his] responsibility," he was "out of town" during the week at issue.  (Doc. 157-11 at 11 [deposition transcript page 134, lines 16-19].)   Haschel then testified during her deposition that, "because Rick Nelson was out of town," she met with Johnston and McMahon.  (Doc. 157-10 at 4 [deposition transcript page 16, lines 5-21]).  Following these depositions, Braun promptly updated its MIDP disclosures to correct the earlier misstatement concerning Nelson's involvement in the authorization process and to clarify that the authorization came in part from McMahon.  (Doc. 154-1 at 11-12.)

Given this backdrop, the Court concludes that Plaintiffs are entitled to some relief, but not the dramatic relief sought in their motion (*i.e.,* an evidence-preclusion sanction that would effectively direct a verdict in their favor on liability).  Under Rule 37(b)(2)(A), which is the rule invoked in Plaintiffs' motion, "[i]f a party . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders."  Here, the only discovery order that Braun has arguably violated is the order requiring the identification of witnesses—McMahon should have been identified as a witness, given his role in the replacement-authorization process.  The Court does not,

however, view this error has some sort of intentional attempt to conceal the truth. Accordingly, a "just" remedy for the violation is the alternative remedy identified in Plaintiffs' motion—an opportunity to depose McMahon at Braun's expense.[12]

Accordingly, **IT IS ORDERED** that:

(1)     Plaintiffs' amended motion to compel and for sanctions (Doc. 157) is **granted in part and denied in part**.

(2)     Braun must, within 21 days of this order, disclose the emails it previously withheld pursuant to the common interest doctrine.

(3)     Plaintiffs may depose McMahon at Braun's expense.  The parties are ordered to meet and confer to work out the timing and arrangements.

Dated this 11th day of May, 2020.

Dominic W. Lanza
United States District Judge

---

[12]     Plaintiffs also contend, in their alternative request, that they should be allowed to depose Johnston and another Braun 30(b)(6) witness at Braun's expense.  The Court disagrees.  Braun's updated MIDP disclosure identifies McMahon, but not Johnston, as providing the authorization.