**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Latricia Flowers-Carter, et al.,

        Plaintiffs,

v.

Braun Corporation,

        Defendant.

No. CV-18-03836-PHX-DWL

**ORDER**

This case, which raises several issues of first impression concerning the Arizona Assistive Device Warranties Act ("AADWA"), arises from a failed attempt to install a wheelchair conversion kit in a minivan.  Despite multiple repair attempts by Defendant Braun Corporation ("Braun") and an entity associated with Braun, the defects could never be cured.  Afterward, Plaintiffs took certain steps to request a replacement or refund from Braun.  Braun eventually provided a refund, but only after this action was filed.  Plaintiffs accuse Braun of violating AADWA by not honoring their replacement/refund requests within 30 days of when each was made and seek an array of different categories of damages based on the alleged AADWA violations, including damages for emotional distress and treble attorneys' fees.

Now pending before the Court are Plaintiffs' and Braun's cross-motions for partial summary judgment (Docs. 178, 179) and Plaintiffs' motion to file a surreply (Doc. 198). For the following reasons, both summary judgment motions are granted in part and denied in part and Plaintiffs' motion to file a surreply is denied.

**BACKGROUND**

I.      Background Law

        In 1998, Arizona enacted AADWA, which is now codified at A.R.S. § 44-1351 *et seq.*  It provides that a manufacturer that sells an "assistive device," such as a wheelchair conversion kit, must "give the consumer an express warranty against defects, malfunctions or conditions."  *Id.* § 44-1352(A).  This express warranty, which must remain in effect "for at least one year," obligates the manufacturer to repair any "nonconformity"—defined as a "defect, malfunction or condition that substantially impairs the use, safety or value" of the assistive device, *id.* § 44-1351(11)—"at no charge" if the consumer "reports the nonconformity" and "makes the assistive device available for repair."  *Id.* § 44-1352(A), (C).  *See also id.* § 44-1354 (text of notice that must be provided to consumer: "To ensure you receive the benefits of this warranty, . . . you must report any problem with the assistive device to the manufacturer . . . and make the assistive device available for repair.").

        As discussed in more detail below, AADWA further provides that if a manufacturer cannot repair a nonconformity "after a reasonable attempt," the consumer has the right to "direct the manufacturer" to either (1) provide a replacement, while "refund[ing] any collateral cost to the consumer," or (2) provide a refund consisting of "the full purchase price plus any finance charge paid by the consumer at the point of sale and collateral costs minus a reasonable allowance for use."  *Id.* § 44-1352(D)(1)-(2).  The manufacturer must honor the consumer's preferred option.  *Id.* § 44-1352(D) ("[T]he manufacturer shall comply with the option chosen by the consumer.").  The replacement or refund must be provided "[w]ithin thirty days after receiving notification of a nonconformity."  *Id.* § 44-1353(A).  After receiving the replacement or refund, the customer is obligated to return the old device to the manufacturer.  *Id.*

        AADWA also creates an express cause of action for a violation of its requirements: "In addition to any other remedy, a consumer may bring an action in superior court to recover damages caused by a violation of this section.  The court may award the prevailing consumer triple the amount of any pecuniary loss plus costs, disbursements and attorney

1   fees.  The court may also award any equitable relief deemed appropriate by the court."  *Id.*

2   § 44-1355(C).  AADWA "does not limit any rights or remedies available to a consumer

3   under any other law."  *Id.* § 44-1355(B).

4   II.   <u>Factual and Procedural History</u>

5          The facts below are taken from the parties' partial summary judgment briefing and

6   other documents in the record.  The facts are uncontroverted unless otherwise noted.

7          A.   **Plaintiffs' Purchase Of The Van And Wheelchair Conversion**

8          Shanyce Flowers ("Flowers") is a quadriplegic who suffers from cerebral palsy and

9   seizures.  (Doc. 182-1 at 70.)  Flowers's primary caregivers are Latricia Flowers-Carter

10  ("Flowers-Carter"), who also serves as Flowers's legal guardian, and Douglas Carter

11  ("Carter").  (Doc. 34 at 1-2; Doc. 178-1 at 45; Doc. 182-1 at 19 ¶ 4.)  Flowers-Carter and

12  Carter also suffer from serious physical ailments: Flowers-Carter has multiple sclerosis

13  ("MS") while Carter has bone cancer and receives dialysis as treatment for a prior bout

14  with kidney cancer.  (Doc. 49-1 at 10-11; Doc. 182-1 at 23 ¶ 28.)  Flowers, Flowers-Carter,

15  and Carter will be referred to collectively as "Plaintiffs."

16         In December 2017, Plaintiffs purchased a 2017 Chrysler Pacifica minivan from a

17  non-party auto dealer for either $47,979.71 or $57,782.80.[1]  Plaintiffs then contracted with

18  Braun, via an authorized Braun dealer known as United Access ("UA"), to equip the

19  minivan with a Braun wheelchair conversion kit for either $23,412.75 or $34,409.31.[2]

20  Braun installed the conversion on or around February 20, 2018.  (Doc. 179-1 at 131, 133.)

21  [1]      Braun states in its summary judgment motion that the price of the minivan was
22  $57,782.20 (Doc. 178 at 2) but Plaintiffs' counsel asserted in a pre-lawsuit letter that the
    price was only $47,979.71 (Doc. 178-1 at 22).  It is not clear whose figure is correct.
23  Attached to Braun's summary judgment motion are two invoices from the dealership: the
    first reflects a "total cash price" of $44,679.71, plus insurance ($895) and service contract
24  ($4,905) charges, for a total of $47,979.71 (Doc. 178-1 at 3), while the second reflects
    certain "loan details" that amount to a total price of $57,782.80 (Doc. 178-1 at 4).  It is
25  unnecessary to resolve this dispute now because the parties' summary judgment arguments
    do not turn on the actual price of the minivan.

26  [2]      Although Braun asserts in its summary judgment motion that the price of the
    conversion was $23,412.75 (Doc. 178 at 2), the document that Braun cites to support this
27  assertion (Doc. 178-1 at 7-8) does not reflect the price.  Moreover, other records submitted
    by Plaintiffs reflect a "Total Selling Price" of $34,409.31.  (Doc. 179-1 at 132.)  It is
28  unnecessary to resolve this dispute now because the parties' summary judgment arguments
    do not turn on the actual price of the conversion.

Plaintiffs had been prescribed the conversion van to "transport [Flowers] and her power wheelchair to get to and from school/work as well as community activities." (Doc. 182-1 at 70.)

Braun tendered a limited warranty alongside the conversion. (Doc. 178-1 at 38-39; Doc. 182-1 at 6-12.) The limited warranty covered "Braun's modifications and alterations for associated parts for three (3) years or the first thirty six thousand (36,000) miles, whichever occurs first." (Doc. 182-1 at 6.) The limited warranty protected against "substantial defects in materials and workmanship attributable to Braun" of relevant parts of the conversion and van. (*Id.*) There was also a corrosion warranty covering defects caused by Braun in certain metal fabrication components of the vehicle and conversion. (*Id.*) The limited warranty only obligated Braun "to repair or replace defective materials or workmanship." (*Id.* at 7.) This obligation would be triggered "[i]n the event that a substantial defect in material or workmanship, attributable to Braun, is found to exist during the warranty coverage periods." (*Id.*) Braun made "no warranty as to the future performance." (*Id.*) Additionally, "Braun shall not be liable for any incidental or consequential damages that may result from a breach of this limited warranty. . . . This warranty does not cover . . . towing charges, travel, lodging, or any other expense incurred due to the loss of use of the product or other reason." (*Id.* at 8, capitalization omitted.)

## B.   Initial Problems And Repair Attempts

Soon after the conversion van passed into Plaintiffs' possession, problems arose. For example, the van's sliding door did not open or close correctly. (Doc. 154-1 at 59; Doc. 157-11 at 5, lines 2-12, 6, lines 14-23; Doc. 157-20 at 267; Doc. 179-1 at 80, 83-84.) On one occasion, when Flowers-Carter and Flowers were driving in Las Vegas, the ramp malfunctioned. (Doc. 154-1 at 63; Doc. 178-1 at 46, 60; Doc. 179-1 at 82.) Flowers-Carter had to enlist the help of passersby to manually lift Flowers into the van. (Doc. 181-1 at 15, lines 1-3.) On the drive back to Arizona from Las Vegas, Flowers was forced to relieve herself in a bucket inside the van, because she was unable to exit the vehicle. (Doc. 182-1 at 22 ¶ 23; Doc. 182-1 at 105, lines 15-16, 106, lines 7-9.)

In March 2018, Flowers-Carter brought the van to UA for repairs for the first time. (Doc. 38 ¶ 50; Doc. 40 ¶ 18.)  Flowers-Carter brought the van back to UA for more repairs very shortly thereafter.  (Doc. 38 ¶¶ 54-55; Doc. 40 ¶ 21.)  It appears that one more round of repairs occurred in late March 2018.  (Doc. 38 ¶¶ 58-60; Doc. 40 ¶¶ 23-24; Doc. 191-1 at 60.)

UA's repair records from April and May 2018 show that the van needed at least three repairs.  (Doc. 179-1 at 80-84.)  For example, on April 2, 2018, Plaintiffs told UA that the side power door of the van "has opened by itself, and when driving" and that the door had other issues.  (Doc 179-1 at 80.)  UA couldn't determine whether the door was in fact opening randomly but noticed other issues with the door and also noticed that the van's rear seats weren't functioning properly.  (*Id.*)  UA attempted to make repairs on the issues it could identify.  (*Id.*)

On April 9, 2018, Plaintiffs were back at UA because the ramp was not working— UA found that the fuse had blown and made repairs.  (*Id.* at 81-83.)

## C.     The May 1, 2018 Conversation Between Flowers-Carter And Haschel

The parties agree that Braun customer service manager Elaine Haschel ("Haschel") and Flowers-Carter first spoke over the phone on May 1, 2018.  (Doc. 178 at 2; Doc. 179-1 at 28, lines 6-11; Doc. 182-1 at 23-24 ¶ 31; Doc. 191-1 at 3.)  Flowers-Carter stated that she "wanted [the van] replaced" and Haschel replied that Braun "needed to be provided with one repair attempt."  (Doc. 179-1 at 27, lines 19-24.)

The parties dispute whether, during the course of this conversation, Haschel also offered to replace the van in the event the repair attempt was unsuccessful.  According to Haschel, she told Flowers-Carter that "if [the repair] didn't work, then at that point we would offer to replace it."  (*Id.* at 27, lines 19-24.)  Flowers-Carter says that Haschel never offered a replacement.  (Doc. 182-1 at 23-24 ¶ 31.)

The parties also dispute whether Flowers-Carter agreed to Haschel's proposal that another repair attempt be made.  Flowers-Carter testified that she made a replacement demand, Haschel "said no," and she acquiesced in the additional repair attempt because

Haschel "didn't leave me an option." (Doc. 181-1 at 15, lines 10-25, 16, lines 8-21.)  In contrast, Haschel testified that Flowers-Carter "was calm by the end of the conversation" and "agreed that we would—with the plan for us to fix it and if we didn't, that I would escalate it for—to fulfill her request of replacing the unit." (Doc. 182-1 at 79, lines 1-4.)

In any event, Braun completed another repair attempt on or about May 4, 2018, noting that it had fixed issues with the door and rear seats and had performed software updates.  (Doc. 179-1 at 84.)  Flowers-Carter and Haschel spoke again that day, with Haschel offering to pay one month of loan payments on the van as an "inconvenience" payment.  (Doc. 182-1 at 23-24 ¶ 31; Doc. 182-1 at 84.)

D.     **The Events Of May 7-8, 2018**

The May 4, 2018 repair attempt was unsuccessful.  As of May 7, 2018, there were still substantial problems with the van.  (Doc. 179-1 at 38.)  The parties dispute certain aspects of what happened next.

Braun's version of the events of May 7-8, 2018 is as follows.  Haschel testified that she called Flowers-Carter twice and left a voicemail each time.  (Doc. 179-1 at 31, lines 12-24.)  In the first voicemail, Haschel asked Flowers-Carter to call her back so the two could discuss "next steps." (*Id.* at lines 22-24.)  In the second voicemail, Haschel emphasized that Braun was "willing to do whatever we can to make this situation right," albeit without specifically saying that Braun was willing to replace the vehicle.  (*Id.* at 32, lines 6-15; Doc. 182-1 at 24 ¶ 32.)

Braun has submitted other evidence that, if credited, suggests it was making efforts to replace Plaintiffs' vehicle during this time period.  For example, Tabatha Chapman ("Chapman"), a Braun employee, testified that on May 7, 2018, she attended an office meeting with Haschel and manager Kevin McMahon ("McMahon"), who authorized Haschel to repurchase or replace the vehicle.  (Doc. 181-1 at 32, lines 14-25, 33, lines 1-24.)  McMahon corroborated this account when he recalled giving Haschel the authorization to "find a solution for a customer that was having a problem with our vehicle." (Doc. 181-1 at 38, lines 3-11.)

Braun has also presented evidence that, if credited, shows that Haschel's attempts to convey a replacement offer to Plaintiffs during this time period were thwarted by Flowers-Carter's refusal to speak with her.  Specifically, Braun has presented evidence that Haschel asked a UA employee named Brent Heermans ("Heermans") to convey to Flowers-Carter that Braun was willing to replace the vehicle, because Haschel knew Flowers-Carter was still in communication with UA but was "not talking" to Braun.  (Doc. 179-1 at 32, lines 12-19, 33, lines 5-25.)  However, after speaking to Flowers-Carter on the phone on May 8, 2018, Heermans emailed Haschel to say that Flowers-Carter "isn't speaking with anyone any longer, says she has an attorney involved now." (Doc. 181-1 at 40.)  Haschel replied the next day: "Even if we agree to replace it for her?  We will be willing to do that and avoid getting attorneys involved." (*Id.*)

Plaintiffs have presented conflicting evidence of the events of May 7-8, 2018.  Flowers-Carter testified that, on May 8, 2018, she called Haschel back and left a voicemail, asking for Haschel to return the call, but Haschel never did so.  (Doc. 181-1 at 20, lines 4-24; Doc. 182-1 at 24 ¶ 32; Doc. 191-1 at 7.)  Flowers-Carter also contends that "Haschel did not offer to replace the [vehicle] in either [voicemail] message." (Doc. 182-1 at 24 ¶ 32.)

As further evidence that Braun never intended to replace the vehicle during this time period, Plaintiffs point to Braun's Salesforce notes from May 7, 2018, wherein Braun employee Mike Smith ("Smith") noted that "EH" (presumably Haschel) "will be contacting the customer to see if we can get the van back to see what is going on." (Doc. 179-1 at 38.)  Smith's deposition testimony also suggests that, during this time period, his intention was to continue looking at the vehicle to see if it could be repaired, rather than replacing it.  (*Id.* at 41, lines 19-25, 42, lines 1-6.)

E.     **Interactions Between May 18, 2018 And June 19, 2018**

On May 18, 2018, Flowers-Carter went to UA to inquire about the status of the van. (Doc. 178-1 at 13, lines 3-16.)  She was told that the van had been picked up by Braun and taken to Braun's Arizona facility, known as "Braun West." (*Id.*)  Flowers-Carter then went

to Braun West, where she met with Smith. (*Id.*) When Smith asked Flowers-Carter if she wanted to take the van home, she explained that she didn't want to do so because the van was broken and instead wanted Braun to replace it. (*Id.* at 14, lines 22-25, 15, lines 1-9.) Smith responded that he couldn't authorize a replacement and explained that her options were to tow the van back to UA, take the vehicle herself from Braun West, or allow Braun West to perform additional repairs. (*Id.* at 15, lines 1-9; Doc. 182-1 at 24 ¶ 34.)

On June 5, 2018, Haschel emailed Flowers-Carter to inform her that the van had been at Braun West since May 18. (Doc. 179-1 at 35.) Haschel told Flowers-Carter that Braun's "legal team has concerns that your vehicle has been at our facility for over two weeks now" because Braun's "insurance does not have sufficient coverage to house vehicles for this period of time." (*Id.*) She said that if Flowers-Carter could not pick up the van by the next day, Braun would ask UA to pick it up and store it at UA. (*Id.*)

On June 6, 2018, seemingly in response to this email, Flowers-Carter went to Braun West, spoke briefly with Smith, and had the van towed away from there. (Doc. 181-1 at 25, lines 15-22, 26, lines 2-25, 27, lines 1-24.) Smith did not offer to replace the van when he and Flowers-Carter briefly spoke on June 6, or on June 5, when they spoke over the phone about removing the van from Braun West. (Doc. 182-1 at 24 ¶ 36.)

On June 19, 2018, Plaintiffs' counsel sent a letter advising Braun that they represented Flowers-Carter "regarding claims against your company" and instructing Braun to direct any future correspondence to counsel. (Doc. 179-1 at 44.)

F.     **Pre-Lawsuit Correspondence Between Plaintiffs' Counsel And Braun**

On June 25, 2018, Plaintiffs' counsel sent a letter to Braun to "determine if this matter can be resolved without resorting to litigation." (Doc. 178-1 at 22.) The letter quoted AADWA at length and stated that "Arizona law grants [Plaintiffs] the right to demand that you take back the Conversion and issue them a refund of their purchase money and pay their collateral costs." (*Id.* at 23.) The letter then formally demanded that Braun refund the price of the conversion and van, pay Plaintiffs' "collateral pecuniary and special damages" and attorney's fees, and take possession of the van and conversion. (*Id.* at 23-

24.)  The letter did not, however, attempt to place a dollar value on many of these claimed categories of damages.  (*Id.*)

On or about July 2, 2018, "approximately one week" after the letter had been sent, Braun received a copy of it.  (Doc. 179-1 at 62.)

On July 11, 2018, Plaintiffs' counsel sent another letter to Braun that reiterated counsel's "desire to engage in good-faith negotiations without incurring the expenses associated with filing a lawsuit."  (Doc. 179-1 at 48.)

On July 12, 2018, Braun's general counsel responded that he had received the correspondence and was turning the matter over to outside counsel Michael Dolenga ("Dolenga").  (*Id.* at 49.)

On July 18, 2018, Dolenga emailed Plaintiffs' counsel to set up a call to discuss Plaintiffs' demand.  (*Id.* at 68 ¶ 3; Doc. 181-1 at 49.)

On July 23, 2018, the call took place.  (Doc. 179-1 at 68 ¶ 4.)  During the call, Dolenga made "multiple requests" for Plaintiffs' counsel to tell him how much money they were seeking behalf of their clients.  (*Id.*)  Counsel requested "$150,000 for the statutory repurchase."  (*Id.*)  This demand was based on the belief that Plaintiffs were entitled to treble damages under AADWA, but counsel did not itemize the expenses considered in arriving at this amount or "provide any documentation with which Braun could verify the value of plaintiffs' requested statutory repurchase."  (*Id.* ¶ 5.)  Dolenga would go on to request an itemization of the demand and documentation regarding the claimed damages, but Plaintiffs' counsel did not satisfy these requests.  (*Id.* ¶ 6.)

On August 6, 2018, Plaintiffs' counsel Jose Gill ("Gill") emailed Dolenga that he was "following up on [Plaintiffs'] demand."  (Doc. 179-1 at 73-74.)

On August 7, 2018, Dolenga responded that he did "not have any official authority from Braun yet."  (*Id.* at 73.)  He noted that he had been in contact with Braun and planned to get back to Gill soon.  (*Id.*)  He added that Braun was "interested in having some more hard numbers on the actual, economic losses in this matter" and that it would be appreciated if Gill could provide documentation on Plaintiffs' conversion-related loans.  (*Id.*)

1    On August 9, 2018, Dolenga emailed again to state that he now had authority and

2    was "prepared to talk." (*Id.* at 72-73.) He also reiterated the need for "hard numbers" on

3    the "loan amount, payment amounts, [and] payoff amount." (*Id.* at 72.)

4    On August 10, 2018, Gill responded by noting that, due to Flowers-Carter's and

5    Carter's ongoing health problems, he had "been delayed in running down the documents

6    on some of the consequential damages here." (*Id.* at 71-72.) He said he would "like to

7    delay providing a detailed breakdown until I get all of that information." (*Id.*) He then

8    provided, without documentation, a breakdown of the basis for the $150,000 demand:

> [T]he vehicle and the assistive device total $84,806, and excluding pain and
> suffering, we estimate that our clients have suffered around $26,000 of
> consequential economic damages as well. Given that our clients can recover
> treble damages, just the economic damages here would justify a $332,418
> demand. Therefore, Braun should consider itself lucky that it only got a
> demand for $150,000.

13   (*Id.*) Gill concluded by noting that he could not speak by phone that day but if Braun had

14   a counteroffer, Dolenga should "please feel free to share it with me via email." (*Id.*)

15   That same day, Dolenga responded with two emails. (*Id.* at 70-71.) In the first,

16   Dolenga said that the parties should plan to speak the next week and that once Gill provided

17   "the requested information, I will provide Braun's counter offer." (*Id.* at 71.) Dolenga

18   noted that Braun was not comfortable determining a precise counteroffer because Gill's

19   claimed figures were "unsupported." (*Id.*) In his second, longer email, Dolenga said that

20   he wanted to make it "clear" that "Braun has authorized me to negotiate a repurchase of

21   Ms. Flowers-Carter's van" and that "Braun intends to repurchase the van to bring this

22   matter to a conclusion." (*Id.* at 70.) Dolenga said that Braun wanted to "negotiate a fair

23   resolution" once Gill "provide[d] the precise economic figures." (*Id.*)

24   It appears that Gill never responded to these emails. The next apparent contact

25   occurred on September 26, 2018, when Dolenga wrote Gill again to reiterate Braun's need

26   for exact numbers and documentation so it could "fully evaluate this claim" before its

27   intended vehicle repurchase. (*Id.*)

28   On October 2, 2018, Gill responded by announcing that Plaintiffs planned to file

- 10 -

suit that day but clarified that this filing "should not be construed as a lack of interest in discussing settlement." (*Id.* at 88-89.) Gill "revoked" Plaintiffs' prior demand and said Plaintiffs would seek all available damages in an amount somewhere between $350,000 and $400,000. (*Id.*) Gill also proposed a bifurcated approach to settlement and damages, with the parties agreeing "on a repurchase number for the vehicle and the device, plus finance charges [Plaintiffs] have paid and costs collateral to the purchase itself, and leave the remaining damages to litigation, and possibly even negotiation[.]" (*Id.*)

That same day, Dolenga responded via email, encouraging Plaintiffs not to file suit, reiterating Braun's intention to repurchase the vehicle, and recommending "global resolution" rather than bifurcation. (*Id.* at 88.)

On October 4, 2018, Gill responded. (*Id.* at 103.) He disputed that Braun had in fact shown willingness to repurchase the van, because Braun had not accepted Plaintiffs' earlier demand or made a repurchase offer of its own. (*Id.*) He restated Plaintiffs' intention to seek damages and noted that the civil complaint "ha[d] been sent for filing." (*Id.*)

On October 5, 2018, Dolenga sent a response email noting that, because the dispute was proceeding to litigation, he would no longer be handling the case. (*Id.* at 102.) He took the position that Braun had made a repurchase offer, subject to more detailed information and documentation from Plaintiffs, and Gill never provided such information or documentation. (*Id.*)

G.    **Post-Lawsuit Correspondence Between Plaintiffs' Counsel And Braun**

On October 6, 2018, Plaintiffs initiated this action by filing a complaint in Maricopa County Superior Court. (Doc. 1-3 at 8-14.)

On October 12, 2018, Dolenga sent another email to Plaintiffs' counsel. (Doc. 179-1 at 75.) He said that Braun's repurchase offer "remains open" and stated that Braun still needed figures in order to calculate the buyback amount. (*Id.*) He emphasized that Braun was open to reaching a negotiated resolution of Plaintiffs' claims but also that Braun was willing to defend Plaintiffs' allegations in litigation using Arizona counsel. (*Id.*)

On November 5, 2018, Braun removed this action to federal court. (Doc. 1.)

On March 26, 2019, Plaintiffs filed the Second Amended Complaint ("SAC"), which is the operative complaint.  (Doc. 38.)

On May 2, 2019, Braun's litigation counsel emailed Plaintiffs' counsel to formally provide "Braun's counter settlement offer of $90,000, inclusive of fees and costs."  (Doc. 181-1 at 87.)  In response, Plaintiffs' counsel asserted that the "$90,000 offer is the very first time [Braun] has put a number on the matter."  (*Id.* at 86.)  Plaintiffs' counsel did not accept the offer and noted that Plaintiffs were still seeking damages beyond replacement costs.  (*Id.* at 86-87.)

On November 7, 2019, Braun's counsel emailed Plaintiffs' counsel with exact figures for the van and conversion purchases plus finance charges, noting that Braun's counsel had authority to repurchase the vehicle and would not need to conduct a vehicle inspection.  (Doc. 179-1 at 125.)

On November 27, 2019, Plaintiffs' counsel sent an email to Braun's counsel that, among other things, provided a detailed breakdown of costs related to the purchase of the van and conversation and noted that Plaintiffs were ready to consummate the repurchase.  (Doc. 181-1 at 78-79.)

On December 4, 2019, Braun formally accepted Plaintiffs' offer to repurchase the van for a total of $92,347.33.  (Doc. 178-1 at 26.)

On December 17, 2019, Braun tendered about $40,000 of this payment to a third party as a means of paying off a loan related to the van.  (*Id.* at 28-30; Doc. 179-1 at 127.)

On January 14, 2020, the remaining sum was paid directly to Carter.  (Doc. 178-1 at 32-33; Doc. 179-1 at 129.)  Braun appears to have retaken possession of the van on January 10, 2020.  (Doc. 182-1 at 50.)

## DISCUSSION

I.    Cross-Motions For Summary Judgment

    A.    **Legal Standard**

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment

inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

"[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both cross-motions when separately reviewing the merits of each motion. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotation marks omitted). For "the party with the burden of persuasion at trial"—usually the plaintiff—to succeed in obtaining summary judgment in its favor, it "must establish beyond controversy every essential element" of each claim on which summary judgment is sought. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). The party without the burden of persuasion at trial—usually the defendant—is entitled to summary judgment where it establishes that the party with the burden of persuasion will be unable to prove at least one element of its claim in light of the undisputed facts. *Celotex Corp.*, 477 U.S. at 322-23. This distinction reflects that the burden is ultimately on the proponent of each claim to prove it. *Id.* ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

B. **Analysis**

The operative complaint has two counts. (Doc. 38.) In Count One, Plaintiffs assert that Braun violated AADWA by not timely complying with their requests for a replacement or refund, which they made after giving Braun a reasonable attempt to repair the nonconformities. (*Id.* ¶¶ 233-47.) Specifically, Plaintiffs contend that (1) they made a replacement request on May 1, 2018, which Braun never honored; and (2) they separately

made a refund request on June 25, 2018 (and/or during subsequent communications between Braun and their counsel), which Braun did not honor within the 30-day period specified by statute.  (*Id.* ¶¶ 244-48.)  In Count Two, Plaintiffs assert a claim entitled "Breach of Common Law Express Warranty." (*Id.* ¶¶ 248-56.)  The contours of that claim are discussed in Part I.B.3 below.

In their motions, Plaintiffs and Braun each request partial summary judgment on distinct but overlapping issues.  Plaintiffs move for summary judgment only on the issue of AADWA liability.  (Doc. 179 at 17.)  Braun moves for summary judgment on certain elements of AADWA liability, Plaintiffs' common-law warranty claim, and damages. (Doc. 178 at 4, 6, 7.)  Because of the significant overlap in analysis, the Court groups the parties' arguments together by issue.

### 1. Count One—AADWA Liability

#### a. **Applicability of 30-Day Requirement**

As noted, Plaintiffs' theory of liability in Count One is that, once a manufacturer has been afforded a reasonable attempt to repair a nonconformity in an assistive device and is unable to do so, AADWA requires the manufacturer to comply with a consumer's request for a replacement device or refund within 30 days of when the request is made.

Braun argues that Plaintiffs' interpretation of AADWA is legally flawed because "the thirty-day limit does not apply at all to Braun's replacement or repair obligations." (Doc. 181 at 11.)  According to Braun, AADWA offers two separate paths for consumers: (1) the path of warranty repairs ("Repair Path"), § 44-1352, which allows a consumer to seek repairs and then, if the device cannot be repaired, to request a refund or replacement without triggering any timeline for the manufacturer to provide a refund or replacement; and (2) the path of immediate refund or replacement ("Notice Path"), § 44-1353, which allows a consumer to forego repairs and simply give notice of the defect and demand refund or replacement within 30 days.  (*Id.* at 11-13.)  Braun argues that although § 44-1352, the Repair Path," states that the manufacturer must provide a replacement or refund at the consumer's election if repairs are unsuccessful, it conspicuously does not set any time limit

for the manufacturer to satisfy the consumer's demand.  (*Id.* at 12.)  In contrast, Braun argues that § 44-1353, the "Notice Path," *does* provide a 30-day deadline.  (*Id.* at 13.)  Braun contends that its reading of AADWA is "logical" because some assistive devices can be easily and quickly replaced, while others, including Plaintiffs' conversion, "cannot reasonably be replaced within thirty days."  (*Id.* at 13.)  Braun also argues that the Repair Path should be interpreted consistently with the Arizona Motor Vehicle Warranty Act, which does not contain any replacement or refund timeline.  (*Id.* at 14.)  Braun contends that Plaintiffs chose to go down the "Repair Path" in this case, because they allowed Braun to pursue a repair attempt, so the 30-day time limit never came into effect.  (*Id.* at 12.)  Plaintiffs respond that Braun's construction of AADWA is "strained" and that a better approach is to read §§ 44-1352 and 44-1353 together.  (Doc. 191 at 9-10.)[3]

The Court agrees with Plaintiffs.  "In determining the law of the state for purposes of diversity, a federal court is bound by the decisions of the highest state court.  If the state's highest court has not decided an issue, it is the responsibility of the federal courts sitting in diversity to predict how the state high court would resolve it."  *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011) (citation and internal quotation marks omitted).  "The decisions of the state's intermediate appellate courts are data that a federal court must consider in undertaking this analysis."  *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 186 (9th Cir. 1989).  Although Arizona appellate courts have not had occasion to interpret the provisions of AADWA at issue in this case, at least in a reasoned manner, the Court predicts that the Arizona Supreme Court would rule that AADWA does

---

[3]    Near the end of the two-hour hearing on the parties' cross-motions for summary judgment, Plaintiffs' counsel suggested for the first time that the Court consider certifying some of the AADWA construction issues presented in this case to the Arizona Supreme Court.  It is unfortunate that Plaintiffs waited so long before making this suggestion.  The parties have already spent substantial resources pursuing discovery and briefing their summary judgment motions and the Court has already spent substantial time reviewing the summary judgment motions and conducting its own research.  "When deciding whether to certify an issue to the state supreme court, federal courts may consider the timing of certification, and whether certification will achieve savings to time, money and resources or promote cooperative judicial federalism."  *City of Glendale v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 2013 WL 12250532, *6 (D. Ariz. 2013) (citation and quotation marks omitted).  The Court concludes, in its discretion, that certification at this juncture would not promote efficiency.

not create two distinct paths, only one of which triggers the 30-day timeline.  Instead, the Arizona Supreme Court would likely rule that, read as a whole, AADWA allows a consumer to seek repairs at no cost, and then, if the repairs prove unsuccessful after reasonable attempts,[4] the consumer may request a refund or replacement, which the manufacturer must provide within 30 days of receiving notice of the request.

When an Arizona court interprets a statute, the "goal is to effectuate the legislature's intent." *McKenna v. Soto*, — P.3d —, 2021 WL 712966, *2 (Ariz. 2021).  "When the plain text of a statute is clear and unambiguous, it controls unless an absurdity or constitutional violation results." *Id.* (internal quotation marks omitted).  If "the text alone does not resolve the parties' dispute, [the court] must attempt to glean and give effect to the legislature's intent, considering the statute's context, effects and consequences, and spirit and purpose." *Id.* (internal quotation marks omitted).  To determine whether a statute is ambiguous, the court "does not focus on statutory words or phrases in isolation . . . . [but] the statute as a whole." *Glazer v. State*, 423 P.3d 993, 995 (Ariz. 2018).  *See also id.* ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.") (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

The Court concludes that AADWA provides for a 30-day timeline when, as here, a consumer gives a manufacturer (or its licensed dealer) a chance to repair an assistive device and then, upon the failure to repair after a reasonable attempt, elects to have the device replaced or repurchased.  Braun is correct that § 44-1352(C) and (D), when read in isolation, do not prescribe a timeline.  But to determine the plain meaning of these provisions, the Court reads the statute as a whole.  The title of § 44-1352 is "New assistive device; nonconformity; reasonable attempt to make a repair; reasonable allowance; options."  Section 44-1353, which sets out the 30-day deadline, is entitled "Replacement

---

[4]    A.R.S. § 44-1351(12) defines a "[r]easonable attempt to repair" as when a nonconformity "has been repaired at least twice by the manufacturer or the manufacturer's authorized assistive device dealer or the assistive device lessor and the same nonconformity continues" or when "[t]he new assistive device is out of service for repair for an aggregate of at least thirty cumulative days due to a nonconformity covered by the warranty."

of assistive device; refund of monies; transfer of possession; limitations; disclosure." That § 44-1352 addresses "reasonable attempt[s] to make a repair," "reasonable allowance," and the consumer's "options," while § 44-1353 addresses "[r]eplacement of assistive device," "refund of monies," and "transfer of possession," suggests that § 44-1352 establishes the repair and request procedure while § 44-1353 prescribes the procedures of replacement or refund alongside the consumer's return of the defective device. Viewing these two sections together as a whole, including their titles, suggests that § 44-1353 establishes the mechanism for the manufacturer to provide the replacement or repurchase introduced in § 44-1352 after the reasonable repair attempt is unsuccessful. *See generally State v. Shepler*, 684 P.2d 924, 925 (Ariz. 1984) ("[I]t is proper to consider the title in attempting to interpret the legislature's intent.").

The subsequent section of AADWA powerfully supports this interpretation. Section 44-1354 provides that a dealer or manufacturer must provide a "written notice" to a consumer taking possession of an assistive device and sets forth the language that must be contained in that notice. Among other things, the notice must state that, "[t]o ensure that you receive the benefits of this warranty, . . . *you must report any problem with the assistive device to the manufacturer . . . and make the assistive device available for repair by the manufacturer*." *Id.* (emphasis added). Then, in the next sentence, the notice must state that "[d]uring the warranty period, if any defect, malfunction or condition cannot be repaired after two attempts or if your assistive device is out of service for at least thirty days . . . , you are entitled to either a comparable new assistive device or a refund of the full purchase price plus any finance charge and collateral cost minus a reasonable allowance for use." *Id.* These sentences are impossible to reconcile with Braun's proffered interpretation of AADWA—which, again, is that § 44-1353 statute creates a "Notice Path" under which a consumer can refuse to give the manufacturer any chance to repair a nonconformity and instead proceed straight to a replacement or refund demand. If that were the case, the written notice's statement that a consumer "must" both "report any problem" and "make the assistive device available for repair" would be inaccurate. It

1   seems self-evident that the Arizona legislature's intent, when formulating the required text

2   of the written notice to be provided to all consumers who purchase assistive devices, wasn't

3   to provide those consumers with inaccurate and misleading information about their options.

4   In any event, when possible, a court should interpret a statute's sections

5   harmoniously. *State v. Razo*, 988 P.2d 1119, 1120 (Ariz. Ct. App. 1999) ("Our objective

6   in interpreting a statute is to give effect to the legislative intent behind the statute and, when

7   possible, to harmonize all its sections."). *See also* Antonin Scalia & Brian A. Garner,

8   *Reading Law: The Interpretation of Legal Texts* 180 (2012) ("The imperative of harmony

9   among provisions is more categorical than most other canons of construction because it is

10  invariably true that intelligent drafters do not contradict themselves (in the absence of

11  duress)."). Here, the best way to harmonize §§ 44-1352, 44-1353, and 44-1354 is as

12  creating a single path, not two distinct paths.

13  Adopting Braun's proffered interpretation would also lead to absurd results. *Ariz.*

14  *Health Care Cost Containment Sys. v. Bentley*, 928 P.2d 653, 657 (Ariz. Ct. App. 1996)

15  ("Statutes must be given a sensible construction that accomplishes the legislative intent

16  and which avoids absurd results."). Under § 44-1353(A), a consumer isn't required to

17  surrender the defective assistive device at the time of the demand for a replacement or

18  refund—instead, "*[a]fter* receiving the new assistive device or refund, the consumer shall

19  return to the manufacturer the assistive device that has the nonconformity including any

20  endorsements necessary to transfer physical possession to the manufacturer." *Id.*

21  (emphasis added). Thus, under Braun's proffered interpretation, a consumer could simply

22  inform a manufacturer that a particular device is defective and then demand a refund,

23  without ever giving the manufacturer a chance to inspect the device and verify its defective

24  condition, and the manufacturer would be responsible for forking over the refund amount

25  within 30 days. This would be an absurd state of affairs. As the facts of this case make

26  clear, the refunds required under AADWA can be quite sizeable—Braun ultimately paid

27  over $90,000 to Plaintiffs to refund the cost of the minivan and conversion. It is hard to

28  believe that the Arizona legislature intended to require assistive device manufacturers to

1  provide sight-unseen refunds running into six figures to consumers who simply assert,
2  without proof, that an assistive device is defective.

3      *Stein v. Sonus USA, Inc.*, 150 P.3d 773 (Ariz. Ct. App. 2007), which appears to be
4  the only published decision by an Arizona appellate court concerning AADWA, further
5  supports (if weakly) the conclusion that a consumer must always offer the manufacturer an
6  opportunity to attempt repairs before proceeding to the replacement/refund option.
7  Although the issue presented in *Stein,* whether hearing aids qualify as "assistive devices"
8  under AADWA, had nothing to do with the replacement/refund process, the court observed
9  in dicta that, "[d]uring the warranty period, the consumer is entitled to have a
10 nonconforming assistive device repaired or, *failing that*, a replacement or a refund." *Id.* at
11 774 (emphasis added).  This is more evidence that repair attempts are a prerequisite to a
12 replacement or refund demand.

13     Finally, to the extent these AADWA provisions are ambiguous, the statute's
14 legislative history—which the Arizona Supreme Court has stated is a legitimate
15 interpretive tool, *see Morrissey v. Garner*, 461 P.3d 428, 430 (Ariz. 2020)—further
16 supports the Court's interpretation.  The Arizona State Senate Fact sheet for AADWA
17 reads, in relevant part: "[AADWA] provides the consumer with options such as a
18 comparable replacement device or a refund if the assistive device they purchased is unable
19 to be repaired or does not conform to the warranty *as long as the assistive device is made
20 available for repair*."  Ariz. State Senate Fact Sheet for H.B. 2676, 43d Leg., 2d Reg. Sess.
21 (Apr. 21, 1998) (emphasis added).  This summary of AADWA accords with the conclusion,
22 set forth above, that the notice and deadline provisions of § 44-1353 come into play after
23 the consumer has made his election under § 44-1352(D), upon failure to repair after a
24 reasonable attempt.

25     The Court therefore concludes that, under AADWA, if a consumer requests either
26 replacement or refund after reasonable repair attempts are unsuccessful, the manufacturer
27 is required to provide the replacement or refund with 30 days.
28     …

1

b.   **AADWA Liability Elements**

2      On the merits, Plaintiffs contend there are six liability elements on an AADWA

3   claim—(1) the plaintiff is a "consumer," (2) the defendant is a "manufacturer," (3) the

4   device at issue is an "assistive device," (4) the device was not repaired within a reasonable

5   number of attempts, (5) the plaintiff "made a demand" for replacement or refund; and (6)

6   the defendant "failed to timely comply" with that demand—and the undisputed evidence

7   establishes that all six elements are established here.  (Doc. 179 at 7-16.)  Braun, in turn,

8   doesn't dispute that these are the correct liability elements under AADWA and

9   acknowledges that the first four elements are satisfied.  (Doc. 38 ¶¶ 6, 41; Doc. 40 ¶¶ 3,

10  14; Doc. 178 at 1; Doc. 179-1 at 21-22.)  Additionally, as for the sixth element, it is

11  undisputed that Braun never provided a replacement and did not provide a refund until

12  December 2019/January 2020.  (Doc. 178-1 at 26, 28-33; Doc. 179-1 at 127, 129; Doc.

13  182-1 at 50.)  Thus, the only disputed element is when (or whether) Plaintiffs made a

14  replacement or refund demand.

15     Plaintiffs' theory is that they made two such demands: *first*, a replacement demand

16  on May 1, 2018, which Flowers-Carter made during a phone call with Haschel; and *second*,

17  a refund demand at some point between June 25, 2018 (when Plaintiffs' counsel sent a

18  letter to Braun that sought a refund) and August 2018 (when Plaintiffs' counsel provided

19  "additional quantification" concerning the requested refund).  (Doc. 179 at 3.)  In response,

20  Braun argues that (1) the May 1, 2018 telephone conversation doesn't qualify as a

21  replacement demand because, although Flowers-Carter initially requested a replacement

22  during this conversation, she later changed course and agreed to allow Braun to make

23  another repair attempt; (2) neither request was effective because "plaintiffs refused to

24  communicate with Braun" after making each request in an attempt to "thwart[]" Braun

25  from complying and/or to "make performance of the repurchase impossible"; and (3) the

26  refund demand was ineffective because Plaintiffs "did not provide Braun with any of the

27  relevant financial information Braun needed to effectuate the repurchase.  For instance,

28  plaintiffs did not provide numbers on the amount of the loan for the van and conversion,

1   their monthly payments, their current payoff amount, or the amount of tax, title fees,

2   insurance or other related costs."  (Doc. 181 at 6-10.)[5]

3                   i.      The May 1, 2018 Conversation

4           Construing the facts in the light most favorable to Braun, as the Court must do

5   because Braun is the nonmovant on the timing question, a reasonable juror could conclude

6   that Flowers-Carter did not make a replacement request during the May 1, 2018 telephone

7   call with Haschel (because she withdrew that request and agreed to allow Braun to make

8   another repair attempt).  Thus, Plaintiffs are not entitled to summary judgment on their

9   claim that an AADWA violation occurred on or about June 1, 2018 (*i.e.,* upon expiration

10  of the 30-day deadline to comply with the alleged May 1, 2018 replacement demand).

11          The Court acknowledges that Flowers-Carter testified that she made an

12  unambiguous request for a replacement during the May 1, 2018 phone call and only

13  acquiesced in giving Braun another chance to repair the vehicle—this time using its own

14  personnel rather than UA's—after Haschel effectively left her no choice.   But this

15  testimony conflicts with Haschel's account of the phone call.  According to Haschel,

16  although Flowers-Carter initially asked for a replacement, she later changed her mind by

17  fully and calmly agreeing to allow for another repair attempt.  A reasonable juror could

18  find that, under these circumstances, Flowers-Carter's statements during the May 1, 2018

19  phone call did not constitute a replacement demand.  As discussed in extensive detail

20  above, § 44-1352(C) provides that a consumer may "make[] the assistive device available

21  for repair" while § 44-1352(D) provides that, "[i]f the nonconformity is not repaired after

22  a reasonable attempt to make a repair, a consumer . . . may direct the manufacturer" to

23  provide a replacement or refund.  Thus, a consumer cannot simultaneously make a device

24  available for repair while also demanding a replacement—the two options are mutually

25  _____

26  [5]      In its response to Plaintiffs' summary judgment motion, Braun also contends there
    is a dispute of fact over whether Plaintiffs mitigated their losses.  (Doc. 181 at 10-11.)  This
27  argument is puzzling because Plaintiffs only sought summary judgment on liability, not
    damages.  In any event, Braun separately identifies the issue of mitigation as one reason
28  why it is affirmatively entitled to summary judgment on the issue of damages.  (Doc. 178
    at 7-9.)  That argument is addressed in Part I.B.2 below.

1    exclusive.  And because a reasonable juror could find that Flowers-Carter ultimately agreed

2    on May 1, 2018 to allow for further repairs, Plaintiffs are not entitled to summary judgment

3    on the claim that the May 1, 2018 conversation also constituted a replacement demand.[6]

4                           ii.    The Refund Request

5            Plaintiffs' other theory is that they made a refund request in their June 25, 2018

6    letter to Braun and then provided "additional quantification" during follow-up

7    communications in July and August 2018.  (Doc. 179 at 3, 10.)

8            In the June 25, 2018 letter, Plaintiffs' counsel identified, down to the penny, the

9    amount Plaintiffs purportedly paid ($47,979.71) when purchasing the minivan from a non-

10   party dealer in December 2017.  (Doc. 178-1 at 22.)  The letter also stated that Plaintiffs

11   purchased the conversion device from Braun in February 2018 and provided the serial

12   number for the device.  (*Id.*)  Next, the letter identified some of the other categories of

13   pecuniary damages that Plaintiffs had suffered.  (*Id.* at 22-23 ["[O]ur clients . . . have been

14   forced to retain their 2012 Dodge Caravan—which they had intended to sell once they

15   purchased the Chrysler Pacifica. Consequently, our clients have had to carry two car

16   payments, and two insurance payments, which has negatively impacted their financial

17   circumstances, and has caused them great pecuniary loss."].)  The letter did not, however,

18   purport to quantify those pecuniary damages.  The letter also stated, again without

19   quantification, that Plaintiffs had suffered "great emotional distress."  (*Id.* at 23.)  After

20   citing various AADWA provisions, the letter concluded: "[O]ur clients hereby demand that

21   your company (1) refund the purchase price of the Conversion; (2) pay our clients the

22   purchase price of the Vehicle; (3) pay our client's collateral pecuniary and special damages

23   and attorney's fees and costs; and (4) take possession of the Vehicle and the Conversion."

24   (*Id.* at 23-24.)  However, no bottom-line refund figure was provided.

25           The parties agree, in all material respects, as to what happened next.  As discussed

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [6]       This conclusion makes it unnecessary to resolve Braun's alternative argument that
28   the May 1, 2018 conversation can't serve as the triggering event for liability because
     Flowers-Carter refused to return phone calls and otherwise communicate with Braun in the
     weeks following the conversation.

in the factual background section of this order, the chronology is that (1) Braun received the letter on or around July 2, 2018; (2) Plaintiffs followed up on July 11, 2018; (3) Braun's general counsel responded on July 12, 2018 to note that he was turning the matter over to Dolenga; (4) Dolenga emailed Plaintiffs' counsel on July 18, 2018 to set up a call; (5) the call took place on July 23, 2018, with Plaintiffs requesting "$150,000 for the statutory repurchase"; (6) Plaintiffs' counsel emailed Dolenga on August 6, 2018 to follow up; (7) Dolenga responded on August 7, 2018 that he did "not have any official authority from Braun yet," adding that Braun was "interested in having some more hard numbers on the actual, economic losses in this matter"; (8) Dolenga emailed again on August 9, 2018 to state that he now had authority and was "prepared to talk," while reiterating the need for hard numbers and supporting documentation; (9) Plaintiffs' counsel responded on August 10, 2018 by providing, without documentation, a breakdown of the basis for the $150,000 demand, placing the total cost of the van and conversion at $84,806 and consequential economic damages at $26,000; (10) Dolenga responded with two emails on August 10, 2018 to the effect that Braun wanted to repurchase the van but needed more precise figures and documentation; (11) Dolenga wrote again on September 26, 2018 to reiterate Braun's need for exact numbers and documentation; and (12) Plaintiffs' counsel responded on October 2, 2018 that Plaintiffs planned to file suit that day and "revoked" their prior demand.

In a nutshell, Braun's position is that Plaintiffs' recalcitrance in providing necessary information and documentation either rendered Plaintiffs' refund requests ineffective (such that AADWA's 30-day deadline never began running) and/or made it impossible for Braun to comply with the refund requests (thereby excusing Braun's non-compliance with the 30-day deadline).  (Doc. 181 at 7-10.)  Plaintiffs disagree, arguing that AADWA's terms are explicit that the manufacturer must satisfy a consumer's demand within 30 days.  (Doc. 179 at 3-5, 11; Doc. 191 at 4-6.)  Plaintiffs also cite authority from outside Arizona suggesting that their failure to provide exact figures or documents justifying their demand did not constitute bad faith or prevent Braun from tendering the refund.  (Doc. 179 at 6-7;

Doc. 191 at 4-6.)  Finally, Plaintiffs argue that Braun had enough information at its own disposal to draw conclusions about the reasonableness of Plaintiffs' $150,000 demand or provide a counteroffer: Braun knew the van's MSRP, according to Haschel's deposition testimony, and Braun's own warranty registration contains the purchase price of the conversion.  (Doc. 179 at 16; Doc. 179-1 at 26, lines 1-7; Doc. 179-1 at 131-33; Doc. 182-1 at 75, lines 10-12.)

AADWA is silent on what, exactly, a consumer must do to make an effective replacement or refund request that triggers the 30-day clock.  Section 44-1352(D) states that a consumer "may direct the manufacturer to perform" a replacement or refund but does not explain how a consumer is expected to do so.  Similarly, § 44-1353(A) provides that "[w]ithin thirty days after receiving notification of a nonconformity, the manufacturer shall provide the consumer with a comparable assistive device or a refund" but provides no information concerning the form this "notification" must take.  Finally, § 44-1354 is even less helpful—it states that if a defect can't be repaired, "you are entitled to either a comparable new assistive device or a refund," but doesn't explain how a consumer is supposed to initiate the replacement/refund process.

Because AADWA itself doesn't explain what a consumer must do to effectively "direct" a manufacturer to provide a replacement or refund, it is appropriate to look to other sources to discern the meaning of this term.  In Arizona, "[t]o determine the plain meaning of a term, we refer to established and widely used dictionaries." *Western Corr. Grp., Inc. v. Tierney*, 96 P.3d 1070, 1074 (Ariz. Ct. App. 2004).  *Accord Parada v. Parada*, 999 P.2d 184, 187 (Ariz. 2000) (looking to Black's Law Dictionary to determine "the plain meaning of the [statutory] language in question").  Around the time of AADWA's passage, Black's Law Dictionary included the following definition of the term "direct" when used as a verb: "To instruct (someone) with authority."  *Direct*, Black's Law Dictionary 471 (7th ed. 1999).  Similarly, contemporary versions of non-legal dictionaries included the following definition of the term "direct" when used as a verb: "[T]o give authoritative instructions to; command; order or ordain: *I directed him to leave the room*."  *Direct*, Webster's New

Universal Unabridged Dictionary 558-59 (1996 ed.).  These definitions suggest that, under AADWA, a consumer's obligation to "direct" a manufacturer to provide a refund isn't a particularly onerous or detailed one—merely "instruct[ing] (someone) with authority" to provide a refund, in the parlance of Black's Law Dictionary, or giving "authoritative instructions to" the manufacturer to provide a refund, in the parlance of Webster's Dictionary, should suffice.

Because Arizona courts haven't addressed how to make an effective replacement or refund demand under AADWA, it is also permissible to look to "decisions from other jurisdictions" when predicting how the Arizona Supreme Court would resolve this issue. *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990).  The case law interpreting Wisconsin's lemon law ("WILL"), cited by both parties, is useful (although obviously not binding) in understanding of how to interpret AADWA.  WILL applies to motor vehicle purchases and, like AADWA, sets out consumers' and manufacturers' rights and obligations when a new motor vehicle is defective and cannot be repaired after a reasonable number of attempts. Wis. Stat. § 218.0171.  As with AADWA, once repair attempts have failed and the consumer demands a refund, the manufacturer must provide the refund "[n]o later than 30 days after." *Id.* § 218.0171(2)(c).

In *Church v. Chrysler Corp.*, 585 N.W.2d 685 (Wis. Ct. App. 1998), a consumer who bought a lemon wrote a letter to the manufacturer requesting a "refund of the full purchase price plus all monies" to which she was entitled under WILL, without quantifying that sum. *Id.* at 687.  The manufacturer responded about two weeks later, agreeing to repurchase the vehicle and "set[ting] forth a detailed computation of its proposed refund in the amount of $27,832.98." *Id.*  One week later, the consumer sent a letter disputing the proposed refund amount, demanding over $30,000. *Id.*  A few days later, the manufacturer responded with its intent to offer a refund of $29,374.51. *Id.*  Then, only three days after the 30-day window elapsed, the consumer filed suit under WILL. *Id.*  The manufacturer paid $29,374.51 a few weeks after the lawsuit was filed. *Id.*  Nevertheless, the court held that the manufacturer was liable under WILL because "once the consumer makes an offer

to transfer title, the burden is on the manufacturer to comply with the thirty-day requirement regardless of whether items or amounts are in dispute." *Id.* at 688-89. The court held that if the parties disagreed about the correct refund amount, the manufacturer could: "(1) pay the amount demanded by the purchaser within the thirty-day period; or (2) pay the amount which the manufacturer deems appropriate within the thirty-day period." *Id.* at 689. If the manufacturer chose the second option, the consumer would still be able to sue but the issue would "not be whether payment has been made within thirty days, but rather whether the amount of the refund was correct." *Id.* Since *Church* was decided, Wisconsin courts have repeatedly "held that thirty days means thirty days; a dispute between the consumer and the manufacturer about the amount of refund does not toll the thirty-day period in which the manufacturer must act." *Chariton v. Saturn Corp.*, 615 N.W.2d 209, 210 (Wis. Ct. App. 2000). *See also Marquez v. Mercedes-Benz USA, LLC*, 751 N.W.2d 859, 865 (Wis. Ct. App. 2008) ("[D]isagreements or negotiations between manufacturer and consumer will not toll or avoid the thirty-day time limit of the Lemon Law. If the parties cannot reach agreement by day thirty, it is up to the manufacturer to decide whether to meet the consumer's demands or make the refund on the terms it believes proper. If it takes the latter course and the consumer brings an action, and the manufacturer turns out to have been wrong, it will be required to face the statutory consequences.").

On the other hand, Wisconsin courts have also recognized that if a manufacturer "need[s] further payoff information to make the proper refund under the Lemon Law" and the consumer "intentionally withheld this information and thereby caused [the manufacturer] to miss the thirty-day refund window," the manufacturer may avoid liability. *Marquez*, 751 N.W.2d at 863. This situation arose in *Marquez*, where a consumer initially sought a replacement but then, near the end of the 30-day window, changed course and demanded a refund. *Id.* at 861, 866. Then, on the 30th day, the consumer ignored the manufacturer's calls, preventing the manufacturer from learning information necessary to complete the refund. *Id.* at 862. The consumer sued the manufacturer the next day. *Id.* Importantly, WILL requires that the manufacturer remit the refund to the consumer *and*

1   the holder of a perfected security interest. *Id.* Because the consumer's failure to respond

2   to the manufacturer's calls prevented the manufacturer from learning relevant information

3   about the bank holding the car loan, the consumer's conduct prevented the manufacturer

4   from complying with the statute. *Id.* at 863. For this reason, the court concluded that

5   summary judgment in favor of the consumer was improper and remanded for trial on the

6   question of the consumer's good faith. *Id.* at 866. The court emphasized "that all the

7   parties covered by the Lemon Law should act in good faith" and "that a consumer fails to

8   act in good faith when he or she intentionally prevents the manufacturer from complying

9   with the statute." *Id.* at 865.

10      Synthesizing the dictionary definitions set forth above and the Wisconsin courts'

11  construction of WILL, the Court concludes that, under AADWA, a consumer effectively

12  "directs" a manufacturer to provide a refund by (1) making a request for a refund and (2)

13  quantifying each category of damages being sought. It is not necessary, in contrast, for the

14  consumer to provide documentary support for each category of claimed damages.

15  Although the Court appreciates Braun's arguments concerning why it might be wise to

16  require a consumer to supply such documentation as a prerequisite to obtaining a refund

17  under AADWA (and also appreciates Braun's argument that, as a practical matter, it may

18  be quite difficult for a manufacturer to provide a sizeable refund within 30 days of receiving

19  a triggering AADWA demand), it is not this Court's role to rewrite statutory language to

20  account for considerations that are, at bottom, policy arguments. *See, e.g., In re Nickolas

21  S.*, 245 P.3d 446, 450 (Ariz. 2011) ("[C]ourts cannot salvage statutes by rewriting them

22  because doing so would invade the legislature's domain."); *New Sun Bus. Park, LLC v.

23  Yuma County*, 209 P.3d 179, 183 (Ariz. Ct. App. 2009) ("Our Legislature did not choose

24  this particular language . . . and we are not at liberty to rewrite the statute under the guise

25  of judicial interpretation.") (citations and internal quotation marks omitted).[7]

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [7]      Braun also contends that Plaintiffs' June 25, 2018 letter couldn't have started the
27  30-day clock because it didn't cite the correct portion of AADWA. (Doc. 190 at 3-4 ["This
    section [§ 44-1353] does not apply. Plaintiffs never invoked this section or even mentioned
28  it, or a time limit, in their initial demand letter. . . . Plaintiffs chose the remedy, invoking
    44-1352 in their initial demand, therefore, § 44-1352 applies and § 44-1353 does not."].)
    Not only is this argument premised on Braun's faulty "two path" interpretation of

1    Applying those standards here, the Court further concludes that Plaintiffs' June 25,

2    2018 letter to Braun was not, standing alone, an effective refund demand under AADWA

3    that triggered the 30-day clock.  This letter sought three different categories of damages:

4    "[O]ur clients hereby demand that your company (1) refund the purchase price of the

5    Conversion; (2) pay our clients the purchase price of the Vehicle; [and] (3) pay our client's

6    collateral pecuniary and special damages and attorney's fees and costs."  (Doc. 178-1 at

7    23-24.)  Had it been limited to the first two categories, it might have been sufficient—the

8    letter specified the purported price of the vehicle and Braun presumably knew the price of

9    the conversion (which, after all, it sold and installed).

10   It was the inclusion of the final category—"collateral pecuniary and special

11   damages and attorney's fees and costs"—that rendered the letter ineffective.  This is

12   because Plaintiffs made no effort to quantify those damages.  Braun had no independent

13   insight into the "collateral costs" Plaintiffs incurred while their vehicle was out of service,[8]

14   so it is difficult to see how Braun could have complied with Plaintiffs' refund request based

15   on the vague information they provided in their letter.  Should it have written a blank check

16   to Plaintiffs and let them fill in the blank?  Under Wisconsin law, a manufacturer cannot

17   be held liable if the consumer's refund request leaves it "need[ing] further payoff

18   information to make the proper refund under the Lemon Law," *Marquez*, 751 N.W.2d at

19   863, and the Court concludes that when an Arizona consumer includes a claim for

20   "collateral costs" in an AADWA refund request, the consumer must, at a minimum,

21   quantify the amount of such costs being sought (because such costs, unlike the price of the

22   assistive device, are uniquely outside the knowledge and control of the manufacturer).[9]

23   _____

AADWA, but it beggars belief that the Arizona legislature would enact a consumer

24   protection statute such as AADWA only to condition its enforceability on a consumer's
ability to identify and cite the correct statutory provision in a demand letter.

25   [8]    Under A.R.S. § 44-1351(4), "'[c]ollateral cost' means an expense incurred by an
assistive device lessor or a consumer in connection with the repair of a nonconformity,

26   including the costs of sales tax and of obtaining an alternative assistive device.  Collateral
cost includes the cost to the consumer of returning a nonconforming assistive device."

27   [9]    The Court also notes that the request for "collateral pecuniary and special damages
and attorney's fees and costs" may have been overinclusive.  If, as discussed above,

28   Flowers-Carter did not make an effective replacement demand during the May 1, 2018
phone call, then Plaintiffs had no basis for including a demand for "special damages and

1

2

3

Fortunately for Plaintiffs, the omissions in the June 25, 2018 letter were cured during the parties' later communications.  It is undisputed that, in an email sent on August 10, 2018, Plaintiffs' counsel provided the following breakdown of Plaintiffs' demand:

4

5

6

7

> [T]he vehicle and the assistive device total $84,806, and excluding pain and suffering, we estimate that our clients have suffered around $26,000 of consequential economic damages as well.  Given that our clients can recover treble damages, just the economic damages here would justify a $332,418 demand.  Therefore, Braun should consider itself lucky that it only got a demand for $150,000.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

(Doc. 179-1 at 71-72.)  This email, unlike the June 25, 2018 letter, was sufficient to serve as an effective refund request.  It quantified the alleged total purchase price of the vehicle and assistive device ($84,806)[10] *and* the extent of Plaintiffs' pecuniary damages ($26,000), which were all of the categories of damages to which Plaintiffs were definitively entitled under § 44-1352(D)(2).  This email gave Braun the information it needed to make a refund under AADWA and thus started the 30-day clock.  To the extent Braun disagreed these were the proper refund amounts, it had two permissible options: "(1) pay the amount demanded by the purchaser within the thirty-day period; or (2) pay the amount which the manufacturer deems appropriate within the thirty-day period."  *Church*, 585 N.W.2d at 689.  It could not, in contrast, refuse to make any payment unless and until Plaintiffs provided more documentation.

Braun argues that Plaintiffs, like the consumer in *Marquez*, prevented it from complying with AADWA by not providing sufficiently detailed information regarding the

22

23

24

25

attorney's fees and costs" (Doc. 178-1 at 23-24) in their June 25, 2018 letter.  Attorneys' fees and costs (unlike a refund of the purchase amount and "collateral costs") become recoverable only after there has been an AADWA violation.  But if the June 25, 2018 letter constituted Plaintiffs' first request for replacement or a refund, there was no AADWA violation at that point—a violation would arise only if Braun failed to honor the request within the next 30 days.

26

27

28

[10]      It is not clear where this $84,806 figure came from.  As discussed in footnotes 1 and 2, the parties have made inconsistent statements concerning the price of the minivan and the price of the conversion.  Moreover, assuming that the minivan cost $47,979.71 (as Plaintiffs assert), the cost of the conversion would need to be $36,826.29 to justify a combined cost of $84,806.  Braun's brief, however, pegged the cost of the conversion at only $23,412.75 while the evidence submitted by Plaintiffs suggests the "Total Selling Price" was $34,409.31.

refund demand.  (Doc. 181 at 16-17.)   But the obstruction in *Marquez* blocked the manufacturer from being able to tender a WILL-compliant refund because the manufacturer was required to pay the consumer's bank.  AADWA contains no such requirement.  Thus, Braun cannot argue that Plaintiffs did anything in this case to prevent it from tendering a refund.  Although Plaintiffs may have failed to give Braun enough documentation to make Braun feel "comfortable" coming up with a number for its own counteroffer (Doc. 179-1 at 107), the plain language of AADWA does not condition the manufacturer's refund obligation on its own subjective comfort level.

Additionally, the *Marquez* court determined that, viewing the facts in the light most favorable to the manufacturer, "the manufacturer stood ready to comply with its statutory obligations and was prevented from doing so by the consumer's deliberate obstruction." 751 N.W.2d at 865.  Here, even viewing the facts in the light most favorable to Braun, the Court cannot conclude that Braun "stood ready to comply" with AADWA's 30-day refund window.  The record does not show that Braun was ready to tender the refund in timely fashion and was prevented from doing so by Plaintiffs.  Instead, this case is more similar to instances where the parties disputed the proper amount of the refund until after the 30-day deadline elapsed, resulting in the manufacturer's liability.  *See, e.g.*, *Mercedes-Benz USA, LLC v. Hinkley*, 918 N.W.2d 644, 2018 WL 3519938, *6 (Wis. Ct. App. 2018) ("Here, Mercedes-Benz offers nothing more than negotiations between counsel—which did not resolve the dispute—as evidence of 'intentional interference' by Hinkley. Mercedes-Benz appears to suggest that it could not make a refund payment in compliance with the statute unless the amount was agreed upon.  There is no such statutory provision . . . .  The record here discloses no evidence that Hinkley did anything during the thirty-day window other than negotiate for more money.  That is not evidence that Hinkley intentionally prevented Mercedes-Benz from paying the amount it believed was due within the statutory window.").[11]

---

[11]    It is true that Dolenga responded promptly to Gill's August 10, 2018 email, telling Plaintiffs that "Braun intends to repurchase the van to bring this matter to a conclusion." (Doc. 179-1 at 106.)  But at the same time, Dolenga continued to request additional information.  (*Id.* at 105-07.)  Nor did Dolenga provide a counteroffer over the next 30

- 31 -

1   For these reasons, Plaintiffs are entitled to summary judgment on the question of

2   Braun's AADWA liability—Plaintiffs made an effective refund demand by no later than

3   August 10, 2018 and Braun did not honor that demand within 30 days, meaning that an

4   AADWA violation occurred no later than September 10, 2018.[12]

5           **c.**     **Other arguments concerning AADWA liability**

6   In its affirmative summary judgment motion, Braun seeks summary judgment on

7   certain purported "elements of plaintiffs' AADWA claim." (Doc. 178 at 4-6.) Specifically,

8   Braun seeks a determination that (1) it "provided an AADWA-complaint express

9   warranty," (2) it "performed all warranty repairs free of charge," and (3) it "complied with

10   the AADWA's exclusive-remedy provision by repurchasing the Conversion." (*Id.*)

11   The first issue is a red herring. Section 44-1352(A) provides that a manufacturer

12   "shall give the consumer an express warranty against defects, malfunctions or conditions

13   for the assistive device. The duration of the express warranty shall be for at least one year

14   after the initial delivery of the assistive device to the consumer." Section 44-1352(B)

15   provides that where there is not an express warranty, "the manufacturer is deemed to have

16   expressly warranted to the consumer that the assistive device will be free from any defect,

17   malfunction or condition that substantially impairs the use, safety or value of the assistive

18   device. The duration of the express warranty shall be for at least one year . . . ." Read

19   together, these provisions state that a manufacturer must provide an express AADWA-

20   compliant warranty, but if it doesn't, the manufacturer "is deemed to have expressly

21   warranted" that the device will be free from any substantial defect for at least one year.

22   Given this backdrop, it is irrelevant—at least for purposes of Count One, which is

23   Plaintiffs' AADWA claim—whether the express limited warranty that Braun actually

---

24   days. Indeed, even on October 2, 2018 (53 days after the August 10, 2018 demand), when
    Gill stated that Plaintiffs were filing suit and offered to bifurcate settlement discussions,
25   Dolenga pressed for "global resolution" but did not provide a counteroffer. (*Id.* at 102-05.)

26   [12]    Whether the violation remained in effect until December 2019/January 2020, when
    Braun finally provided the refund, is a separate question that the parties have not asked the
27   Court to address at summary judgment. Thus, the Court does not reach whether Plaintiffs'
    counsel's decision to "revoke" the settlement offer on October 2, 2018 was also a
28   withdrawal of the refund request (and, if so, whether that withdrawal should have a limiting
    effect on Plaintiffs' ability to recover damages under AADWA).

provided to Plaintiffs (Doc. 178-1 at 38-39; Doc. 182-1 at 3-12) was compliant with § 44-1352(A).  Even if it wasn't compliant, this would just mean that Braun was "deemed" to have provided an AADWA-complaint warranty, too.  Put another way, the only effect Braun's written warranty could have had was to increase the warranty protections provided to Plaintiffs above and beyond those "deemed" to exist, as a matter of law, by AADWA.  *Cf.* A.R.S. § 47-2317 (when multiple warranties exist, they must "be construed as consistent with each other and as cumulative" unless such a construction is unreasonable, in which case "the intention of the parties shall determine which warranty is dominant").

In any event, Count One isn't premised on the theory that Plaintiffs somehow incurred damages due to the lack of an AADWA-compliant warranty.  As discussed in detail above, the theory underlying Count One is that Braun violated AADWA by not providing a replacement or refund within 30 days of Plaintiffs' request for those remedies.  (Doc. 38 ¶¶ 245, 248, 251-52.)

Braun's second affirmative summary judgment argument—that it complied with AADWA's requirement that repairs be made free of charge—is similarly irrelevant.  Neither party disputes that Braun and its authorized dealer were unable to adequately repair the van after a reasonable number of attempts and that these unrepaired defects substantially impaired the use and value of the van.  (Doc. 179-1 at 21-22.)  Nothing turns on whether these admittedly unsuccessful repairs themselves complied with AADWA.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

Finally, as for Braun's last affirmative summary judgment argument, although it is undisputed that Braun ultimately repurchased the van, Braun is incorrect that this necessarily shows it complied with AADWA.  Braun's arguments on this point are premised on its faulty belief that AADWA creates "two paths," only one of which requires that the replacement or refund by provided within 30 days.

…

2.      <u>Count One—AADWA Damages</u>

Braun moves for summary judgment on certain issues related to the damages available under AADWA, arguing that Plaintiffs may not recover (1) noneconomic damages, (2) treble attorneys' fees, or (3) any further pecuniary losses (because they already received AADWA's exclusive remedy when it provided the full refund).  (Doc. 178 at 7-13.)  Plaintiffs respond that AADWA does not provide for an exclusive remedy of replacement or refund, their damages are not limited to economic damages, their common-law breach of warranty claim entitles them to any damages they seek, Braun proximately caused their economic and noneconomic damages, and attorneys' fees are a form of "pecuniary loss" that can be trebled.  (Doc. 182 at 5-17.)

As discussed below, Braun is correct that AADWA does not allow Plaintiffs to recover treble attorneys' fees and that Plaintiffs' damages are limited to pecuniary losses, which may be trebled.  However, Braun is incorrect that the sole remedy under AADWA is repurchase or replacement—the statute provides a cause of action allowing for recovery of trebled pecuniary losses, disbursements, costs, and attorneys' fees.  Thus, because Braun violated AADWA, all these remedies may potentially be recovered in this case.

The Court further concludes that the parties have raised genuine disputes of material fact regarding Plaintiffs' damages in this case, including the extent to which Plaintiffs appropriately mitigated their damages; when precisely the AADWA 30-day window began to run (and thus when Plaintiffs' damages started to accrue); and the full scope of Plaintiffs' pecuniary losses.  Braun's motion is therefore granted in part, as to the scope of damages available under AADWA, but denied regarding the amount of damages.

a.      **Scope Of Recoverable Damages Under AADWA**

Braun's motion raises three distinct issues regarding the scope of damages available under AADWA: (1) whether AADWA's remedial provision allows a plaintiff to recover pecuniary losses, including consequential damages, apart from the refund or repurchase of the assistive device; (2) whether an AADWA plaintiff may recover noneconomic damages; and (3) whether AADWA allows a plaintiff to recover treble attorneys' fees.

i.   Economic Damages (Apart From Refund)

AADWA's remedial provision provides, in relevant part, as follows:

> In addition to any other remedy, a consumer may bring an action in superior court the recover damages caused by a violation of this section.  The court may award the prevailing consumer triple the amount of any pecuniary loss plus costs, disbursements and attorney fees.  The court may also award any equitable relief deemed appropriate by the court.

A.R.S. §44-1355(C).  Braun argues that when it repurchased the van in January 2020, it paid "all pecuniary losses related to the vehicle, including the purchase price, finance charges, registration costs, taxes, and insurance" and thus "plaintiffs have no other pecuniary losses related to the purchase of the Conversion." (Doc. 178 at 8.)  Plaintiffs respond that they have additional consequential and economic damages that are recoverable under AADWA. (Doc. 182 at 11, 14.)  These include, *inter alia*, losses arising from keeping their older, defective conversion van as a backup and losses arising from their purchase of a new conversion van, which was more expensive than the original van, after receiving their refund.  (*Id.* at 14.)

Plaintiffs are correct.  As an initial matter, it must be recalled that, when a consumer makes a refund request under AADWA after a reasonable number of repair attempts, the manufacturer's refund obligation at that point isn't limited to the purchase price.  Instead, the consumer is also entitled to a refund of "collateral costs."  A.R.S. § 44-1352(D)(2) (manufacturer must "refund to the consumer . . . the full purchase price plus any finance charge paid by the consumer at the point of sale *and collateral costs* minus a reasonable allowance for use") (emphasis added).  A "collateral cost," in turn, is defined as "an expense incurred by an assistive device lessor or a consumer in connection with the repair of a nonconformity, including the costs of sales tax *and of obtaining an alternative assistive device*.  Collateral cost includes the cost to the consumer of returning a nonconforming assistive device."  A.R.S. § 44-1351(4) (emphasis added).  Given this backdrop, it would make no sense to construe the term "pecuniary damages," as it appears in § 44-1355(C), as excluding consequential damages (such as the cost of obtaining a replacement device).  It would be anomalous to conclude that a consumer is statutorily entitled to recover such

consequential damages within 30 days of making a refund request, per § 44-1352(D)(2), yet if a manufacturer ignores that 30-day deadline and violates AADWA, the consumer is somehow precluded from recovering any consequential damages as part of a claim under § 44-1355(C).

At any rate, the term "pecuniary loss," as it is ordinarily understood, is not limited to the purchase price, finance charges, registration costs, taxes, and insurance.  Instead, it also encompasses consequential damages.  *Pecuniary Loss*, Black's Law Dictionary (11th ed. 2019) ("A loss of money or of something having monetary value."); *Consequential Damages*, Black's Law Dictionary ("Losses that do not flow directly and immediately from an injurious act but that result indirectly from that act."); *Pecuniary Damages*, Black's Law Dictionary ("Damages that can be estimated and monetarily compensated.  Although this phrase appears in many old cases, it is now widely considered a redundancy—since damages are always pecuniary.").  *Cf. Three Crown Ltd. P'ship v. Salomon Bros., Inc.*, 906 F. Supp. 876, 891 (S.D.N.Y. 1995) (construing "pecuniary losses" as synonymous with "out-of-pocket losses and consequential damages").  This is true even though, as Braun argues, AADWA creates an express warranty and thus an action under AADWA sounds in contract rather than tort.  *Raatz v. Dealer Trade Inc.*, 261 F. Supp. 3d 997, 1000 (D. Ariz. 2017) ("Arizona courts repeatedly have held that breach of warranty claims arise out of contract").  Under Arizona law, consequential damages are available in contract actions, provided the losses are reasonably foreseeable.  *Seekings v. Jimmy GMC of Tucson, Inc.*, 638 P.2d 210, 215 (Ariz. 1981) ("At common law, 'consequential' or 'special' damages are those damages caused by a breach of contract or warranty that can reasonably be supposed to be within the contemplation of the parties at the time of the contracting."); *McAlister v. Citibank*, 829 P.2d 1253, 1257 (Ariz. Ct. App. 1992) ("Consequential damages are those reasonably foreseeable losses that flow from a breach of contract.").

ii.    Noneconomic Damages

Braun argues that, because AADWA expressly limits the recovery of damages to "triple the amount of any pecuniary loss plus costs, disbursements and attorney fees,"

- 36 -

1   Plaintiffs cannot recover noneconomic damages related to pain, suffering, or emotional

2   distress caused by the AADWA violation.  (Doc. 178 at 9-11.)  Plaintiffs respond that the

3   use of the term "damages" in the first sentence of § 44-1355(C) suggests that an AADWA

4   plaintiff may recover any type of damages, notwithstanding the enumerated list of remedies

5   provided in the subsequent sentence.  (Doc. 182 at 6-7.)  They further assert that because

6   AADWA is "broadly drafted" to provide consumers with remedies and "shifts the risk from

7   the consumer to the manufacturer," AADWA should be read to allow for noneconomic

8   damages.  (*Id.* at 7-8.)

9          Plaintiffs' argument is unavailing.  The first sentence of § 44-1355(C) is a general

10  provision that establishes a consumer's right to seek redress in court for a violation of

11  AADWA, allowing the consumer to "recover damages."  The second sentence, in contrast,

12  addresses the power of the court to provide such redress, specifically enumerating the types

13  of relief the court may provide.  It state that the court "may award the prevailing consumer"

14  the following: "triple the amount of any pecuniary loss plus costs, disbursements and

15  attorney fees."[13]

16         One clue that the second sentence provides an exhaustive list of the relief a court

17  may provide is that it addresses the power of the court as conferred by the legislature,

18  whereas the first sentence addresses the power of the consumer to bring an AADWA

19  action.  Given the different subjects of the two sentences, it would make no sense to hold

20  that the first sentence's broad use of the term "damages" controls the second sentence's

21  grant of judicial power.  Courts may "not read into a statute something that is not within

22  the manifest intent of the legislature as indicated by the statute itself" or "inflate, expand,

23  stretch, or extend a statute to matters not falling within its express provisions."  *In re Estate*

24  *of Winn*, 237 P.3d 628, 630 (Ariz. Ct. App. 2010) (citations and quotation marks omitted).

25         Another clue that the remedies list of the second sentence is exhaustive comes from

26

27  ───────────────
    [13]     The third sentence of § 44-1355(C) provides that "[t]he court may also award any
28  equitable relief deemed appropriate by the court."  Thus, in addition to the remedies
    specified earlier in subsection (C), courts are empowered to grant equitable relief.
    Plaintiffs do not seek equitable relief in this case.  (Doc. 38 at 39.)

the interpretive principle that a specific provision controls a more general provision on the same subject. Here, the first sentence generally provides for "damages," while the second sentence lays out specific remedies. The most harmonious and commonsense reading of these two sentences, to the extent there is a conflict between them, is that the second, more specific enumeration of remedies in the second sentence controls the general, undefined use of "damages" in the first sentence. *City of Phoenix v. Superior Ct. in & for Maricopa Cnty.*, 677 P.2d 1283, 1286 (Ariz. 1984) ("[S]pecial or specific statutory provisions will usually control over those that are general."); *Sempre Ltd. P'ship v. Maricopa County*, 235 P.3d 259, 263 (Ariz. Ct. App. 2010) ("We agree that a specific provision will usually prevail over a conflicting general provision."). *Cf. Clouse ex rel. Clouse v. State*, 16 P.3d 757, 760 (Ariz. 2001) ("It is an established axiom of constitutional law that where there are both general and specific constitutional provisions relating to the same subject, the specific provision will control.") (internal quotation marks omitted); *ELM Ret. Ctr., LP v. Callaway*, 246 P.3d 938, 942 (Ariz. Ct. App. 2010) ("[B]ecause specific contract provisions express the parties' intent more precisely than general provisions, specific provisions qualify the meaning of general provisions."); *Johnson v. Mohave County*, 78 P.3d 1051, 1055 (Ariz. Ct. App. 2003) ("[I]f a provision of a specific statute is inconsistent with one in a general statute on the same subject, the specific statute controls[.]") (internal quotation marks omitted).

The final and perhaps most conclusive indication that a plaintiff's remedies are limited to those enumerated in the second sentence of § 44-1355(C) is application of the doctrine of *expressio unius*. Under the canon of *expressio unius*, the enumeration of one or more terms implies the exclusion of others. Garner & Scalia, *Reading Law* at 107-11. This canon is "appropriate when one term is reasonably understood as an expression of all terms included in the statutory grant or prohibition." *City of Surprise v. Ariz. Corp. Comm'n*, 437 P.3d 865, 870 (Ariz. 2019). In the context of AADWA, it is reasonable to understand the express list of remedies set forth in the second sentence of § 44-1355(C)— "triple the amount of any pecuniary loss plus costs, disbursements and attorney fees"—as

1   implying the exclusion of noneconomic damages.  Had the legislature wanted to authorize

2   recovery beyond "pecuniary loss," such as recovery for emotional distress or pain and

3   suffering, it presumably would have said so.

4          This conclusion is bolstered by the statute's lack of language suggesting that the list

5   of remedies is nonexhaustive, such as "including" or "including but not limited to."

6   *Compare In re Mark Anthony Constr., Inc.*, 886 F.2d 1101, 1106 (9th Cir. 1989) ("[W]e

7   conclude that the administrative expense statute's use of 'including' renders the *expressio*

8   *unius* rule inapplicable . . . .").  The use of the term "may" in this context provides further

9   support.  "May" is a word of authority that means "has discretion to; is permitted to."  Brian

10  A. Garner, *Garner's Dictionary of Legal Usage* 954 (3d ed. 2011).  Section 44-1355(C)

11  thus is a statutory grant of permission to courts to provide certain remedies, and in this

12  context the grant of authority to provide the enumerated remedies strongly implies the lack

13  of authority to provide other forms of relief.  "It is for the legislature to make policy

14  decisions about the scope of recoverable damages in a statutory cause of action."  *Estate*

15  *of Winn*, 237 P.3d at 630.

16         Plaintiffs argue that AADWA recovery should encompass noneconomic damages

17  in light of *Shaw v. CTVT Motors, Inc.*, 300 P.3d 907 (Ariz. Ct. App. 2013).  The *Shaw*

18  court held that Arizona's economic loss rule—"a judicially created doctrine limiting the

19  availability of common law tort remedies"—does not bar the recovery of noneconomic

20  damages under the Arizona Consumer Fraud Act ("CFA").  300 P.3d at 909-10.  The court

21  reasoned that the economic loss rule should not apply to the statutory cause of action under

22  the CFA because it "is a judicially created limitation on common law remedies . . . . not a

23  substantive restraint on the power of the Legislature to create new remedies."  *Id.*  Plaintiffs

24  argue that the same reasoning extends here, and thus AADWA remedies shouldn't be

25  limited to economic damages by the economic loss rule.  (Doc. 182 at 8.)  The problem

26  with this argument is that AADWA's remedies are not limited by the economic loss rule,

27  but by the language of the statute itself.  Limiting Plaintiffs' recovery to triple pecuniary

28  losses and the other enumerated remedies therefore does not contradict the holding of *Shaw*

1   in any respect.  In *Shaw*, the court had to determine the scope of remedies available under

2   the CFA, which did not have an express remedies provision and in fact had a judicially

3   created private right of action.  300 P.3d at 909-10.  Thus, the question in *Shaw* was whether

4   the remedies available under the CFA were limited by the economic loss rule in the absence

5   of any statutory language expressly guiding the outcome.  *Id.*  But here, the Court is guided

6   by the express terms of § 44-1355(C).  The Court therefore "must adhere to the plain

7   language of the statute, leaving any deficiencies or inequities to be corrected by the

8   legislature" because "[i]t is for the legislature to make policy decisions about the scope of

9   recoverable damages in a statutory cause of action."  *Estate of Winn*, 237 P.3d at 630.

10          Plaintiffs also contend that, although non-economic damages are usually

11  unavailable in contract actions (such as a breach-of-warranty action), Arizona courts have

12  authorized the recovery of such damages in contract actions where "a breach is particularly

13  likely to result in serious emotional disturbance" and/or "where willful and wanton or

14  intentional conduct and outrageous conduct accompanies the breach."  (Doc. 182 at 12-13,

15  citing *Alday v. Raytheon Co.*, 619 F. Supp. 2d 726 (D. Ariz. 2008).)  This argument fails

16  for the same reason as Plaintiffs' *Shaw* argument.  Had the Arizona legislature simply

17  created a contract-based AADWA action without specifying the available remedies, it

18  might have been appropriate to consider the applicability of these exceptions to Arizona's

19  usual prohibition against the recovery of non-economic damages in a contract action.  But

20  here, the legislature has expressly defined which remedies are available in an AADWA

21  action—and, by necessary implication, rendered other remedies unavailable.

22          Finally, Plaintiffs raise concerns that AADWA's remedial purpose would be

23  undermined if non-economic damages were disallowed.  But as discussed at length in other

24  portions of this order, the Court's role is not to ponder competing policy arguments but to

25  follow the plain terms of the statute.  *Cf. Hull v. DaimlerChrysler Corp.*, 99 P.3d 1026,

26  1027-29 (Ariz. Ct. App. 2004) (concluding that claim under the Arizona Lemon Law was

27  foreclosed by "the clear language" of the statute and emphasizing that, even though "we

28  are concerned that [enforcing] such a requirement creates certain hardships for consumers,"

1   "the crafting of such a statutory remedy is the province of the legislature, not the courts"

2   and thus the available "relief is limited to that prescribed by the act").  Further, AADWA,

3   unlike many other statutory causes of action, allows for triple recovery of pecuniary losses,

4   likely reflecting the legislature's awareness of the special hardships that users of assistive

5   devices may suffer when those devices fail and are not promptly repaired, replaced, or

6   refunded.  *Cf. Schade v. Diethrich*, 760 P.2d 1050, 1063 (Ariz. 1988) ("We believe that the

7   treble damages statute was enacted to discourage just such [bad faith] practices.").

8       Accordingly, Plaintiffs' recovery is limited to damages that can reasonably be

9   described as "pecuniary" in nature, plus their costs, disbursements, and attorneys' fees.[14]

10                  iii.    Treble Attorneys' Fees

11       Plaintiffs argue that attorneys' fees are a form of "pecuniary loss" that, just like

12   other pecuniary losses, may be trebled.  (Doc. 182 at 16-17.)  Braun argues that AADWA's

13   plain language does not support this reading and that Plaintiffs contradict themselves

14   elsewhere in their brief on this point.  (Doc. 178 at 13; Doc. 190 at 11; *see also* Doc. 182

15   at 6 ["The next sentence clarifies that 'damages' in the first sentence are not limited to

16   'pecuniary loss' by expressly limiting treble damages to 'pecuniary loss' in the second

17   sentence."].)

18       Braun is correct.  The plain text of § 44-1355(C) does not support Plaintiffs'

19   reading.  In context, it is obvious that "triple the amount" modifies "any pecuniary loss,"

20   rather than "costs, disbursements and attorney fees."  *See also* Garner & Scalia, Reading

21   Law at 152 ("When the syntax involves something other than a parallel series of nouns or

22

---

23   [14]    The Court notes that Braun characterizes Plaintiffs' claimed damages for "loss of
24   credit score/increased debt to credit ratio" as noneconomic.  (Doc. 178 at 9.)  Plaintiffs do
     not address whether they consider these purported damages to be economic or
     noneconomic, but such claims, as opposed to emotional distress and pain and suffering, are
25   generally considered pecuniary or economic in nature.  *See, e.g.*, *Adler v. DirecTV, LLC*,
     2018 WL 6981838, *6 (C.D. Cal. 2018) ("The Complaint alleges that Plaintiff suffered
26   shock and embarrassment upon learning that, through no fault of his own, his credit score
     may decrease and that he may suffer further economic harm as a result.  Plaintiff has thus
27   plausibly demonstrated that he suffered actual damages as required to state a cause of action
     under the CCRAA."); *Long v. Bank of Am., N.A.*, 2013 WL 1326550, *4 (E.D. Cal. 2013)
28   ("Plaintiff has alleged that Defendants' [conduct] has caused Plaintiff significant injury to
     her credit score.  Therefore, Plaintiff has alleged pecuniary damages.") (citation omitted).

  
verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent.").  Further, Plaintiffs do not cite any legal authority suggesting that a prevailing plaintiff under AADWA or an analogous (or indeed, any) statute may be entitled to treble attorneys' fees, nor did the Court uncover any in its own research.  The Court therefore rejects Plaintiffs' argument that their attorneys' fees may be trebled and grants summary judgment to Braun with respect to this issue.

### b.  **Disputes Of Fact Regarding Pecuniary Losses**

In their summary judgment briefing, the parties have raised significant issues of material fact regarding Plaintiffs' damages.  For example, the parties dispute the extent to which Plaintiffs' pecuniary losses were caused by themselves or Braun.  (Doc. 178 at 8-9, 11-12; Doc. 182 at 11-15; Doc. 190 at 8-9.)  Braun has not met its burden to "produce evidence negating an essential element" of Plaintiffs' claim for damages under AADWA. *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102.  Nor has Braun shown that Plaintiffs do "not have enough evidence of an essential element to carry [their] ultimate burden of persuasion at trial" with respect to this issue or other damages-related issues, such as the total amount of Plaintiffs' pecuniary losses, whether the Court should award Plaintiffs' triple those pecuniary losses, and the time at which Plaintiffs began to accrue pecuniary losses.  *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102.  The Court therefore denies Braun's motion with respect to damages, apart from the legal issues outlined above.

### 3.  <u>Count Two—Breach of Express Warranty</u>

Braun moves for summary judgment on Count Two, which is a claim for common-law breach of express warranty.  Braun accuses Plaintiffs of "repeatedly conflat[ing] common law and statutory theories of liability" and argues that Count Two is either a second AADWA claim or a common-law claim based on an alleged breach of the express limited warranty Braun provided.  (Doc. 178 at 6-7; Doc. 190 at 4-5.)  If it is the former, Braun argues it is redundant of Count One.  (*Id.*)  If it is the latter, Braun seeks summary judgment because Plaintiffs—who will bear the burden of proof on this claim at trial— have offered no evidence that Braun breached its written warranty.  (*Id.*)

Plaintiffs' response is not a model of clarity.  As for liability, Plaintiffs seem to argue that, although Braun's written limited warranty disclaimed any responsibility for "future performance," this disclaimer is invalid under § 44-1352(B) and, without it, Braun violated its "modified" warranty obligations by providing a "vehicle [that] was riddled with substantial defects it could not cure." (Doc. 182 at 3-5.)  As for damages, Plaintiffs seem to argue that Count Two provides a vehicle for recovering "all damages they seek" in this action, even if some of those categories of damages are barred by AADWA (and thus not recoverable in Count One), because the limitations on remedies appearing in Braun's written warranty are invalid under § 44-1355(B) and/or under Arizona's "failure of essential purpose" doctrine.  (*Id.* at 5 n.3, 9-10.)  Plaintiffs summarize their position as follows: "AADWA rewrites contrary warranty provisions and gives rise to a common law breach of warranty claim, creates its own statutory express warranty, or does both." (*Id.* at 3 n.2.  *See also id.* at 10 n.7 ["Defendant's 'Limited Warranty' also attempts to disclaim any and all damages caused by a breach.  But . . . the AADWA rewrote the warranty on that issue and voided that limitation . . . ."].)[15]

Plaintiffs' arguments lack merit.  At bottom, Plaintiffs' theory is that AADWA not only creates its own statutory cause of action, which is subject to limited remedies, but also "rewrites" the terms of manufacturers' written limited warranties in a one-sided manner—by incorporating all of AADWA's liability standards while invalidating any contractual limitations on remedies (even if they are consistent with AADWA's own limitations on remedies)—and then authorizes consumers to pursue parallel "common law" warranty claims premised on those "modified" written warranties.

The statutory language does not, to put it mildly, support this outcome.  The first statutory provision on which Plaintiffs rely, § 44-1352(B), merely states that a manufacturer is "deemed" to have provided a one-year warranty from certain defects,

---

[15]     During oral argument, the Court sought further clarification from Plaintiffs' counsel as to the difference between Counts One and Two.  In response, Plaintiffs' counsel stated that although Count Two is based in part on Braun's written limited warranty, AADWA "goes to change the terms of . . . the piece of paper that Braun provided" by stripping out any limitations on liability and damages.

1    malfunctions, and other conditions if the manufacturer hasn't otherwise provided such a

2    warranty.  AADWA then goes on to flesh out the contours of this statutory warranty—a

3    consumer may seek free repairs under § 44-1352(C); if the repairs are unsuccessful after a

4    reasonable number of attempts, the consumer may request a replacement device or refund

5    under §§ 44-1352(D) and 44-1353(A); and if the replacement device or refund isn't

6    provided within 30 days of request, the consumer may pursue an action to recover

7    pecuniary losses, which may be trebled, plus costs, disbursements, attorneys' fees, and

8    equitable relief under § 44-1355(C).  The creation of this detailed statutory scheme negates,

9    rather than supports, the notion that the Arizona legislature was also attempting to authorize

10   a common law warranty claim not subject to the limitations it had just fashioned.

11          The other statutory provision on which Plaintiffs rely, § 44-1355(B), provides as

12   follows: "This section does not limit any rights or remedies available to a consumer under

13   any other law.  Any waiver of rights by a consumer is void."  On the one hand, the first

14   sentence of this provision makes clear that nothing prevents Plaintiffs from bringing

15   parallel claims under AADWA and pursuant to Braun's written limited warranty.  By

16   creating a new statutory cause of action, the Arizona legislature did not intend to displace

17   existing remedies, such as the right to bring a common law claim for breach of warranty.

18   But *not displacing* existing remedies is different from *affirmatively changing* existing

19   remedies, and Plaintiffs' theory here is that the Arizona legislature sought, through its

20   enactment of AADWA, not only to create a new statutory cause of action but also to

21   transform the standards governing common law warranty claims.  The statutory language

22   does not support, and indeed undermines, this inference.

23          As for the final sentence of § 44-1355(B)—"Any waiver of rights by a consumer is

24   void"—Plaintiffs apparently view this as a universal declaration by the Arizona legislature

25   that a consumer may never engage in any waiver of rights related to assistive devices.  But

26   this interpretation fails to account for the context in which the language appears.  *Glazer,*

27   423 P.3d at 995 (courts should consider "the specific context in which that language is

28   used" and "the broader context of the statute as a whole") (citation omitted).  The language

at issue appears in the portion of AADWA detailing consumers' ability to bring a "action to recover damages" under "[t]his section."   Viewed in context, this language is best viewed as a statement that a consumer may not waive his or her rights *under AADWA*.  *Cf. Chariton,* 615 N.W.2d at 211 (manufacturer could not require consumer to sign general release as precondition to receiving refund pursuant to Wisconsin's lemon law).

Finally, Plaintiffs' reliance on the "failure of essential purpose" doctrine is misplaced.  As background, that doctrine provides that although a product manufacturer may, in general, use a limited warranty to "properly limit [a consumer's] recovery to repair and replacement of non-conforming parts," this limitation on remedies "is no longer exclusive when the circumstances cause this exclusive or limited remedy to fail of its essential purpose."  *Roberts v. Morgensen Motors*, 659 P.2d 1307, 1311 (Ariz. Ct. App. 1982).  As the Ninth Circuit has summarized: "Under the Uniform Commercial Code, as adopted by Arizona, a buyer can recover remedies outside the scope of a limited warranty where circumstances cause an exclusive or limited warranty to fail of its essential purpose." *Sharp Structural, Inc. v. Franklin Mfg., Inc.*, 283 F. App'x 585, 587 (9th Cir. 2008) (cleaned up) (quoting A.R.S. § 47-2719(B)).

Plaintiffs' theory here is that the "failure of essential purpose" doctrine provides an alternative ground—separate and apart from their theory that AADWA automatically strips out the limitations on remedies appearing in any assistive device manufacturer's written warranty—for disregarding the limitations on remedies appearing in Braun's written limited warranty and allowing them to recover consequential, emotional distress, and other forms of damages.  The problem with this approach is that Plaintiffs have given short shrift to an antecedent step in the "failure of essential purpose" analysis—they must also show that Braun breached the terms of its written warranty.  *See, e.g., Genchev v. Detroit Diesel Corp.*, 608 F. App'x 478, 478-79 (9th Cir. 2015) (district court did not commit reversible error by "failing to give a jury instruction that would have allowed the jury to award consequential damages . . . if it found that [the manufacturer's] express warranties had failed their essential purpose" because "[t]he jury found that [the manufacturer] did not

1   breach its express warranties" and "[i]n light of this finding, it would have been impossible

2   for the jury to also find that the warranties failed their essential purpose"). *Cf. Chaurasia*

3   *v. Gen. Motors Corp.*, 126 P.3d 165, 169 (Ariz. Ct. App. 2006) ("There is no cause of

4   action under the MMWA for a limited warranty unless the consumer can prove that the

5   manufacturer did not comply with the limited express warranty's terms."). On the issue of

6   breach, Plaintiffs make no effort to show that Braun violated the terms of its limited

7   warranty *as written*. Instead, Plaintiffs' theory is that AADWA also rewrites (and expands)

8   the scope of Braun's warranty, such that any disclaimers or limitations on the scope of that

9   warranty are void. (Doc. 182 at 9 ["Defendant (is deemed to have) provided a one-year

10  express warranty against defects. A.R.S. § 44-1352(B). . . . Thus, the warranty was an

11  absolute promise against defects, which Defendant broke . . . ."].) But as discussed above,

12  this theory is incorrect. And because Plaintiffs have not developed the claim that Braun

13  breached the terms of its limited warranty as written, they have failed to meet their burden

14  under *Celotex*.[16]

15      For these reasons, Braun is entitled to summary judgment on Count Two.

16  II.    Plaintiffs' Motion To File A Surreply

17      Plaintiffs seek leave to file a surreply to Braun's reply in support of its motion for

18  summary judgment. (Doc. 198.) They argue that Braun's reply "raises new arguments and

19  presents previously undisclosed evidence." (*Id.* at ¶¶ 4-9.) The new arguments and

20  evidence to which Plaintiffs refer address the accuracy of Plaintiffs' evidence regarding

21  their alleged "emotional and/or physical harm" and their alleged pecuniary losses from

22  having to own two conversion vans at once and from not being able to purchase a new

23  conversion van. (Docs. 190 at 8-10, 190-1.) Braun argues this evidence was properly

24  attached to its reply as rebuttal to the evidence attached to Plaintiffs' response brief. (Doc.

25

26  ---

    [16]    Braun's written warranty covers only a limited set of obligations over enumerated
    parts and components. (Doc. 182-1 at 6 [The . . . warranty covers substantial defects in
27  materials and workmanship attributable to Braun of the conversion van frame, floor
    structural components, ramp, door and associated structural components, [and] electrical
    components . . . ."].) It also warrants only that "[i]n the event that a substantial defect in
28  material or workmanship, attributable to Braun, is found to exist . . . it will be repaired or
    replaced, at Braun's option, without charge to the owners." (*Id.* at 7.)

1    201 at 2-5.)

2          On the one hand, when "new evidence is presented in a reply to a motion for

3    summary judgment, the district court should not consider the new evidence without giving

4    the [non-]movant an opportunity to respond." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th

5    Cir. 1996).  On the other hand, "[w]hile a party may not file 'new' evidence with a reply,

6    it may file 'rebuttal' evidence to contravene arguments first raised by the non-moving party

7    in its opposition. . . .  District of Arizona precedent is clear . . . that it is immaterial that [the

8    movant] already had this evidence in its possession at the time it filed is motion for

9    summary judgment, so long as it is rebuttal evidence." *TSI Inc. v. Azbil BioVigilant Inc.*,

10   2014 WL 880408, *1 (D. Ariz. 2014).

11         Here, it is unnecessary to decide whether the evidence Braun submitted with its

12   reply constituted "new" or "rebuttal" evidence because that evidence did not affect the

13   outcome of either party's motion for summary judgment.  Plaintiffs' motion to file a

14   surreply is therefore denied.  *JG v. Douglas Cnty. Sch. Dist.*, 552 F.3d 786, 803 n.14 (9th

15   Cir. 2008) ("The district court did not consider the new evidence and its denial of leave to

16   file a sur-reply accordingly did not prejudice Appellants.").

17         Accordingly, **IT IS ORDERED** that:

18         1.    Plaintiffs motion for partial summary judgment (Doc. 179) is **granted in**

19               **part and denied in part**.

20         2.    Braun's motion for partial summary judgment (Doc. 178) is **granted in part**

21               **and denied in part**.

22         3.    Plaintiffs' motion for leave to file a surreply (Doc. 198) is **denied**.

23         Dated this 31st day of March, 2021.

24

25

26                                              _____

27                                              Dominic W. Lanza
                                                United States District Judge
28

- 47 -